ACCEPTED
03-15-00596-CV
7771576
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/10/2015 3:54:12 PM
JEFFREY D. KYLE
CLERK

NO. 03-15-00596-CV

IN THE COURT OF APPEALS
THIRD DISTRICT OF TEXAS, AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
11/10/2015 3:54:12 PM
JEFFREY D. KYLE
Clerk

GRACY WOODS I NURSING HOME

Appellant,

v.

MARTHA MAHAN, AS THE REPRESENTATIVE
OF THE ESTATE OF MARY RIVERA

Appellee.

ON INTERLOCUTORY APPEAL FROM
THE 250TH JUDICIAL DISTRICT, TRAVIS COUNTY, TEXAS

APPELLANT'S BRIEF

EMILY J. DAVENPORT
STATE BAR NO. 24012501
REED, CLAYMON, MEEKER
& HARGETT, PLLC
5608 PARKCREST DRIVE, SUITE 200
AUSTIN, TEXAS 78731
(512) 660-5960 TELEPHONE
(512) 660-5979 FACSIMILE

ATTORNEYS FOR APPELLANT

ORAL ARGUMENT REQUESTED

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to TEX. R. APP. 38.1(a), Appellant certifies that the following is a complete list of all parties to this litigation and the names and addresses of all counsel.

| Party | Appellate Counsel | Trial Counsel |
|---|---|---|
| Gracy Woods I Nursing Home, Appellant | Emily J. Davenport Janice Byington Reed, Claymon, Meeker & Hargett, PLLC 5608 Parkcrest Drive Suite 200 Austin, Texas 78731 edavenport@rcmhlaw.com jbyington@rcmhlaw.com | Emily J. Davenport Janice Byington Reed, Claymon, Meeker & Hargett, PLLC 5608 Parkcrest Drive Suite 200 Austin, Texas 78731 edavenport@rcmhlaw.com jbyington@rcmhlaw.com |
| Martha Mahan, as the Representative of the Estate of Mary Rivera, Appellee | | Jack Modesett, III ModesettWilliams, PLLC 515 Congress Avenue Suite 1650 Austin, Texas 78701 jack@modesettlaw.com |

# TABLE OF CONTENTS

Page

IDENTITY OF PARTIES AND COUNSEL ...............................................i

TABLE OF CONTENTS ..................................................................ii

INDEX OF AUTHORITIES ..............................................................iv

ABBREVIATIONS AND RECORD REFERENCES ...........................viii

APPENDIX ..................................................................................ix

STATEMENT OF THE CASE ............................................................x

STATEMENT REGARDING ORAL ARGUMENT .................................1

STATEMENT OF JURISDICTION ....................................................1

ISSUE PRESENTED .....................................................................1

    Does Dr. Lipson's report represent a good faith effort to comply with TEX. CIV. PRAC. & REM. CODE §74.351?

STATEMENT OF FACTS .................................................................2

SUMMARY OF THE ARGUMENT .....................................................4

ARGUMENT AND AUTHORITIES ....................................................6

    I.    Standard of Review ..............................................6

    II.    The Expert Report Requirement ............................7

    III.    The Four Corners Rule ........................................10

    IV.    Dr. Lipson is Not Qualified to Offer the Opinions Asserted in His Report...........................................11

A. Dr. Lipson is Not Qualified to Offer Causation Opinions, Particularly That a Sexual Assault Occurred ................................................................... 11

B. Dr. Lipson is Not Qualified to Offer Opinions Concerning Gracy Woods' Standard of Care or Alleged Breach ................................................................... 13

    1. The expert must be qualified on standard of care and breach ................................................................... 13

    2. Dr. Lipson did not establish his qualification ............. 17

V.    Dr. Lipson's Report is Conclusory, Based on Assumption and, Therefore, Deficient ................................................................... 20

A. Dr. Lipson's Report is Deficient as to the Element of Breach ................................................................... 20

B. Dr. Lipson's Report is Deficient as to the Element of Causation ................................................................... 23

CONCLUSION ................................................................... 27

PRAYER ................................................................... 28

CERTIFICATE OF COMPLIANCE ................................................................... 30

CERTIFICATE OF SERVICE ................................................................... 31

# INDEX OF AUTHORITIES

## CASES

*Am. Transitional Care Ctrs. v. Palacios,* 46 S.W.3d 873
(Tex. 2001) ........................... 5, 6, 7, 9, 10, 15, 20, 21, 22, 23, 24,28

*Austin Heart, P.A. v. Webb*, 228 S.W.3d 276
(Tex.App. –Austin 2007, no pet.) ......................................... 9, 10, 20

*Bowie Memorial Hosp. v. Wright*, 79 S.W.3d 48
(Tex. 2002) ...................................................................... 6, 9, 10, 23

*Broders v. Heise*, 924 S.W.2d 148 (Tex. 1996) .................. 4, 10, 11, 12, 13

*Certified EMS, Inc. v. Potts,* 392 S.W.3d 625 (Tex.2013) ................... 6, 26

*Christus Health Southeast Texas v. Broussard*, 267 S.W.3d 531
(Tex.App. –Beaumont 2008, no pet.) ............................................... 16

*Cooper v. Arizpe*, 2008 WL 940490
(Tex.App. –San Antonio 2008, pet. denied) ............................... 6, 26

*Cortez v. Tomas*, 2012 WL 407382
(Tex.App. –Fort Worth 2012, no pet.) ............................................. 13

*Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245
(Tex.App. –San Antonio 2004, no pet.) ........................................... 25

*Earle v. Ratliff*, 998 S.W.2d 882 (Tex. 1999) ............................................ 9

*Foster v. Zavala,* 214 S.W.3d 106
(Tex.App.—Eastland 2006, pet. denied) ......................................... 19

*Fung v. Fischer,* 365 S.W.3d 507
(Tex.App.-Austin 2012, no pet.) ................................................. 6, 26

*Hutchinson v. Montemayor*, 144 S.W.3d 614
 (Tex.App. –San Antonio 2004, no pet.)..........................................26

*In re Samonte*, 163 S.W.3d 229
 (Tex.App. –El Paso 2005, orig. proceeding)........................11, 15, 28

*In re Windisch*, 138 S.W.3d 507
 (Tex.App. –Amarillo 2004, orig. proceeding)................................28

*Jelinek v. Casas*, 328 S.W.3d 526
 (Tex. 2010) ...........................5, 6, 7, 9, 20, 23, 24, 27, 28

*Jones v. King*, 255 S.W.3d 156
 (Tex.App. –San Antonio 2008, pet. denied))..................................10

*Kerlin v. Arias*, 274 S.W.3d 666, 668 (Tex. 2008) ..................................22

*Kettle v. Baylor Med. Ctr.*, 232 S.W.3d 832
 (Tex.App. –Dallas 2007, pet. denied)........................................7, 10

*Lenger v. Physician's Gen. Hosp.*, 455 S.W.2d 703 (Tex. 1970) .............23

*Lewis v. Funderburk*, 253 S.W.3d 204 (Tex. 2008) ..................................8

*Ly v. Austin*, 2007 WL 2010757
 (Tex.App. –Austin 2007, no pet.) ..............................4, 6, 10, 15, 18

*Methodist Hosp. Levelland v. Kimbrell*, 2009 WL 3101315
 (Tex.App. –Amarillo 2009, no pet.)..............................................15

*Murphy v. Mendoza*, 234 S.W.3d 23
 (Tex.App. –El Paso 2007, no pet.)................................................26

*Nacogdoches County Hosp. Dist. v. Felment*, 2013 WL 6207838
 (Tex.App. –Tyler 2013, no pet.).........................................16, 18, 19

*Nexion Health v. Treybig*, 2014 WL 7499373
 (Tex.App. –Dallas 2014, no pet.)................................5, 7, 16, 19, 28

*Pediatrix Med. Servs. Inc. v. De La O*, 368 S.W.3d 34
(Tex.App.–El Paso 2012, no pet.) .................................................... 13

*Reed v. Granbury Hosp. Corp.,* 117 S.W.3d 404
(Tex. App. – Ft. Worth 2003, no pet.) ................................. 5, 16, 19

*Samlowski v. Wooten*, 332 S.W.3d 404 (Tex. 2011) ............................... 20

*Scoresby v. Santillan*, 346 S.W.3d 546 (Tex. 2011) ............................ 9, 10

*Senior Care Centers, LLC v. Shelton*, 459 S.W.3d 753
(Tex.App. –Dallas 2015, no pet.) .................... 5, 6, 21, 22, 23, 24, 27

*Shelton v. Sargent*, 144 S.W.3d 113
(Tex. App. – Ft. Worth 2004, pet. denied) .............................. 17, 19

*Tenet Hosps. Ltd v. Love*, 347 S.W.3d 743
(Tex.App. –El Paso 2011, no pet.) ............. 5, 7, 16, 18, 19, 23, 24, 28

*Tomasi v. Liao*, 63 S.W.3d 62
(Tex.App. –San Antonio 2001, no pet.) ................................... 15, 18

*Walker v. Packer*, 827 S.W.2d 833 (Tex. 1992) ........................................ 6

## STATUTES

TEX. CIV. PRAC. & REM. CODE § 51.014(a)(9) ............................................ 1

TEX. CIV. PRAC. & REM. CODE § 74.351 ........................................... *passim*

TEX. CIV. PRAC. & REM. CODE § 74.351(a) ......................................... 3, 7

TEX. CIV. PRAC. & REM. CODE § 74.351(b) ......................................... 1, 7

TEX. CIV. PRAC. & REM. CODE § 74.351(c) ............................................. 7

TEX. CIV. PRAC. & REM. CODE § 74.351(l) ......................................... 8, 28

TEX. CIV. PRAC. & REM. CODE § 74.351(r)(5) ...................................... 4, 14

TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6) .... 5, 9, 10, 20, 23, 24, 27, 28

TEX. CIV. PRAC. & REM. CODE § 74.402..... 4, 10, 13, 14, 15, 16, 18, 19, 28

TEX. CIV. PRAC. & REM. CODE § 74.403........................... 4, 10, 11, 13, 28

TEX. R. EVID. 702................................................................. 4, 12, 13, 28

# ABBREVIATIONS AND RECORD REFERENCES

## Abbreviations:

Appellee, Martha Mahan, as the Representative of the Estate of Mary Rivera, will be referred to as "Mahan."

Mary Rivera will be referred to as "Ms. Rivera."

Appellant, Gracy Woods I Nursing Home,[1] will be referred to as "Gracy Woods."

The Texas Medical Liability Act will be referred to as "TMLA." TEX. CIV. PRAC. & REM. CODE §74.001-§74.507.

## Record References:

References to the Clerk's Record are in the form of "CR _____."

References to the Clerk's Supplemental Record are in the form of "Supp. CR ___."

References to the Reporter's Record are in the form of "RR ___."

References to Appendix items attached to the Brief are in the form of "App. ___."

---

[1] Gracy Woods was sued as "Gracy Woods I Nursing Home." Appellant is actually known as PM Management – Austin NC, LLC d/b/a Gracy Woods Nursing Home (also referred to herein as "Gracy Woods"). (CR 8).

# APPENDIX

Order Denying Defendant's Motion to Dismiss ........................ Appendix 1

Defendant's Motion to Dismiss ................................................ Appendix 2

Plaintiff's Response to Defendant's Motion to Dismiss ........... Appendix 3

Defendant's Objections to Plaintiff's Expert Report
and Curriculum Vitae ............................................................. Appendix 4

Report of Loren Lipson, M.D. .................................................. Appendix 5

Curriculum Vitae of Loren Lipson, M.D. ................................. Appendix 6

# STATEMENT OF THE CASE

**Nature of the Case**

This is a health care liability claim. (CR 3, 4). Gracy Woods is a nursing home where Ms. Rivera resided. *Id.* Mahan has sued on behalf of Ms. Rivera's estate. *Id.* Mahan claims that Ms. Rivera was sexually assaulted at Gracy Woods. (CR 4).

**Trial Court**

200th District Court, Travis County, Texas, Honorable Gisela D. Triana, Presiding.

Filed in 250th District Court, Travis County, Texas.

## Course of the Proceedings and Disposition

December 11, 2014:

Mahan filed suit. (CR 3).

December 12, 2014:

Gracy Woods filed its Original Answer. (CR 8).

January 30, 2015:

Mahan served the report and curriculum vitae of Loren Lipson, M.D. (CR 11).

February 20, 2015:

Gracy Woods filed its objections to Dr. Lipson's report and curriculum vitae. (CR 101).

April 11, 2015:                 The 120-day expert report deadline
                                expired. (CR 8). TEX. CIV. PRAC. & REM.
                                CODE §74.351(a).

August 12, 2015:                Gracy Woods filed its Motion to
                                Dismiss.[2] (CR 301).

August 24, 2015:                Mahan filed her response. (CR 376).

August 25, 2015:                The trial court heard oral argument.
                                (CR 374, RR 1).

September 1, 2015:              The trial court denied Gracy Woods'
                                Motion to Dismiss. (CR 446).

September 17, 2015:             Gracy Woods filed its Notice of
                                Accelerated Appeal. (CR 447).

---

[2] Proceedings against Gracy Woods were abated for 60 days on March 4, 2015 pursuant to TEX. CIV. PRAC. & REM. CODE §74.052 due to Mahan's failure to identify physicians and health care providers in her presuit notice and authorization. (CR 196, 269). TEX. CIV. PRAC. & REM. CODE §74.052.

## STATEMENT REGARDING ORAL ARGUMENT

Gracy Woods requests oral argument pursuant to TEX. R. APP. P 39.1 and respectfully submits that oral argument would aid the Court in determining the legal and factual issues presented in this appeal.

## STATEMENT OF JURISDICTION

Gracy Woods seeks interlocutory relief from an order denying a motion to dismiss pursued under Section 74.351(b) of the Texas Civil Practice and Remedies Code. (CR 446). TEX. CIV. PRAC. & REM. CODE §74.351(b). This Court has jurisdiction pursuant to Section 51.014(a)(9) of the Texas Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM. CODE §51.014(a)(9).

## ISSUE PRESENTED

Does Dr. Lipson's report represent a good faith effort to comply with TEX. CIV. PRAC. & REM. CODE §74.351?

## STATEMENT OF FACTS

Gracy Woods is a nursing home. (CR 3-4). Ms. Rivera, now deceased, was a resident of Gracy Woods. *Id.* Mahan, Ms. Rivera's daughter, has sued Gracy Woods on behalf of Ms. Rivera's estate.[3] *Id.*

Mahan filed suit on December 11, 2014, alleging that Ms. Rivera was sexually assaulted at Gracy Woods on November 10, 2012.[4] (CR 3-4). Mahan claims that she discovered the alleged assault, based on what Mahan describes as "signs of a struggle in her mother's room" and "bloody tissue in the bathroom trash can." *Id.* at 4. In her petition, Mahan claims that a Sexual Assault Nurse Examination (referred to herein as the "SANE nurse report") "indicated sexual assault on Ms. Rivera."[5] *Id.*

---

[3] Mahan was appointed guardian of Ms. Rivera in June 2013. Ms. Rivera objected to Mahan's appointment. According to the Order Appointing Permanent Guardian, Mahan was prohibited from removing Ms. Rivera from Gracy Woods without further order from that court. (CR 69).

[4] The petition asserts that a sexual assault occurred on <u>November 10, 2012</u>. (Supp. CR 4). Dr. Lipson's report implies that an assault allegedly occurred on the night of November 8, 2013. (CR 17). The SANE report, reviewed by Dr. Lipson and filed with his report, contends that the date and time of the alleged assault were <u>unknown</u> and occurred "<u>perhaps early 11/8/13</u>." (CR 92).

[5] According to the SANE nurse report, Ms. Rivera recalled no sexual contact. (CR 96).

Mahan alleges that Gracy Woods failed to protect Ms. Rivera from sexual assault.[6] (CR 5). (Supp. CR 4).

Gracy Woods denies Mahan's allegations. (CR 8). Gracy Woods filed its Original Answer on December 12, 2014. *Id.*

Mahan served the report and curriculum vitae of Loren Lipson, M.D., on January 30, 2015, in an attempt to comply with the 120-day expert report deadline. (CR 11). TEX. CIV. PRAC. & REM. CODE §74.351. Gracy Woods timely filed objections to the report and curriculum vitae on February 20, 2015. (CR 101). TEX. CIV. PRAC. & REM. CODE §74.351(a).

The 120-day deadline for Mahan to serve a compliant expert report expired on April 11, 2015. (CR 8). TEX. CIV. PRAC. & REM. CODE §74.351(a).

Gracy Woods filed its Motion to Dismiss on August 12, 2015. (CR 301). Mahan filed her response on August 24, 2015. (CR 376). The Honorable Gisela Triana heard oral argument on August 25, 2015. (CR 374, RR 1).

---

[6] On behalf of Ms. Rivera's estate, Mahan seeks punitive damages and damages for pain, suffering, mental anguish, disability, reasonable and necessary medical expenses, lost earning capacity, loss of household services, and past and future medical care. (CR 5). (Supp. CR 5).

Judge Triana denied Gracy Woods' Motion to Dismiss on September 1, 2015. (CR 446). Gracy Woods filed its Notice of Accelerated Appeal on September 17, 2015. (CR 447).

## SUMMARY OF THE ARGUMENT

Dr. Lipson's report is deficient and does not satisfy the expert report requirement set forth in TEX. CIV. PRAC. & REM. CODE §74.351.

### Qualification on Sexual Assault

Dr. Lipson is not qualified to offer the opinion that Ms. Rivera was sexually assaulted. Dr. Lipson lacks the requisite knowledge, skill, experience, training or education regarding the diagnosis or treatment of sexual assault to opine that an assault occurred. TEX. CIV. PRAC. & REM. CODE §74.351(r)(5)(C), §74.403; TEX. R. EVID. 702; *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996); *Ly v. Austin*, 2007 WL 2010757, at *2 (Tex.App. –Austin 2007, no pet.).

### Qualification on Nursing Home Standards of Care

Dr. Lipson has not shown that he is qualified by training or experience to offer the standard of care opinions at issue. TEX. CIV. PRAC. & REM. CODE §74.351(r)(5)(C), §74.402; *Ly*, 2007 WL 2010757, at *5 (generalized, conclusory statements do not establish an expert's

qualification); *Nexion Health at Garland, Inc. v. Treybig*, 2014 WL 7499373, at *4 (Tex.App. –Dallas 2014, no pet.); *Reed v. Granbury Hosp. Corp.,* 117 S.W.3d 404, 411-414 (Tex. App. – Ft. Worth 2003, no pet.).

### Opinions on Breach

Dr. Lipson's report is deficient as to the element of breach. (CR 15-21). Dr. Lipson's report offers no explanation based in fact as to when the alleged assault occurred, where the alleged assault occurred, who committed the alleged assault, or how Gracy Woods departed from its applicable standards of care to prevent the alleged assault. (CR 15-21). *Am. Transitional Care Ctrs. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001)(breach cannot be inferred exclusively from an alleged injury); *Senior Care Centers, LLC v. Shelton*, 459 S.W.3d 753, 758 and 760 (Tex.App. –Dallas 2015, no pet.)(plaintiff's affidavit does not supply a basis any greater than the expert's own conclusions).

### Opinions on Causation

Dr. Lipson's report is deficient as to the element of causation. Dr. Lipson offers no explanation to link his conclusions to the facts. TEX. CIV. PRAC. & REM. CODE §74.351(r)(6); *Jelinek v. Casas*, 328 S.W.3d 526, 539-40 (Tex. 2010); *Tenet Hosps. Ltd v. Love*, 347 S.W.3d 743, 755 (Tex.App.

5

–El Paso 2011, no pet.) ("… causation cannot be inferred; it must be clearly stated."). Dr. Lipson's opinions are based on assumption. *Fung v. Fischer*, 365 S.W.3d 507, 533-34 (Tex.App.-Austin 2012, no pet.), *overruled on other grounds by Certified EMS, Inc. v. Potts,* 392 S.W.3d 625 (Tex.2013); *Cooper v. Arizpe*, 2008 WL 940490, at *3-4 (Tex.App. – San Antonio 2008, pet. denied). He fails to explain how – if at all – he eliminated causes other than sexual contact. (CR 15-21). *Jelinek*, 328 S.W.3d at 536; *Senior Care Centers, LLC*, 459 S.W.3d at 759.

## ARGUMENT AND AUTHORITIES

### I.    Standard of Review.

A challenge to a trial court's decision concerning the sufficiency of an expert report is reviewed for abuse of discretion. *Am. Transitional Care Ctrs. v. Palacios*, 46 S.W.3d 873, 875, 877-78 (Tex. 2001). An abuse of discretion occurs when a trial court acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Bowie Memorial Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). A clear failure by the trial court to analyze or apply the law correctly constitutes an abuse of discretion. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992); *Ly*, 2007 WL 2010757, at *3.

A court has no discretion to find that a conclusory report is sufficient. *Palacios*, 46 S.W.3d at 880; *Jelinek v. Casas*, 328 S.W.3d 526, 540 (Tex. 2010); *Kettle v. Baylor Med. Ctr.*, 232 S.W.3d 832, 837 (Tex.App. –Dallas 2007, pet. denied). It is an abuse of discretion to overrule a defendant's objection when qualification is not demonstrated in the report. *Nexion Health v. Treybig*, 2014 WL 7499373, at * (Tex.App. –Dallas 2014, no pet.); *Tenet Hosps. Ltd.*, 347 S.W.3d at 752.

## II.  The Expert Report Requirement.

Section 74.351 of the Texas Civil Practice and Remedies Code requires a health care liability claimant to serve on each defendant one or more expert reports, with corresponding curricula vitae, no later than 120 days of the date the original answer was filed. TEX. CIV. PRAC. & REM. CODE §74.351(a). Section 74.351 provides:

(a)  In a health care liability claim, a claimant shall, not later than the 120th day after the date each defendant's original answer is filed, serve on that party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. ...

(b)  If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of

the affected physician or health care provider, shall, subject to Subsection (c), enter an order that:

(1) awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and

(2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.

(c) If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency. …

TEX. CIV. PRAC. & REM. CODE §74.351(a)-(c).

Dismissal is mandatory if no report is served within the 120-day deadline. *Id.* at §74.351(b). A deficient report, even if timely served, does not satisfy the statute. *Lewis v. Funderburk*, 253 S.W.3d 204, 207-08 (Tex. 2008). A report is deficient when it "does not represent an objective good faith effort to comply with the definition of an expert report." TEX. CIV. PRAC. & REM. CODE §74.351(*l*).

The statute defines "expert report" as:

a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to

meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* at §74.351(r)(6).

To qualify as a "good faith effort" and satisfy the statute, the report must provide enough information to fulfill two purposes. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit. *Scoresby v. Santillan*, 346 S.W.3d 546, 556 (Tex. 2011), *citing Am. Transitional Care Ctrs of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001). The report or reports must include the expert's opinion on all three elements – standard of care, breach and causation. *Scoresby*, 346 S.W.3d at 556; *Palacios*, 46 S.W.3d at 878-79.

A report cannot merely state the expert's conclusions about the elements, but rather, the expert must explain the basis of his statements to link his conclusions to the facts. *Jelinek v. Casas*, 328 S.W.3d at 539; *Bowie v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002)(quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999); *Palacios*, 46 S.W.3d at 879; *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex.App. –Austin 2007, no pet.). It is not enough that the report "provide insight" about the

9

plaintiff's claims. *Jones v. King*, 255 S.W.3d 156, 159 (Tex.App. –San Antonio 2008, pet. denied).

Also, the author of the report must be qualified. TEX. CIV. PRAC. & REM. CODE §74.351(r)(6), §74.402 (defining qualifications of an expert witness as to departures from the standard of care), and §74.403 (defining the qualifications of an expert on causation); *Broders*, 924 S.W.2d at 153; *Ly v. Austin*, 2007 WL 2010757, at *2 (Tex.App. –Austin 2007, no pet.)("an 'expert report' first must be a 'written report by an *expert*.'")(emphasis in original).

## III.   The Four Corners Rule.

When evaluating the report, the court must not fill gaps or draw inferences with respect to opinions or qualification.[7] *Scoresby*, 346 S.W.3d at 556; *Wright*, 79 S.W.3d at 53; *Palacios*, 46 S.W.3d at 878 ("… the only information relevant to the inquiry is within the four corners of the report."); *Austin Heart, P.A.*, 228 S.W.3d at 279 (the four corners rule "precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended to say."); *Ly v.*

---

[7] Reports <u>should not</u> be construed in favor of the claimant. *Kettle v. Baylor Med. Ctr.*, 232 S.W.3d 832, 837 (Tex.App. –Dallas 2007, pet. denied (emphasis supplied); *Palacios*, 46 S.W.3d at 877 (directing courts not to indulge in reasonable inferences in favor of the nonmovant).

*Austin*, 2007 WL 2010757, at *2; *In re Samonte*, 163 S.W.3d 229, 234 (Tex.App. –El Paso 2005, orig. proceeding).

## IV. Dr. Lipson is Not Qualified to Offer the Opinions Asserted in His Report.

### A. Dr. Lipson is Not Qualified to Offer Causation Opinions, Particularly That a Sexual Assault Occurred.

Ms. Rivera did not claim that she was sexually assaulted. (CR 15-22). According to the records Dr. Lipson reviewed, Ms. Rivera did not recall having any sexual contact. (CR 16, 96). Dr. Lipson is not qualified to conclude that Ms. Rivera's alleged injuries and behavior were the result of sexual assault. TEX. CIV. PRAC. & REM. CODE §74.403(a); *Broders*, 924 S.W.2d at 152-53.

The TMLA provides that "… a person may qualify as an expert on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm or damages claimed only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence." TEX. CIV. PRAC. & REM. CODE §74.403(a).

The Texas Rules of Evidence state that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the

11

evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702.

Every licensed doctor is not automatically qualified to testify as an expert on every medical question. *Broders*, 924 S.W.2d at 152. "What is required is that the offering party establish that the expert has 'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that *particular subject*." *Id.* (emphasis supplied).

Dr. Lipson does not claim to have any expertise in the diagnosis of sexual assault. (CR 15-67). Dr. Lipson's report does not show that he has ever examined a patient for sexual assault, diagnosed a patient with sexual assault, or treated a patient for sexual assault. *Id.* Dr. Lipson's report does not reveal that he has any experience treating any injury or conditions of the female genitalia or even performing pelvic examinations. *Id.*

Dr. Lipson's opinions do not rise above mere speculation. He simply lacks the special knowledge, skill, experience, training, or education to testify that Ms. Rivera's alleged injuries were caused by sexual assault.

(CR 15-67). TEX. CIV. PRAC. & REM. CODE §74.403; TEX. R. EVID. 702; *Broders*, 924 S.W.2d at 152-54 (finding that an emergency medicine physician was not qualified to offer opinions that earlier diagnosis and treatment of a head injury would have prevented the patient's death due to lack of experience treating head injuries); *Cortez v. Tomas*, 2012 WL 407382, at *3, 6 (Tex.App. –Fort Worth 2012, no pet.)(finding that a Board-certified OB/GYN was not qualified to offer causation opinions concerning the outcome of an ovarian surgery due to lack of experience performing the surgery); *Pediatrix Med. Servs. Inc. v. De La O*, 368 S.W.3d 34, 39-40 (Tex.App.–El Paso 2012, no pet.) (finding that a Board-certified neonatologist and pediatrician was not qualified to render opinions as to the cause of a baby's blindness).

## B. Dr. Lipson is Not Qualified to Offer Opinions Concerning Gracy Woods' Standard of Care or Alleged Breach.

### 1. The expert must be qualified on standard of care and breach.

To offer opinions on the issue of whether a health care provider departed from the accepted standards of health care, the expert must satisfy the requirements of TEX. CIV. PRAC. & REM. CODE §74.402:

> (b)  In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider

departed from accepted standards of care only if the person:

(1)     is practicing health care in a field of practice that involves the same type of care and treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2)     has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3)     is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

(c)     In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1)     is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

(2)     is actively practicing health care in rendering health care services relevant to the claim.

TEX. CIV. PRAC. & REM. CODE §74.402(b) and (c), §74.351(r)(5)(B).

"Practicing health care" includes:

> (1)    training health care providers in the same field as the defendant health care provider at an accredited educational institution; or

> (2)    serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider.

*Id.* at §74.402(a).

Generalized, conclusory statements do not establish an expert's qualification; the report must provide *specific details* regarding the expert's training and experience. *Ly*, 2007 WL 2010757, at \*5 (emphasis supplied); *Tomasi v. Liao*, 63 S.W.3d 62, 66 (Tex.App. –San Antonio 2001, no pet.); *Methodist Hosp. Levelland v. Kimbrell*, 2009 WL 3101315, at \*2 (Tex.App. –Amarillo 2009, no pet.)("… we must know not only what the nurse was obligated to do but also how the expert knew that."); *In re Samonte*, 163 S.W.3d at 234; *see Palacios*, 46 S.W.3d at 879 ("the only information relevant to the inquiry is within the four corners of the document.").

Experience as a physician – even experience as a physician who treats geriatric patients in nursing homes – does not automatically establish expertise on nursing home standards of care. TEX. CIV. PRAC. &

REM. CODE §74.402(b); *Nexion Health at Garland, Inc. v. Treybig*, 2014 WL 7499373, at *4 (Tex.App. –Dallas 2014, no pet.)(a physician's statement that he has provided primary care to patients in nursing homes did not establish the physician's familiarity with nursing home standards of care); *Nacogdoches County Hosp. Dist. v. Felment*, 2013 WL 6207838, at *3-4 (Tex.App. –Tyler 2013, no pet.)(a physician who served on hospital ethics and bylaws committees was not qualified to offer opinions concerning hospital protocols); *Tenet Hosps. Ltd. v. Love*, 347 S.W.3d 743, 750-51 (Tex.App. –El Paso 2011, no pet.) ("merely working for a hospital does not automatically qualify an expert with experience in running a hospital, nor does serving on a committee without further explanation as to whether those committees involved determining hospital policies and procedures…"); *Christus Health Southeast Texas v. Broussard*, 267 S.W.3d 531, 536 (Tex.App. –Beaumont 2008, no pet.)("[t]he fact that [Dr.] Peters is on staff at a hospital and serves on the hospital's credentials committee does not establish that he possesses specialized knowledge of the protocols, policies, or procedures a hospital of ordinary prudence would have in place … ."); *Reed v. Granbury Hosp. Corp.,* 117 S.W.3d 404, 411-414 (Tex. App. – Ft. Worth 2003, no pet.)(a

16

board certified emergency medicine physician and neurologist with thirty years of experience treating stroke patients was not qualified to offer opinions on standards of care for hospital policy relating to administration of stroke therapy); *Shelton v. Sargent*, 144 S.W.3d 113, 123 (Tex. App. – Ft. Worth 2004, pet. denied) (a physician's experience on tumor boards and staffs of various hospitals did not qualify the physician to offer opinions on hospital standards of care relating to the diagnosis of cancer).

### 2.    Dr. Lipson did not establish his qualification.

Dr. Lipson describes his experience as follows:

> I am familiar with the problem of sexual assault in the nursing home setting. I am familiar with the standard of care for preventing such assaults. I continue to treat patients in the long term care setting and have done so for more than thirty years. I am familiar with the standard of care for the treatment of patients like Mary Rivera and familiar with the required training of employees providing care to residents like Mary Rivera.

(CR 16).

Dr. Lipson does not explain the foundation for his familiarity with sexual assault in nursing homes, or how he knows the standard of care to prevent sexual assault in nursing homes. (CR 16). Further, Dr. Lipson does not explain how or why he knows the standard of care for training

17

employees in nursing homes. (CR 16). Dr. Lipson cannot utilize generalized, conclusory statements to establish his qualification. *Ly*, 2007 WL 2010757, at \*5; *Tomasi*, 63 S.W.3d at 66; *see also* TEX. CIV. PRAC. & REM. CODE §74.402. He must provide specific details of his training and experience and relate that to the specific issue in this case. *Ly*, 2007 WL 2010757, at \*5; *Tenet Hosps. Ltd.*, 347 S.W.3d at 750-51; *Tomasi*, 63 S.W.3d at 66; *Nacogdoches County Hosp. Dist.*, 2013 WL 6207838, at \*3-4.

Dr. Lipson asserts that the standard of care requires nursing staff to be in each resident's room, the adjacent room, or moving through the hall next to the room at all times. (CR 20). Dr. Lipson also asserts that nursing staff should have be walking the halls at intervals not to exceed ten minutes and documenting "regular checks" in residents' charts. *Id.*

Dr. Lipson provides no basis or explanation as to how or why he allegedly knows these measures were required by the standard of care for nursing home staffing and documentation. (CR 15-67). Dr. Lipson's report does not establish that he has ever participated in determining nursing home staffing levels or supervising nursing home staff, or that he has any expertise to opine that the standard of care requires nursing

staff to walk the halls at intervals not to exceed ten minutes. *Id.* Dr. Lipson's report does not show any basis, nor does he offer any explanation, as to how he would know the documentary requirements for nursing home staff, generally, or in relation to performing "regular checks" on residents. *Id.*

Dr. Lipson's report does not establish that he has the requisite expertise to offer opinions on the alleged nursing home standards of care at issue or as set forth in his report, and consequently, his report is deficient. (CR 15-67). TEX. CIV. PRAC. & REM. CODE §74.402; *Treybig*, 2014 WL 7499373, at *4-6; *Nacogdoches County Hosp. Dist.*, 2013 WL 6207838, at *3-4; *Tenet Hosps. Ltd.*, 347 S.W.3d at 750-51; *Christus Health Southeast Texas*, 267 S.W.3d at 536; *see also Reed,* 117 S.W.3d at 411-414; *Shelton v. Sargent*, 144 S.W.3d at 123; *Foster v. Zavala,* 214 S.W.3d 106, 116 (Tex.App.—Eastland 2006, pet. denied)(concluding that an expert report by a person not qualified to testify regarding the standard of care does not represent a good faith effort to comply with the statute.).

## V. Dr. Lipson's Report is Conclusory, Based on Assumption and, Therefore, Deficient.

To satisfy the "good faith effort" requirement, the report must include all the required elements and explain their connection to the defendant's conduct in a non-conclusory fashion. *Samlowski v. Wooten*, 332 S.W.3d 404, 410 (Tex. 2011); *Jelinek*, 328 S.W.3d at 539; *Palacios*, 46 S.W.3d at 879. The trial court's analysis is limited to the four corners of the report, and the court may not consider extrinsic evidence or supply omissions by inference. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002); *Palacios*, 46 S.W.3d at 878.

### A. Dr. Lipson's Report is Deficient as to the Element of Breach.

Dr. Lipson's report is deficient as to the element of breach because he offers only conclusory opinions without the requisite factual basis and explanation. (CR 15-21). TEX. CIV. PRAC. & REM. CODE §74.351(r)(6). Consequently, the report does not provide the court with a reasonable basis to conclude the claims have merit. (CR 15-21). *Palacios*, 46 S.W.3d at 878-9; *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex.App. – Austin 2007, no pet.)(the trial court is precluded from drawing inferences or filling gaps).

Dr. Lipson alleges that "[t]he facility breached the standard of care by not providing twenty-four hour skilled nursing care. The nursing staff was not present in the halls or her room to prevent the sexual assault of Ms. Rivera." (CR 20). Dr. Lipson offers no factual basis for these opinions, and therefore, they are deficient. (CR 15-21). *Palacios*, 46 S.W.3d at 879.

The opinions are further conclusory because they require the court to infer that a breach occurred based solely on the alleged injury. (CR 20). A finding of negligence may not be inferred solely on evidence of an alleged injury. *Palacios*, 46 S.W.3d at 880 (breach cannot be inferred from the existence of an injury alone because the doctrine of res ipsa loquitur generally does not apply in health care liability claims); *Senior Care Centers, LLC v. Shelton*, 459 S.W.3d 753, 758 (Tex.App. –Dallas 2015, no pet.); *see also* TEX. CIV. PRAC. & REM. CODE §74.303(e)(2)(jury instruction for health care liability claims) and §74.201 (provision limiting application of res ipsa loquitur).

Dr. Lipson also asserts that "[t]he facility breached the standard of care by not preventing access to her room by unsupervised males." (CR 20). Dr. Lipson does not explain – with any basis in fact – when the assault allegedly occurred, where the assault allegedly occurred, or who

21

allegedly assaulted Ms. Rivera. (CR 15-21). His allegations that the facility allowed access to Ms. Rivera's room by unsupervised males is merely conclusory and, therefore, deficient. *Id.*; *Palacios*, 46 S.W.3d at 879.

Dr. Lipson alleges that "[t]he records do not indicate any checks on Ms. Rivera the night she was assaulted." (CR 20). Dr. Lipson does not provide any factual basis as to which night he claims the alleged assault occurred. (CR 15-21). The court must infer that date based on Dr. Lipson's reliance on Mahan's affidavit regarding broken Christmas ornaments.[8] (CR 17).

Dr. Lipson also asserts that "[t]he facility breached the standard of care by not moving Ms. Rivera to a room close to the nursing station where no unsupervised males could enter her room." (CR 20). Dr. Lipson does not identify the location of Ms. Rivera's room or its proximity to the nursing station, nor does he describe where Ms. Rivera allegedly should have been moved in relation to the nursing station. (CR 15-21).

---

[8] Mahan's allegations and affidavit do not supply Dr. Lipson with the necessary rational basis for his opinion to any greater degree than if they were his own belief about the facts. *Senior Care Centers, LLC*, 459 S.W.3d at 760, *citing Kerlin v. Arias*, 274 S.W.3d 666, 668 (Tex. 2008).

Dr. Lipson's opinions concerning Gracy Woods' alleged breach are deficient because they do not include the requisite explanation and connection to the facts. TEX. CIV. PRAC. & REM. CODE §74.351(r)(6); *Jelinek*, 328 S.W.3d at 539-40; *Palacios*, 46 S.W.3d at 879-80. Dr. Lipson's bare conclusions do not provide the court with a reasonable basis to conclude that the claim has merit. *Palacios*, 46 S.W.3d at 879-80.

### B.    Dr. Lipson's Report is Deficient as to the Element of Causation.

Causation cannot be inferred; it must be clearly stated. *Senior Care Centers, LLC v. Shelton*, 459 S.W.3d 753, 760 (Tex.App. –Dallas 2015, no pet.); *Tenet Hosps. Ltd. v. Love*, 347 S.W.3d 743, 755 (Tex.App. –El Paso 2011, no pet.).

The causal connection in health care liability claims must be made "beyond the point of conjecture" and "must show more than a possibility." *Lenger v. Physician's Gen. Hosp.*, 455 S.W.2d 703, 706 (Tex. 1970); *see Wright*, 79 S.W.3d at 53; *algreen Co. v. Hieger*, 243 S.W.3d 183, 186-87 (Tex.App. –Houston [14th Dist.] 2007, pet. denied)( report stating that the patient had symptoms "consistent with" known side effects of medication was insufficient to demonstrate causal link).

23

An expert report cannot simply opine that the breach caused the injury. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). Otherwise, the report does not give the trial court any reasonable basis for concluding that the claims have merit. *Id.*; *Palacios*, 46 S.W.3d at 879; *Jelinek*, 328 S.W.3d at 539-40 (reiterating that the expert must explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented); *Senior Care Centers, LLC*, 459 S.W.3d at 760 (holding that the statement "neglect of [the patient] … caused her to aspirate food into her airway, causing acute respiratory failure and is the proximate cause of her death," was insufficient to satisfy the element of causation); *Tenet Hosps. Ltd. v. Love*, 347 S.W.3d 743, 755 (Tex.App. –El Paso 2011, no pet.).

Dr. Lipson does not explain, to any reasonable degree, how an alleged breach by Gracy Woods caused the injuries, damages or harm asserted in this litigation. (CR 15-21). TEX. CIV. PRAC. & REM. CODE §74.351(r)(6). He simply states "[s]he was sexually assaulted." (CR 20).

Dr. Lipson does not explain how an alleged failure to conduct hallway surveillance every ten minutes caused the alleged assault. (CR 15-21). Dr. Lipson does not explain how or why the alleged assault would

have been prevented but for such surveillance. *Id.*; *see e.g., Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex.App.–San Antonio 2004, no pet.)(the report was deficient because it failed to explain how the alleged breach was a substantial factor in bringing about the injury, without which the injury would not have occurred).

Similarly, Dr. Lipson does not explain how the location of Ms. Rivera's room in proximity to the nursing station caused the alleged sexual assault. (CR 15-21). Dr. Lipson does not explain how an unidentified, unsupervised male allegedly accessed Ms. Rivera's room, nor does he explain how moving Ms. Rivera to a different room would have prevented that alleged access. *Id.* Accordingly, the report does not provide the court with a reasonable basis to conclude the claim has merit.

Dr. Lipson's report is equally conclusory as to the question of whether sexual contact occurred. (CR 15-21). Dr. Lipson does not explain how he concluded that the alleged injuries were sexual in origin. *Id.* Dr. Lipson does not explain how he determined that Ms. Rivera's alleged presentation as "tearful and afraid" was the result of sexual assault rather than her depression and dementia, which was documented in his report. (CR 17, 20). Dr. Lipson does not explain how he concluded that

25

the physical findings were caused by sexual contact rather than medical examination or routine perineal care.[9] (CR 15-21). (RR 11).

Connecting the opinion to the facts is key. Reports based on assumption, speculation, conjecture or contradictory statements do not provide the trial court with a basis to conclude the claim has merit. *Fung v. Fischer,* 365 S.W.3d 507, 533-34 (Tex.App.-Austin 2012, no pet.)(opinion was deficient because it turned on assumption unsupported by the report), *overruled on other grounds by Certified EMS, Inc. v. Potts,* 392 S.W.3d 625 (Tex.2013); *Cooper v. Arizpe,* 2008 WL 940490, at *3-4 (Tex.App. –San Antonio 2008, pet. denied)(report was deficient because it relied on the assumption of what was contained in the emergency department chart); *Murphy v. Mendoza,* 234 S.W.3d 23, 28 (Tex.App. –El Paso 2007, no pet.)(report was deficient because it was based on an *assumption* that recuts of pathology slides were identical to the originals)(emphasis in original); *Hutchinson v. Montemayor,* 144 S.W.3d 614, 617-18 (Tex.App. –San Antonio 2004, no pet.)(report was deficient because it did not show more than possibility and speculation that the

---

[9] Ms. Rivera had an extensive list of physicians and health care providers, but Dr. Lipson limited his analysis of medical records to Gracy Woods and St. David's Hospital. (CR 16, 282-92). *See also* CR 105 (Gracy Woods' objection to Dr. Lipson's limited review of Ms. Rivera's medical records).

patient would have had a better outcome had an arteriogram been performed).

When the facts support equal inferences from which different conclusions could be drawn, the expert must explain how he eliminated the possibilities not chosen to reach his conclusion. *Senior Care Centers, LLC*, 459 S.W.3d at 753, *citing Jelinek*, 328 S.W.3d at 536. A conclusion should be rejected if it is not accompanied by an explanation demonstrating why the other, rational possibilities are inferior to the chosen conclusion. *Jelinek*, 328 S.W.3d at 536; *Senior Care Centers, LLC*, 459 S.W.3d at 759-60.

Dr. Lipson assumes that Ms. Rivera experienced sexual contact, without excluding other, innocuous causes. Consequently, his report is deficient. *Jelinek*, 328 S.W.3d at 536; *Senior Care Centers, LLC*, 459 S.W.3d at 759-60.

## CONCLUSION

Dr. Lipson's report does not represent a good faith effort to comply with TEX. CIV. PRAC. & REM. CODE §74.351(r)(6).

Dr. Lipson is not qualified to render the opinions contained in his report, as to the standard of care, alleged breach, or the purported causal

relationship. (CR 15-67). TEX. CIV. PRAC. & REM. CODE §74.402, §74.403; TEX. R. EVID. 702. As such, the trial court abused its by overruling Gracy Woods' objections to Dr. Lipson's lack of qualification. *Nexion Health v. Treybig*, 2014 WL 7499373, at * (Tex.App. –Dallas 2014, no pet.); *Tenet Hosps. Ltd.*, 347 S.W.3d at 752; *In re Samonte*, 163 S.W.3d 229, 237-38 (Tex.App. –El Paso 2005, orig. proceeding); *In re Windisch*, 138 S.W.3d 507, 514 (Tex.App. –Amarillo 2004, orig. proceeding).

Additionally, the trial court abused its discretion in finding Dr. Lipson's report satisfies TEX. CIV. PRAC. & REM. CODE §74.351(r)(6) because the report is conclusory and, therefore, deficient as to the elements of breach and causation. (CR 15-21). TEX. CIV. PRAC. & REM. CODE §74.351 (*l*), (r)(6); *Palacios*, 46 S.W.3d at 880; *Jelinek v. Casas*, 328 S.W.3d at 540.

## PRAYER

Gracy Woods prays that the Court reverse the trial court's Order Denying Defendant's Motion to Dismiss and that the Court render dismissal of all claims against Gracy Woods with prejudice to their re-filing. Gracy Woods seeks such other relief that the Court deems appropriate.

Respectfully submitted,

By: /s/ Emily J. Davenport
  EMILY J. DAVENPORT
  State Bar No. 24012501
  JANICE M. BYINGTON
  State Bar No. 24006938
  REED, CLAYMON, MEEKER
  & HARGETT, PLLC
  5608 Parkcrest Drive, Suite 200
  Austin, Texas 78731
  (512) 660-5960 Telephone
  (512) 660-5979 Facsimile

**ATTORNEYS FOR APPELLANT**

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief has been compiled using a computer program in Word with 14-point font conventional typeface for the body of this brief. Excluding the portions of the brief exempted pursuant to rule 9.4 of the Texas Rules of Appellate Procedure, this petition for writ of mandamus contains 6,113 words.

/s/    Emily J. Davenport
Emily J. Davenport

## CERTIFICATE OF SERVICE

Pursuant to rule 9.5 of the Texas Rules of Appellate Procedure, I hereby certify that a true and correct copy of the foregoing instrument has been served electronically through the electronic filing manager or sent by e-mail, if possible, and also by certified mail, return receipt requested on the Appellee this 10th day of November, 2015:

Jack Modesett, III
ModesettWilliams, PLLC
515 Congress Ave., Suite 1650
Austin, Texas 78701
jack@jmodesettlaw.com


/s/   Emily J. Davenport
Emily J. Davenport

Filed in The District Court
of Travis County, Texas

SEP - 1 2015

At_____4:00____A.M.
Velva L. Price, District Clerk

CAUSE NO. D-1-GN-14-005169

| | | |
|---|---|---|
| MARTHA MAHAN, AS THE REPRE-SENTATIVE OF THE ESTATE OF MARY RIVERA, | § § § § | IN THE DISTRICT COURT OF<br><br>TRAVIS COUNTY, TEXA |
| v. | § § § | |
| PM MANAGEMENT – AUSTIN NC, LLC d/b/a GRACY WOODS I NURSING HOME | § § | 250TH JUDICIAL DISTRICT |

## ORDER DENYING
## DEFENDANT'S MOTION TO DISMISS

On ~~this day~~ August 25, 2015, came to be heard Defendant's Motion to Dismiss in this matter.

Having heard the evidence and arguments of counsel in this matter the Court hereby denies

in all things Defendant's motion.



Signed the 1 Day of September, 2015

_____
JUDGE PRESIDING

004195097

**APPENDIX 1**

8/12/2015 4:05:13 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-14-005169
Tamara Franklin

CAUSE NO. D-1-GN-14-005169

| | | |
|---|---|---|
| MARTHA MAHAN, AS THE | § | IN THE DISTRICT COURT |
| REPRESENTATIVE OF THE | § | |
| ESTATE OF MARY RIVERA | § | |
| | § | |
| V. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| GRACY WOODS I NURSING HOME | § | 250TH JUDICIAL DISTRICT |

## DEFENDANT'S MOTION TO DISMISS

TO THE HONORABLE COURT:

NOW COMES Defendant Gracy Woods I Nursing Home, actually known as PM Management – Austin NC, LLC d/b/a Gracy Woods Nursing Center ("Defendant"), and files its Motion to Dismiss pursuant to TEX. CIV. PRAC. & REM. CODE §74.351(b) and would respectfully show:

### I.

This is a motion to dismiss a health care liability claim pursuant to TEX. CIV. PRAC. & REM. CODE. §74.351(b). Plaintiff filed suit on December 11, 2014, alleging that Ms. Rivera was sexually assaulted while a resident at Gracy Woods. Defendant filed its answer the next day, December 12, 2014, denying Plaintiff's allegations. Plaintiff served the report and curriculum vitae of Loren Lipson, M.D., on January 30, 2015 in an effort to comply with the 120-day expert report rule.[1] Gracy Woods timely filed its objections.[2] In summary, Defendant objected that Dr. Lipson is not qualified to offer the opinions stated in his report, that Dr. Lipson's opinions are conclusory and speculative, and that Dr. Lipson relies on and incorporates causation opinions

---

[1] True and correct copies of Dr. Lipson's report and curriculum vitae are attached hereto as Exhibits A and B, respectively, and incorporated herein for all purposes.
[2] Defendant previously filed its Objections to Plaintiff's Expert Report and Curriculum Vitae. Defendant incorporates its Objections to Plaintiff's Expert Report and Curriculum Vitae herein by reference pursuant to Rule 58 of the Texas Rules of Civil Procedure.

1

from witnesses who are barred from offering opinions pursuant to TEX. CIV. PRAC. & REM. CODE §74.402 and §74.403. More than 120 days have expired since Defendant filed its original answer on December 12, 2014, and Defendant seeks dismissal pursuant to TEX. CIV. PRAC. & REM. CODE §74.351(b).

## II.

Section 74.351 of the Texas Civil Practice and Remedies Code provides:

(a) In a health care liability claim, a claimant shall, not later than the 120th day after the date each defendant's original answer is filed, serve on that party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. The date for serving the report may be extended by written agreement of the affected parties. Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the later of the 21st day after the date the report is served or the 21st day after the date the defendant's answer is filed, failing which all objections are waived.

(b) If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall, subject to Subsection (c), enter an order that:

(1) awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and

(2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim.

(c) If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency. …

TEX. CIV. PRAC. & REM. CODE §74.351(a)-(c).

## III.

A report "has not been served" under the statute when it has been physically and timely served but is found deficient by the trial court. *Lewis v. Funderburk*, 253 S.W.3d 204, 207-08

2

(Tex. 2008). A report is deficient when it "does not represent an objective good faith effort to comply with the [statute's] definition of an expert report." Tex. Civ. Prac. & Rem. Code §74.351 (*l*). The statute defines "expert report" as "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id*. §74.351(r)(6).

## IV.

To qualify as a "good faith effort," the report must provide enough information to fulfill two purposes. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit. *Scoresby v. Santillan*, 346 S.W.3d 546, 556 (Tex. 2011), *citing Am. Transitional Care Ctrs of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001). No particular words or formality are required, but bare conclusions will not suffice. *Palacios*, 46 S.W.3d at 879. The report must address all elements, and omissions may not be supplied by inference. *Id*.; *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. ("[t]he report must include the required information within its four corners."). The trial court is precluded from filling gaps by drawing inferences or guessing as to what the expert likely meant or intended to say. *Austin Heart P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex.App. –Austin 2007, no pet.).

## V.

## OBJECTIONS TO QUALIFICATIONS

An expert report is not adequate unless the author is qualified. *Ly v. Austin*, 2007 WL 2010757, at *2 (Tex.App. –Austin 2007, no pet.) ("an 'expert report' must first be a 'written report by an *expert*.'") (emphasis in original); *In re Windisch*, 138 S.W.3d 507, 511 (Tex.App. –

3

Amarillo 2004, orig. proceeding). The author must be qualified to offer opinions regarding the care which is the specific subject of the claim against the defendant. *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996); *Cortez v. Tomas*, 2012 WL 407382, at *3. Analysis of the expert's qualification is limited to the four corners of the report and the expert's CV. *Cortez*, 2012 WL 407382, at *3; *Ly v. Austin*, 2007 WL 2010757, at *2 (reiterating that the "report itself must establish the expert's qualifications on the basis of training and experience"); *Foster v. Zavala*, 214 S.W.3d 106 (Tex.App. –Eastland 2006, pet. denied); *In re Samonte*, 163 S.W.3d 229, 234 (Tex.App. –El Paso 2005, orig. proceeding); *In re Windisch*, 138 S.W.3d at 511; *Palacios*, 46 S.W.3d at 879.

## VI.

For someone offering opinion testimony regarding the standard of care and alleged breach, the statute defines an "expert" as follows:

(a) For the purposes of this section, "practicing health care" includes:

(1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or

(2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider.

(b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

(1) is practicing health care in a field of practice that involves the same type of care and treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

4

> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.
>
> (c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:
>
> > (1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and
> >
> > (2) is actively practicing health care in rendering health care services relevant to the claim.

TEX. CIV. PRAC. & REM. CODE §74.351(r)(5)(B), §74.402.

## VII.

For someone offering opinion testimony as to the alleged causal relationship, the statute defines "expert" as a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence. *Id.* at §74.351(r)(5)(C), §74.403 ("… a person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence."); TEX. R. EVID. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."). The expert must have knowledge, skill, experience, training, or education regarding the *specific issue* before the court that would qualify the expert to give an opinion on that particular subject. *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996).

## A. LOREN LIPSON, MD, IS NOT QUALIFIED TO OFFER CAUSATION OPINIONS.

Dr. Lipson does not claim to have any special training or experience in the diagnosis or treatment of gynecological illnesses or injuries, nor does he claim to have any special knowledge, skill, experience, training or education in the diagnosis or treatment of sexual assault. Exhibits A and B. Nothing in Dr. Lipson's report or curriculum vitae indicates that he has ever diagnosed a sexual assault or rendered any treatment to a patient following an alleged sexual assault. *Id.* Nothing in Dr. Lipson's curriculum vitae or his report indicates that he lectures on sexual assault or gynecological illnesses or injuries relevant to this claim or that Dr. Lipson has any other special knowledge in the diagnosis or treatment of sexual assault. *Id.*

Dr. Lipson has failed to establish that he has any special knowledge, skill, experience, training or education on the specific issues in this case: whether Ms. Rivera sustained injuries and whether those injuries, if any, were caused by a sexual assault. Exhibits A and B; TEX. CIV. PRAC. & REM. CODE §74.403; TEX. R. EVID. 702; *Broders*, 924 S.W.2d at 152-54. Although Dr. Lipson is a physician, his opinions on causation do not rise above mere speculation. *Id.* at 153. Dr. Lipson is not qualified to offer the opinions asserted in his report concerning Ms. Rivera's alleged sexual assault, and consequently, his report is deficient. TEX. CIV. PRAC. & REM. CODE §74.351, §74.403; TEX. R. EVID. 702; *Broders*, 924 S.W.2d at 152-54 (finding that an emergency medicine physician was not qualified to offer opinions regarding causation in a head injury case); *Pediatrix Med. Servs. Inc. v. De La O*, 368 S.W.3d 34, 39-40 (Tex.App.–El Paso 2012, no pet.) (finding that a Board-certified neonatologist and pediatrician was not qualified to render an expert opinion as to the cause of a baby's blindness); *Cortez*, 2012 WL 407382, at *3, 6 (finding that a Board-certified OB/GYN was not qualified to offer causation opinions

6

concerning an ovarian surgery because the physician lacked surgical experience removing ovaries and relating to injury to the patient's bowel).

**B.    JENNY BLACK, RN, IS NOT QUALIFIED TO OFFER CAUSATION OPINIONS.**

Plaintiff served a statement by Jenny Black, RN, but failed to serve any corresponding curriculum vitae. According to her statement, Ms. Black is a nurse but not a physician. Therefore, she is not qualified to make medical diagnoses or offer causation opinions in this litigation.[3] TEX. CIV. PRAC. & REM. CODE §74.351(r)(5)(C), §74.403 (limiting causation opinions only to physicians who are otherwise qualified pursuant to the Texas Rules of Evidence); TEX. R. EVID. 702; *Costello v. Christus Santa Rosa Health Care*, 141 S.W.3d 245, 248-49 (Tex.App. – San Antonio 2004, no pet.)(discussing nurses' lack of qualification to render medical opinions in expert reports).

**C.    LOREN LIPSON, MD, IS NOT QUALIFIED TO OFFER LIABILITY OPINIONS.**

Dr. Lipson has failed to establish that he has the requisite knowledge, training or experience in the operation, management or supervision of nursing homes to offer the opinions asserted in his report. TEX. CIV. PRAC. & REM. CODE §74.402.

Dr. Lipson claims that he continues to treat patients in the long term care setting, but neither his report nor his CV identifies a medical practice or a long term care facility where such treatment occurs. Exhibits A and B. Dr. Lipson does not explain how that alleged experience or experience in geriatric medicine qualify him to offer opinions relating to nursing home standards of care. *Id*. Dr. Lipson does not appear to have any current Board Certification in geriatric medicine. Exhibit A at 1.

---

[3] Dr. Lipson's reliance on Ms. Black's opinion does not qualify it for the purposes of TEX. CIV. PRAC. & REM. CODE §74.403 and TEX. R. EVID. 702, because Dr. Lipson is not qualified by his own special knowledge, skill, experience, training or education in the diagnosis and treatment of sexual assault. *See, e.g., Kelly v. Rendon*, 255 S.W.3d 665 (Tex.App. –Houston [14th Dist.] 2008, no pet.) (finding that "[w]hile a nurse's report, standing alone, is inadequate to meet the requirements of the statute as to medical causation, nothing in the health care liability statute prohibits an *otherwise qualified physician* from relying on a nurse's report in the formation of the physician's own opinion.") (emphasis added).

7

Dr. Lipson's report and CV do not describe events in the last decade where he has had responsibility for the operation or management of a nursing home, nor does he appear to have had the responsibility as the medical director of any nursing home. *Id.* Dr. Lipson offers conclusory statements regarding his alleged familiarity with the standard of care by stating "I am familiar with the standard of care for the treatment of patients like Mary Rivera and familiar with the required training of employees providing care to residents like Mary Rivera," but he provides no facts in support of those assertions. Exhibit A at 2.

Dr. Lipson's conclusory statements do not establish qualification on the specific issues in this case. "An expert cannot rely on generalized, conclusory statements to establish [his] qualifications; [he] must provide specific details of [his] training and experience." *Ly v. Austin*, 2007 WL 2010757, at *5 (Tex.App. –Austin 2007, no pet.) (affirming the trial court's decision that a Board Certified Physical Medicine and Rehabilitation physician who treated stroke patients was not qualified to offer expert opinions concerning standards of care for the emergency care of acute stroke patients).

Dr. Lipson has failed to establish that he has experience in the specific issue before this court – nursing home standards of care to prevent sexual assault. TEX. CIV. PRAC. & REM. CODE §74.402. Even if it is recent, Dr. Lipson's experience in geriatric medicine does not qualify him to offer opinions relating to nursing facility standards of care. *Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 411-414 (Tex. App. – Ft. Worth 2003, no pet.)(a board certified emergency medicine physician and neurologist with thirty years of experience treating stroke patients not qualified to offer opinions on standards of care for hospital policy relating to administration of stroke therapy); *Shelton v. Sargent*, 144 S.W.3d 113, 123 (Tex. App. – Ft. Worth 2004, pet. denied). Dr. Lipson has failed to demonstrate that he has the relevant, recent experience required to offer opinions relating to Gracy Woods' standards of care and alleged breach, meaning that his

8

report is deficient. TEX. CIV. PRAC. & REM. CODE §74.402; *Ly v. Austin*, 2007 WL 2010757 (Tex.App. –Austin 2007, no pet.) (concerning Chapter 74's predecessor, TEX. REV. CIV. STAT., art. 4590i).

## IX.
## OBJECTIONS TO THE REPORT

A report is deficient, and dismissal is mandatory, if the report does not represent an objective good faith effort to comply with the definition of an expert report as set out in TEX. CIV. PRAC. & REM. CODE §74.351 (r)(6). TEX. CIV. PRAC. & REM. CODE §74.351 (b), (l) and (r)(6). To constitute a good faith effort to comply with the statute, the report must provide enough information to fulfill two purposes: (1) inform each defendant of the specific conduct the plaintiff has called into question; and (2) provide a basis for the trial court to conclude that the claims have merit. *Palacios*, 46 S.W.3d at 878. A report cannot merely state the expert's conclusions about the elements, but rather, the expert must explain the basis of his statements to link his conclusions to the facts. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010); *Bowie v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002)(quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999); *Palacios*, 46 S.W.3d at 879. "A report that merely states the expert's conclusions about the standard of care, breach and causation does not fulfill the two purposes of the good-faith effort." *Jelinek*, 328 S.W.3d at 539.

When assessing the sufficiency of an expert report, the trial court's review is limited exclusively to the four corners of the report, and the court may draw no inferences as to what the expert meant or intended to say. *Gray v. CHCA Bayshore, L.P.*, 189 S.W.3d 855, 859 (Tex.App. –Houston [1st Dist.] 2006, no pet.)(*citing Palacios*, 46 S.W.3d at 879 (Tex. 2001)); *Wright*, 79 S.W.3d at 53; *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Austin 2007, no pet.); *see also Garcia v. Marichalar*, 198 S.W.3d 250, 254 (Tex.App. –San Antonio 2006, no pet.)(holding that

9

the trial court could not consider counsel's argument or any evidence brought forward at the hearing).

A report cannot merely state the expert's conclusions about the elements, but rather, the expert must explain the basis of his statements to link his conclusions to the facts. *Jelinek*, 328 S.W.3d at 539 (Tex. 2010); *Bowie*, 79 S.W.3d at 52 (Tex. 2002); *Palacios*, 46 S.W.3d at 870. "A report that merely states the expert's conclusions about the standard of care, breach and causation does not fulfill the two purposes of the good faith effort," which is to put the defendant on notice of the specific claims against it and to give the trial court a reasonable basis to conclude the claim has merit. *Jelinek*, 328 S.W.3d at 539; *Palacios*, 46 S.W.3d 873.

For example, it is conclusory to say that a health care provider's breach in "reasonable medical probability, resulted in a prolonged hospital course and increased pain and suffering." *Jelinek*, 328 S.W.3d at 539. An expert cannot simply opine that a breach caused the injury. *Id*. Stated so briefly, the report fails to satisfy the second prong of the good faith effort in that it does not give the trial court a reasonable basis to conclude the case has merit. *Id*.; *Palacios*, 46 S.W.3d at 879. Instead, the expert must go further and explain "to a reasonable degree, how and why the breach caused the injury based on the facts presented." *Jelinek*, 328 S.W.3d at 539-40.

## A. DR. LIPSON'S REPORT IS DEFICIENT AS TO BREACH.

Dr. Lipson's report is deficient because he offers only broad, conclusory opinions, without the requisite factual basis and explanation. TEX. CIV. PRAC. & REM. CODE §74.351(r)(6).

For example, Dr. Lipson asserts that "[t]he facility breached the standard of care by not providing twenty-four hour skilled nursing care." Exhibit A, at 6. Dr. Lipson offers no explanation or factual basis for his opinion. This assertion does not inform Defendant of the specific conduct Plaintiff has called into question with respect to twenty-four hour skilled nursing care, nor does it give the court a reasonable basis to conclude that the claim has merit.

10

This is merely a bare, conclusory statement, and it does not reflect a good faith effort to comply with TEX. CIV. PRAC. & REM. CODE §74.351. TEX. CIV. PRAC. & REM. CODE §74.351; *Jelinek*, 328 S.W.3d at 539; *Palacios*, 46 S.W.3d 873.

Similarly, Dr. Lipson concludes that "[t]he nursing staff was not present in the halls or her room to prevent the sexual assault of Ms. Rivera." Exhibit A, at 6. Dr. Lipson does not identify when or how the alleged sexual assault occurred or who the alleged perpetrator was. He does not explain the basis for his conclusion that staff were not present in the halls or Ms. Rivera's room. Dr. Lipson does not offer an explanation from which Gracy Woods could determine how Dr. Lipson believes the events allegedly occurred, so as to put Gracy Woods on notice of the claim, nor does Dr. Lipson offer a reasonable basis for a court to conclude this claim has merit. TEX. CIV. PRAC. & REM. CODE §74.351. TEX. CIV. PRAC. & REM. CODE §74.351; *Jelinek*, 328 S.W.3d at 539; *Palacios*, 46 S.W.3d 873.

Dr. Lipson's report claims that "[t]he facility breached the standard of care by not preventing access to her room by unsupervised males." Exhibit A at 6. Dr. Lipson does not identify any factual basis for his assertion that Ms. Rivera's room was accessed by any unsupervised males. He does not identify the time at which the alleged access occurred, nor does he make any effort to identify the person who he claims accessed Ms. Rivera's room. This is merely a bare assertion, with no factual basis. It does not provide enough information to inform Defendant of the specific conduct Plaintiff has called into question, nor does it give the trial court a reasonable basis to conclude this claim has merit. TEX. CIV. PRAC. & REM. CODE §74.351. TEX. CIV. PRAC. & REM. CODE §74.351; *Jelinek*, 328 S.W.3d at 539; *Palacios*, 46 S.W.3d 873.

Similarly, Dr. Lipson asserts that "[t]he facility breached the standard of care by not moving Ms. Rivera to a room close to the nursing station where no unsupervised males could

11

enter her room." Exhibit A at 6. Dr. Lipson offers no explanation or factual basis for his opinion. He does not describe the location of Ms. Rivera's room as it relates to the nursing station. As discussed above, he offers no information concerning the alleged access to Ms. Rivera's room by any unsupervised male. This conclusory statement does not provide the trial court a reasonable basis to conclude this claim has merit. TEX. CIV. PRAC. & REM. CODE §74.351. TEX. CIV. PRAC. & REM. CODE §74.351; *Jelinek*, 328 S.W.3d at 539; *Palacios*, 46 S.W.3d 873.

**B.      DR. LIPSON'S REPORT IS DEFICIENT AS TO CAUSATION.**

Dr. Lipson does not offer an explanation or factual basis concerning a causal relationship between an alleged breach by Gracy Woods and an alleged sexual assault of Ms. Rivera.  Exhibit A. Dr. Lipson's report does not provide the trial a reasonable basis to conclude that this claim has merit. TEX. CIV. PRAC. & REM. CODE §74.351. TEX. CIV. PRAC. & REM. CODE §74.351; *Jelinek*, 328 S.W.3d at 539; *Palacios*, 46 S.W.3d 873.

Dr. Lipson does not explain the basis for his conclusion that a sexual assault occurred. Exhibit A. His opinion on this is based on assumption and speculation, and therefore, it is deficient.

Dr. Lipson states that he has considered "other causes of this injury," but he does not indicate that the "other causes" are by any means exhaustive. Exhibit A at 7. Dr. Lipson considers no alternative to sexual assault, except that the alleged injury might have been self-inflicted. *Id.*

When facts support equal references from which different conclusions could be drawn, it is incumbent on the expert to explain to a reasonable degree of medical probability how the expert eliminated the possibilities not chosen and derived his conclusion. *Jelinek*, 328 S.W.3d at 536; *Senior Care Centers, LLC v. Shelton*, 459 S.W.3d 753, 759-60 (Tex.App. –Dallas 2015, no pet.). Here, Dr. Lipson failed to consider and eliminate other causes – particularly those

12

incidental to the patient's care or underlying conditions. Exhibit A. An expert's conclusion not accompanied by a rational explanation demonstrating why the other possibilities are inferior to the expert's chosen conclusion is a conclusory opinion based solely on the ipse dixit of a credentialed witness, and the Texas Supreme Court has instructed that such opinions be rejected. *Jelinek*, 328 S.W.3d at 536; *Shelton*, 459 S.W.3d at 759-60.

Dr. Lipson's opinions are merely speculative and, therefore, deficient. Dr. Lipson's causation opinions do not provide the court with a reasonable basis to conclude this claim has merit. Consequently, this report does not constitute a good faith effort to comply with TEX. CIV. PRAC. & REM. CODE §74.351. TEX. CIV. PRAC. & REM. CODE §74.351; *Jelinek*, 328 S.W.3d at 539; *Palacios*, 46 S.W.3d at 878 (Tex. 2001).

## X.
## OBJECTIONS TO THE ATTACHMENTS TO THE REPORT

Defendant reiterates its objections to Dr. Lipson's report to the extent it incorporates statements, medical records and other attachments and would require the Court to draw inferences and fill gaps in violation of the four corners rule. Exhibit A. *Am. Transitional Care v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001).

## XI.

Defendant objects to Ms. Black's statement or other documentation attached to and referenced in Dr. Lipson's report to the extent Plaintiff asserts those items, individually, constitute expert reports, which they do not.[4] Defendant reasserts its objections that Ms. Black lacks the qualification to offer expert opinions regarding causation because she is not a licensed physician. TEX. CIV. PRAC. & REM. CODE §74.403; TEX. R. EVID. 702. Defendant objects that no

---

[4] Exhibit 3 to Dr. Lipson's report, documents bearing the names of Austin/Travis County and St. David's Medical Center, are attached hereto as Exhibit F and incorporated herein for all purposes. Defendant attaches these documents for the purpose of objecting to them pursuant to TEX. CIV. PRAC. & REM. CODE §74.351. Defendant objects to the admissibility of these documents pursuant to TEX. R. EVID. 802.

13

curriculum vitae was provided with respect to Ms. Black. TEX. CIV. PRAC. & REM. CODE §74.351, §74.402 and §74.403. Defendant objects that Ms. Black is not qualified to offer standard of care or breach opinions relating to Defendant. TEX. CIV. PRAC. & REM. CODE §74.402. Defendant further objects to Ms. Black's statement and all other documents authored by Ms. Black that are attached to Dr. Lipson's report because they are conclusory and do not provide the required explanation or factual bases to represent a good faith effort to comply with Section 74.351. TEX. CIV. PRAC. & REM. CODE §74.351; *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52-53 (Tex. 2002); *Palacios*, 46 S.W.3d 873, 878 (Tex. 2001).

## XII.

Defendant reiterates its objections to the Affidavit of Martha Mahan to the extent Plaintiff asserts that Ms. Mahan's affidavit constitutes an expert report, which it does not. Plaintiff provided no curriculum vitae. Plaintiff lacks the knowledge, skill, training, education or experience to offer opinions regarding Defendant's standard of care, alleged breach or the alleged causal relationship. TEX. CIV. PRAC. & REM. CODE §74.351, §74.402 and §74.403. Defendant further objects to the Affidavit of Martha Mahan because it is conclusory, speculative, and does not constitute a good faith effort to comply with TEX. CIV. PRAC. & REM. CODE §74.351. Additionally, Ms. Mahan's affidavit does not supply Dr. Lipson with the necessary rational basis for his medical opinion to any greater degree than the beliefs stated in Ms. Mahan's affidavit were his own beliefs. An affiant's beliefs about what the facts are does not make those beliefs facts nor constitute personal knowledge of the believed facts. *Shelton*, 459 S.W.3d at 760.

## XIII.

Defendant reiterates its objections to the records attached as Exhibit 3 to Dr. Lipson's report because they do not constitute an expert report. TEX. CIV. PRAC. & REM. CODE §74.351.

14

Defendant objects that no curricula vitae of the records' authors were produced. Defendant objects that the authors of the records attached as Exhibit 3 to Dr. Lipson's report are not qualified to offer opinions regarding Defendant's standard of care, alleged breach or the alleged causal relationship. TEX. CIV. PRAC. & REM. CODE §74.351, §74.402 and §74.403. Defendant further objects to the records attached to Dr. Lipson's report as Exhibit 3 because the opinions contained therein, if any, are conclusory and do not constitute a good faith effort to comply with TEX. CIV. PRAC. & REM. CODE §74.351.

## XIV.

## CONCLUSION

Defendant object to Dr. Lipson's report because he has not demonstrated that he is qualified to offer opinions concerning Defendant's standard of care or alleged breach. TEX. CIV. PRAC. & REM. CODE §74.402. Defendant further objects to Dr. Lipson's report because Dr. Lipson lacks the requisite experience to offer opinions concerning the diagnosis of sexual assault or opinions concerning the alleged causal relationship. TEX. CIV. PRAC. & REM. CODE §74.403; TEX. R. EVID. 702. Defendant further objects to Dr. Lipson's report because Dr. Lipson offers no explanation or factual basis to support his breach opinions, meaning that they are merely conclusory and, therefore, deficient. TEX. CIV. PRAC. & REM. CODE §74.351(*l*), (r)(6); *Jelinek*, 328 S.W.3d at 539; *Palacios*, 46 S.W.3d 873. Finally, Defendant objects to Dr. Lipson's report because it offers no factual basis or explanation of the causal relationship between Defendant's alleged breach and the injuries, damages or harm asserted in this litigation, and because Dr. Lipson fails to exclude other reasonable causes for Ms. Rivera's presentation. TEX. CIV. PRAC. & REM. CODE §74.351(*l*), (r)(6); *Jelinek*, 328 S.W.3d at 536, 539; *Palacios*, 46 S.W.3d 873; *Shelton*, 459 S.W.3d at 759-60.

15

WHEREFORE, Defendant Gracy Woods I Nursing Home, actually known as PM Management – Austin NC, LLC d/b/a Gracy Woods Nursing Center, respectfully requests that its objections to Plaintiff's expert report be sustained, that all claims against it be dismissed with prejudice to their refiling, that it be awarded its reasonable attorneys' fees and costs of court, and that it be granted such further relief to which it may show itself justly entitled.

**REED, CLAYMON, MEEKER & HARGETT, PLLC**
5608 Parkcrest Dr., Suite 200
Austin, Texas 78731
(512) 660-5960
(512) 660-5979  (facsimile)
edavenport@rcmhlaw.com
jbyington@rcmhlaw.com


By:___/s/ Emily J. Davenport_____
    Emily J. Davenport
    State Bar No. 24012501
    Janice M. Byington
    State Bar No. 24006938

**ATTORNEYS FOR DEFENDANT**
**GRACY WOODS I NURSING HOME**
**A/K/A  PM  MANAGEMENT – AUSTIN  NC,  LLC**
**D/B/A GRACY WOODS NURSING CENTER**

16

316

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served in accordance with TRCP 21a on the 12th day of August, 2015 to the following:

Jack Modesett III
Walter V. Williams
ModesettWilliams, PLLC
2202 Lake Austin Blvd.
Austin, TX 78703
jack@jmodesettlaw.com


    /s/ Emily J. Davenport
Emily J. Davenport

317

8/24/2015 3:25:36 PM

Velva L. Price
District Clerk
Travis County
D-1-GN-14-005169
Jonathan Sanders

CAUSE NO. D-1-GN-14-005169

| | | |
|---|---|---|
| MARTHA MAHAN, AS THE REPRE- | § | IN THE DISTRICT COURT OF |
| SENTATIVE OF THE ESTATE OF | § | |
| MARY RIVERA, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| PM MANAGEMENT – AUSTIN NC, LLC | § | |
| d/b/a GRACY WOODS I NURSING HOME | § | 250TH JUDICIAL DISTRICT |

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S MOTION TO DISMISS**

COMES NOW Plaintiff Martha Mahan, as the Representative of the Estate of Mary Rivera, and files this her response to Defendant's Motion to Dismiss and would respectfully show the Court the following:

**I.**
**INTRODUCTION**

On November 8, 2013, 78 year-old demented Mary Rivera was sexually assaulted in her room, while a resident at Defendant's nursing home facility. The rape occurred after regularly scheduled events at the nursing home during which alcohol was served. Mrs. Rivera's daughter, Martha Mahan, had previously complained to the facility that younger male residents had behaved inappropriately towards Mrs. Rivera. Defendant took no action.

Early in the morning of November 9, 2013, Ms. Mahan went to visit her mother in the nursing home. Ms. Rivera was distressed. Ms. Mahan noted broken glass on the floor of her room. When she took her mother to the bathroom, Ms. Rivera attempted to urinate standing up, which was unusual. Ms. Mahan also found a wad of bloody rags in Mrs. Rivera's trash can. Ms. Mahan showed this evidence to nursing home employees, who destroyed it. Ultimately, Mrs. Rivera was taken to St. David's Medical Center where a Sexual Assault Nurse Examiner (SANE) performed a post-rape examination. This SANE nurse found bruising to posterior fourchette and

periurethral areas of Mrs. Rivera's vulva as well as bruising on her posterior vaginal wall. According to the SANE nurse, this definitively indicated penetration of the female sexual organ.

In general, Defendant's motion complains that Plaintiff's expert is not qualified to opine that a nursing home should take reasonable steps to protect its residents from sexual assault and failed in that responsibility to Ms. Rivera. This, of course, is just common sense.

## II.
## WHY DEFENDANT'S MOTION SHOULD BE DENIED

⇒ Defendant's criticism of Dr. Lipson's qualifications is misplaced. Dr. Loren Lipson is one of the most qualified experts in the nation in geriatric medicine and elder abuse. His experience is broad and deep. His 44 page CV makes the point. In addition to his education and teaching, he consults with numerous governmental agencies concerning the standard of care for nursing homes, including elder abuse.

⇒ Contrary to Defendant's straw man assertion, there is no need for an expert on "gynecological illnesses." Ms. Rivera was raped while a resident in Defendant's facility. Rape is not an illness. It is a physical, sexual assault. Dr. Lipson's report on the standard of care for a nursing home to not let their residents be sexually assaulted, in light of the facts contained in the Mrs. Rivera's medical records, witness statements, Defendant's records and the unassailable statistical data concerning sexual assault in nursing homes, is on point and remains unrefuted.

⇒ Defendant's other criticism of Dr. Lipson's report is equally misplaced. It is axiomatic that experts may rely on a patient's medical records for purposes of a Chapter 74 report. Experts can even rely on the pleadings to support a Chapter 74 report. Defendant's objections are really evidentiary and wholly inappropriate in connection with a Chapter 74 report.

⇒ Defendant's criticism about the detail in the report – that it is "conclusory," is betrayed by a simple reading of the report itself.

## III.
## DR. LOREN LIPSON – NATIONALLY PROMINENT PHYSICIAN, PROFESSOR, LECTURER, CONSULTANT IN GERIATRIC MEDICINE, ELDER ABUSE AND RELATED TOPICS

1.      Plaintiff retained the services of Dr. Loren Lipson to evaluate and opine on the facts of this case. Dr. Lipson's 7 page report and 44 page CV is attached as Exhibit 1.

*Plaintiff's Response to Defendant's Motion to Dismiss*                              *Page 2*

## A. Dr. Lipson - Educational Background in Geriatric Medicine

2. Dr. Lipson is a graduate of UCLA and The John Hopkins University School of Medicine (See CV). Dr. Lipson did his internship and residency at The John Hopkins Hospital. Dr. Lipson has fellowships from Harvard (**Geriatric** Medicine), Beth Israel Hospital (**Gerontology**), Brigham-Women's Hospital (**Gerontology**), Hebrew Rehabilitation Center (**Geriatric** Medicine) and John Hopkins (Clinical Fellow) among others (See CV).

## B. Dr. Lipson - Certification in Geriatric Medicine

3. He is boarded in Internal Medicine and Quality Assurance and Utilization Review and holds a Certificate of Expertise in **Geriatric** Medicine from the American Board of Internal Medicine (See CV). Quality assurance is the study and implementation of improvements to care provided, in Dr. Lipson's case, for the elder population in both the nursing home and hospital setting (See CV).

## C. Dr. Lipson – Twenty Seven Academic Appointments in Geriatric Medicine

4. Dr. Lipson has received twenty-seven academic appointments to include John Hopkins, Harvard Medical School (Scholar **Geriatric** Medicine), Massachusetts General Hospital, USC (Associate Professor-**Geriatric** Medicine), USC (Chief-Division of **Geriatric** Medicine), Brigham-Women's Hospital (**Geriatric** Medicine), Beth Israel (**Geriatric** Medicine), USC (**Gerontology** Research Institute) and University of Alaska (**Geriatrics**). His teaching responsibilities include USC-Fellowship Program-**Geriatric** Medicine, USC-Development and Improvement of **Geriatric** Medical Curriculum, USC-Steering Committee-Pacific **Geriatric** Education Center, and USC-Ethel Percy Andrus **Gerontology**-Director and lecturer. His

teaching responsibilities at the University of Alaska also include Director-Care of Elderly, Co-Director in **Geriatric** Education and Faculty Consultant to Geriatric residents.

**D.      Dr. Lipson – Geriatric Administrative Positions, Including Directorships**

5.      Dr. Lipson has further served in numerous administrative positions to include Chief of Division **Geriatric** Medicine, Senior Staff Physician–**Geriatric** Programs, Director of the USC Ambulatory Health Center Japanese Retirement Homes, **Director–Geriatric** Medicine VA Clinic, Director of USC Teaching Nursing Home Program, Director of Senior Cancer Center, **Director** of Senior Care Program–USC, Co-Director–Adult Protective Team–**Geriatric** Medicine Program–LAC/USC, Medical **Director**–Alaska **Geriatric** Education Center and Medical **Director** National Resource Center for Studies in Native American, Alaskans and Hawaiian Elders, University of Alaska.

**E.      Dr. Lipson – Geriatric Consultancies: Boards, Program Development**

6.      His public service includes **Consultant–Geriatric** Medicine–State of Alaska, Board of Directors, California Association of Medical Directors, and Task Force on Elder Abuse, City of Los Angeles.

7.      Dr. Lipson's consultancies include **Geriatric** Medicine-Silverado Senior Living Centers, **Geriatric** Medicine-Glendale Adventist Medical Center, Geriatric Program Development-Bay Shores Medical Group, **Geriatric** Program Development–San Dimas Community Hospital, **Geriatric** Program Development and Long Term Care-The Motion Picture & Television Home, Long Term & **Geriatric** Medicine– State of California, Elder Abuse & Geriatric Medicine – State of California, Office of the Attorney General, Long Term Care, Elder Abuse and Geriatric Medicine–State of California–Office of the Attorney General – Medicaid Fraud, Geriatric Medicine and Elder Abuse–State of New Mexico, Geriatric Medicine and Elder

Abuse–United States of America–Department of Justice, and Long Term Care, Geriatric Medicine and Elder Abuse–United States of America–Department of Health and Human Services–Office of the Inspector General (See CV).

**F.    Dr. Lipson's Lectures on Elder Abuse: Washington U; Harvard; Stanford; Yale; Brown; Baylor, etc.**

8.    Dr. Lipson has lectured all over the country on issues involving geriatrics, long term care, and elder abuse (See CV).   The lectures include Washington University, Harvard, Yale, the University of New Brunswick, the University of Florida, Stanford, University of Pittsburgh, University of Hawaii, University of California San Francisco, Brown, University of Nevada, University of Guam, Kansas University, Baylor, Chicago Medical College, University of Oklahoma, University of Colorado, University of Kentucky, University of Utah, Southern Illinois Medical School, Allegheny Medical School, University of Arizona as well as many others (CV).

9.    Dr. Lipson has published numerous peer reviewed articles, book chapters and monograms dealing with the care of the elderly (See CV).

10.    In short, Dr. Lipson is a nationally prominent physician, professor, lecturer and consultant in geriatric medicine, abuse of the elderly and related topics.   Indeed, he may be the most qualified expert in the country and the one the United States Department of Justice and the United States Department of Health and Human Services retain when they are in need of this type of expertise.

**IV.**
**DR. LIPSON'S REPORT EXCEEDS CHAPTER 74's REQUIREMENTS**

**A.    Dr. Lipson's Review of Pertinent Medical and Other Record**

11.    Dr. Lipson's report sets out in detail the information he reviewed in order to render his opinions.   They include:

*Plaintiff's Response to Defendant's Motion to Dismiss*                                         *Page 5*

a. The statement of the daughter Martha Mahan;

b. The Gracy Woods nursing home records;

c. The SANE nurse report;

d. The SANE nurse statement;

e. The St. David's Hospital records;

f. The guardianship records regarding Mrs. Rivera; and

g. The Texas Department of Aging and Disability Services Report.

**B.    Dr. Lipson Sets Out Facts Leading to Ms. Rivera's Rape**

12.    Dr. Lipson analyzes the facts leading up to the rape of Mrs. Rivera. Dr. Lipson notes that several months before Mrs. Rivera's incident another complaint of sexual assault was made in the same facility. He opines this should place the facility on heightened alert for this type of problem.

13.    Dr. Lipson reviews the citations issued by the State against the nursing home including the failure to implement written policies and the failure to report the prior incident to the proper law enforcement authorities.

14.    Dr. Lipson then reviews the guardianship records of Mrs. Rivera, which place her under the guardianship of her daughter, Martha Mahan. Judge Herman, based on medical exams, found Mrs. Rivera was a "totally incapacitated person without capacity to care for herself." Dr. Lipson opines this finding is consistent with the records from the nursing home.

**C.    Dr. Lipson Carefully Reviews Nursing Home Chart and Ms. Mahan's Statement**

15.    Dr. Lipson then conducts a careful review of the nursing home chart to establish the fact that Ms. Rivera had very poor short and long term memory problems and often did not

remember people or where her room was. Dr. Lipson goes on to opine that due to her significant mental limitations, Mrs. Rivera required careful monitoring by the staff.

16. Dr. Lipson then reviews the statement of Martha Mahan, Mrs. Rivera's daughter and guardian. Ms. Mahan's statement discussed parties on Friday afternoons where alcohol is served to the residents. Ms. Mahan reports that certain male residents acted inappropriately towards Mrs. Rivera and that this fact was reported to the management.

17. Dr. Lipson then reviews the facts surrounding the discovery of the broken glass, bloody rags and distressed Mrs. Rivera. He then notes that an external head to toe exam was done on Mrs. Rivera which found no exterior wounds. No vaginal exam was done.

18. Dr. Lipson then discusses the calling of the police and the examination done at St. David's Hospital by SANE nurse Jenny Black. Dr. Lipson notes the injuries to both the posterior and anterior portions of the vagina. He further reviewed the statement of the SANE nurse indicating definitive "penetration of the female sexual organ".

**D.     Dr. Lipson Reviews Literature on Sexual Assaults in Texas**

19. Dr. Lipson then cites literature for the disturbing fact that in the four years leading up to Mrs. Rivera's assault nearly 400 sexual assaults were reported in Texas nursing homes. Dr. Lipson further relates the fact that those who suffer from dementia are at particularly high risk for this type of abuse as they are very poor historians.

20. Dr. Lipson then goes on to discuss how these assaults can be prevented. He notes that these facilities all provide 24 hour skilled nursing care as required by law. This means the facility must have skilled nurses as well as certified nursing aides on staff twenty-four hours a day three hundred and sixty-five days a year.

21.     Dr. Lipson goes on to review the literature and reports that most of these assaults occur at night and if a facility has a history of reported assaults they are at a greater risk for additional incidents.   He then reviews the history of reported assault, non-compliance and management awareness of these issues.   Dr. Lipson reviews the general knowledge within the industry of these assaults and the press coverage regularly offered this issue.

**E.     Dr. Lipson – Ms. Rivera's Injury Foreseeable and Defendant Owed Duty to Ms. Rivera**

22.     He then opines that with the significant number of assaults in Texas nursing homes, the recent history of reported assault in Defendant's facility and the complaints of the daughter Martha Mahan that it is foreseeable assaults would occur if precautions are not taken. He then opines a nursing home owes a duty of protection to patients suffering from mental incapacity.   He then writes that such patients require enhanced supervision and additional staff time to protect them from others.   This is particularly true, he states, in a facility with a history of reported assault and a history of family complaints of inappropriate behavior towards Ms. Rivera.

**F.     Dr. Lipson Sets Out Standard of Care**

23.     After pages of detail concerning the facts, the records and the foreseeability, Dr. Lipson then sets out the standard of care.

   a.     The standard of care requires the nursing home provide twenty-four hour a day skilled nursing care.   The practical result of this requirement is that the staff must be moving through the halls and the rooms of the residents all night long.   There should never be a time when a staff member is not in the next room or moving through the halls next to a resident's room.

   b.     The standard of care requires that following the report of an assault at a nursing facility that the facility control unsupervised access to the rooms of residents at risk. The standard of care requires the facility take note of the families' concerns of inappropriate behavior and eliminate access to the patient by unsupervised males. Residents at risk include women with significant dementia such as Ms. Rivera.   In light of the family's expressed concern of inappropriate advances to Ms. Rivera,

*Plaintiff's Response to Defendant's Motion to Dismiss*                                              *Page 8*

383

the standard requires heightened scrutiny to include regular walks through the entire hall at intervals not to exceed ten minutes to prevent access to her room by males. The standard of care requires the nursing staff document the fact that it is performing the regular checks in the patients' charts. In addition, the standard of care requires Ms. Rivera be moved to a room in close proximity to the nursing station following complaints of inappropriate contact with Ms. Rivera.

## G. Dr. Lipson Identifies Breaches of Standard of Care

24. Dr. Lipson then set out the breaches of the standard of care.

a. The facility breached the standard of care by not providing twenty-four hour skilled nursing care. The nursing staff was not present in the halls or her room to prevent the sexual assault of Ms. Rivera.

b. The facility breached the standard of care by not preventing access to her room by unsupervised males. The records do not indicate any checks on Ms. Rivera the night she was assaulted. The facility breached the standard of care by not moving Ms. Rivera to a room close to the nursing station where no unsupervised males could enter her room.

## H. Dr. Lipson Identifies the Harm to Ms. Mahan

25. Dr. Lipson then sets out the harm caused. The harm caused Ms. Rivera is significant. She was sexually assaulted. The injuries to her vagina are well documented in the SANE nurse report and above. The daughter reports she was tearful and afraid. This is a common response in sexual assault victims. The daughter reports this behavior of fear continued even after Ms. Rivera was removed from the facility. The fact she suffered from dementia does not lessen the harmful mental effects of sexual assault. Even an animal can remember when it has been abused. In many ways Ms. Rivera was like a small child – confused and afraid as a result of this sexual assault. The history of problems together with the decision to ignore the families' complaints and eliminate unsupervised males from Ms. Rivera's room indicates a conscious disregard for the well-being of Ms. Rivera by the facility's management.

## I. Dr. Lipson Eliminates Other Causes of Injury

26. Dr. Lipson then considers other potential causes of this injury. He considers whether the injuries may be self-inflicted, but discards this idea after a chart review found no indications of sexual self-stimulation or self-abuse. He further considered whether the family might have caused these injuries but again discards this idea after a chart review indicates the family was nothing but supportive. Dr. Lipson further notes Mrs. Rivera was in the nursing home at all relevant times and there was no indication she was assaulted on the way to the hospital to check to see if she had been sexually assaulted.

27. In short, Dr. Lipson explains the background facts, his review of the medical and factual history, explains the problem with sexual assaults in nursing homes, explains the standard of care, the breaches of the standard of care as well as the harm caused. His report explains the Defendant's conduct called into question and provides detailed information for this Court to determine the claims have merit.

## V.
## ARGUMENT AND AUTHORITIES

### A. The Legal Standard for Qualifications and Reports

Defendant complains that Dr. Lipson is not qualified under TEX. CIV. PRAC. & REM. CODE §74.402 (be a healthcare provider or consultant in "same field" as a defendant, knowledge of the standard of care and qualified on basis of training or experience) and §74.403 (i.e., be a physician and be otherwise qualified). Dr. Lipson's qualifications are unassailable.

Defendant also complains that Dr. Lipson's report does not provide it adequate notice ("good faith effort") under TEX. CIV. PRAC. & REM. CODE §74.351(l). *Scoresby v. Santillan*, 346 S.W.3d 546, 556 (Tex. 2011)(To qualify as a good faith effort, it must inform the defendant of the

*Plaintiff's Response to Defendant's Motion to Dismiss*                    *Page 10*

385

conduct called into question and provide a basis for the trial court to conclude the claims have merit.). The Supreme Court's position on expert reports is well described.

> "The expert report must represent only a good faith effort to provide a fair summary of the expert's opinions. A report need not marshall all the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute.

*Am. Transitional Care Ctrs. Of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878.

Dr. Lipson's detailed report exceeds this standard.

### A. Dr. Lipson Well-Qualified to Opine on Preventable Sexual Assault in Nursing Home

Defendant complains Dr. Lipson is not qualified to issue opinions about whether Ms. Mahan suffered from a "gynecological illness." Rape is not a gynecological illness. It is an assault. The assault has been copiously documented by the SANE nurse and a doctor and reviewed by Dr. Lipson. The argument that Dr. Lipson cannot rely on other medical professionals' records for his opinions strains credulity. That's like saying a surgeon couldn't rely on a radiologist's reading of an MRI to provide the opinion that a patient had a brain tumor. The Court's inquiry should focus on whether the expert has the "knowledge, skill, experience, training or education regarding the specific issue before the Court which would qualify the expert to opine on a particular subject." *Tenet Hosp. Ltd. v. Love*, 347 S.W.3d 743, 749-50 (Tex. App. – El Paso 2011, no pet.)

The relevant issues addressed by Dr. Lipson are: what do the records say about Ms. Mahan's assault; what is the standard of care with respect to the assault; did Defendant breach the standard of care concerning the assault; and, was Ms. Mahan injured as a result of that breach. In short, should this nursing home have prevented Ms. Rivera's sexual assault? Dr. Lipson is well-qualified to render those opinions.

## 1. Defendant's Straw Man Argument - Whether Sexual Assault Occurred

After setting up the straw man – that the required opinions should include whether a sexual assault occurred at all – Defendant takes a swing at the medical records that establish the sexual assault. Defendant misses. Defendant argues Dr. Lipson may not rely upon the SANE nurse report or the medical records in this matter. Defendant cites TEX. CIV. PRAC. & REM. CODE § 74.402 & § 74.403 and Texas Rules of Evidence 702 for this proposition. Defendant's reliance is misplaced. §74.402(b)(3) and (c)(2) set out in relevant part:

> (b)(3) (an expert may qualify if he) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care
> (c)(2) is actively practicing health care in rendering health care services relevant to the claim.

§ 74.403 deals with the qualification of a <u>retained</u> expert witness to render opinions. It sets out in part:

> A person may qualify as an expert witness on the issue of causal relationship between the alleged departure from the accepted standard of care and the injury, harm or damages claimed only if the person is a physician . . .

This section does apply to Dr. Lipson. It **<u>does not</u>** apply to the medical records or statements. Only Dr. Lipson addresses the issues of "causal relationships" and "departure from the accepted standard of care". Expert witnesses must be able to rely upon the medical records to render opinion. Expert witnesses may rely on witness statements. If one follows Defendant's argument to its logical conclusion, experts could not rely on the nursing home chart (made mostly by nurses), the medical records (made by nurses and treating doctors whose resumes are not available). This is not the law in Texas. Defendant knows this because it cites a case for this very proposition in a footnote of its motion. *See* Motion at 7 fn 3.

Indeed, the Texas Supreme Court has expressly stated that expert reports would likely be inadequate if they did not look at the medical records. *Loaisiga v. Cerda*, 379 S.W.3d 248, 261 (Tex. 2012). This is a case which involved the sexual assault of patients. The Supreme Court also held in the same case that experts could rely upon the pleadings on file in the case to render expert opinions. *Id.* A reading of the statute and the relevant case law make it clear that § 74.402 and § 74.403 do not apply to the underlying information reviewed by experts, such as the medical records or SANE nurse examination. The Defendant's objection to the review of the statement of Martha Mahan is unfounded for the same reason.

**B.     Dr. Lipson - Well-Qualified to Opine on Nursing Home Elder Abuse**

Defendant has closely scrutinized the Plaintiff's report, but appears to have overlooked the pages and pages of Dr. Lipson's CV setting out his experience teaching future nursing home directors at multiple Tier 1 universities and governmental entities. In Dr. Lipson's CV, there are at least 9 references to lectures, courses and papers relating to "Elder Abuse." There are over 30 references to geriatrics, including fellowships at Harvard. There are multiple references to his directorships over programs and facilities involving care for the elderly. His experience includes consulting at nursing homes and governmental entities on the operation of nursing homes. He is board certified in Quality Assurance. He has spent a many years learning, lecturing, writing and testifying on nursing home abuse issues.

## V.
## CONCLUSION

Over the course of its 16 page motion, Defendant strains mightily to copy and paste pages of black letter law on Chapter 74 claims. This larding of citations attempts to serve as a substitution for actual analysis of Dr. Lipson's report. Defendant ignores the details of the report,

cherry-picking quotes to create a false sense that the report is conclusory and has otherwise failed to make any meaningful criticism. The report from this nationally recognized physician is detailed on the facts, causation and harm. Defendant knows exactly what the claims are against it: A helpless old woman got raped in her room after alcohol was served on its premises, and after being put on notice of inappropriate conduct towards Mr. Rivera. It should have never happened. Plaintiff has met and exceeded the standard for expert qualifications and reports. Defendant's motion should be denied in all things.

Respectfully Submitted,

**MODESETT WILLIAMS, PLLC**
515 Congress Avenue, Suite 1650
Austin, Texas 78701
512.472.6097 – Telephone
512.481.0130 – Telecopier
jack@jmodesettlaw.com

By: _____
Jack Modesett, III
Texas Bar No. 14244337
Walter V. Williams
Texas Bar No. 21584800

## CERTIFICATE OF SERVICE

I hereby do certify that in compliance with the provisions of Rule 21a, a true and correct copy of the above and foregoing has been served via ProDocs electronic service on this 24 day of July, 2015 as follows:

Emily J. Davenport
Kemp Smith, LLP
816 Congress Avenue, Suite 1260
Austin, Texas 78701-2443
Emily.davenport@kempsmith.com

_____
Jack H. Modesett

CAUSE NO. D-1-GN-14-005169

| | | |
|---|---|---|
| MARTHA MAHAN, AS THE | § | IN THE DISTRICT COURT |
| REPRESENTATIVE OF THE | § | |
| ESTATE OF MARY RIVERA | § | |
| | § | |
| V. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| GRACY WOODS I NURSING HOME | § | 250TH JUDICIAL DISTRICT |

### DEFENDANT'S OBJECTIONS TO
### PLAINTIFF'S EXPERT REPORT AND CURRICULUM VITAE

TO THE HONORABLE COURT:

NOW COMES Defendant Gracy Woods I Nursing Home, actually known as PM Management – Austin NC, LLC d/b/a Gracy Woods Nursing Center, and files its Objections to Plaintiff's Expert Report and Curriculum Vitae pursuant to TEX. CIV. PRAC. & REM. CODE §74.351(a) and would respectfully show:

#### I.

This is a health care liability claim. On January 30, 2015, Plaintiff served the report and curriculum vitae of Loren G. Lipson, M.D., in an attempt to comply with Section 74.351 of the Texas Civil Practice and Remedies Code. True and correct copies of Dr. Lipson's report and curriculum vitae are attached here to as Exhibits A and B, respectively, and incorporated herein for all purposes.

#### II.
#### OBJECTIONS TO QUALIFICATIONS

Defendant objects to Dr. Lipson's report and curriculum vitae because Dr. Lipson has failed to establish that he has any expertise to offer opinions that an alleged sexual assault occurred. TEX. CIV. PRAC. & REM. CODE §74.403; TEX. R. EVID. 702; *Broders v. Heise*, 924

1

**APPENDIX 4** 101

S.W.2d 148, 152-54 (Tex. 1996). Neither Dr. Lipson's report nor his curriculum vitae indicates that he has any education, training, skill or experience in the diagnosis or treatment of sexual assault; the diagnosis or treatment of gynecological injury, conditions or disease; or gynecological care or treatment of patients like Mary Rivera. Exhibits A and B. *Broders*, 924 S.W.2d at 152-54; *Thomas v. Alford*, 230 S.W.3d 853, 857 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *Pediatrix Med. Servs. Inc. v. De La O*, 368 S.W.3d 34, 39-40 (Tex.App.–El Paso 2012, no pet.); *Cortez v. Tomas*, 2012 WL 407382, at *3, 6 (Tex.App. –Fort Worth 2012, no pet.). Dr. Lipson lacks the requisite expertise regarding the *specific issue* before the court that would qualify him to offer the opinions asserted in his report. TEX. CIV. PRAC. & REM. CODE §74.403; TEX. R. EVID. 702; *Broders*, 924 S.W.2d at 152-54.

### III.

Defendant objects to Dr. Lipson's report to the extent it relies on the conclusions of non-physicians.[1] Dr. Lipson relies on the observations and conclusions of Plaintiff and a registered nurse, neither of whom is qualified to offer diagnoses or medical causation opinions.[2] Exhibit A. TEX. CIV. PRAC. & REM. CODE §74.403(a) (limiting causation opinions to physicians otherwise qualified according to TEX. R. EVID. 702); TEX. R. EVID. 702. Exhibits D, E. Dr. Lipson relies on the statement of Jenny Black, R.N. Ms. Black is a registered nurse, not a licensed physician. Exhibit E. Registered nurses are expressly prohibited from rendering medical diagnoses, and they lack the medical expertise required to offer causation opinions. TEX. OCC. CODE §301.002(2)(excluding "acts of medical diagnosis" from the definition of "professional

---

[1] Defendant also respectfully objects to Exhibit 1 to Dr. Lipson's report to the extent Plaintiff or Dr. Lipson attempts to rely upon the opinion of a non-physician for a medical causation opinion in a health care liability claim. TEX. CIV. PRAC. & REM. CODE §74.403(a); TEX. R. EVID. 702. A true and correct copy of the Order Appointing Permanent Guardian is attached hereto as Exhibit C and incorporated herein for all purposes.

[2] A true and correct copy of the Affidavit of Martha Mahan is attached hereto as Exhibit D and incorporated herein for all purposes. A true and correct copy of the Statement of Jenny Black is attached hereto as Exhibit E and incorporated herein for all purposes.

nursing"); TEX. CIV. PRAC. & REM. CODE §74.403(a); TEX. R. EVID. 702; *Costello v. Christus Santa Rosa Health Care*, 141 S.W.3d 245, 248-49 (Tex.App. –San Antonio 2004, no pet)(regarding nurses' lack of qualification to render medical opinions in expert reports); *Jones v. King*, 255 S.W.3d 156, (Tex.App. –San Antonio 2008, pet. denied)(regarding application of the four corners rule when an expert report attempts to rely on the opinions of a physician whose qualifications were not established in the report).

**IV.**

Defendant further objects to Dr. Lipson's report because Dr. Lipson has failed to establish that he has the requisite knowledge, training or experience in the operation, management or supervision of nursing homes to offer the opinions on standard of care and breach asserted in his report. TEX. CIV. PRAC. & REM. CODE §74.402; *Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 411-414 (Tex. App. – Ft. Worth 2003, no pet.)(a board certified emergency medicine physician and neurologist with thirty years of experience treating stroke patients not qualified to offer opinions on standards of care for hospital policy relating to administration of stroke therapy); *Shelton v. Sargent*, 144 S.W.3d 113, 123 (Tex. App. – Ft. Worth 2004, pet. denied). Dr. Lipson's conclusory statements about his alleged familiarity with the standard of care do not establish that he has the knowledge, training or experience on the specific issues in this case.

**V.**
**OBJECTIONS TO THE REPORT**

Defendant objects to Dr. Lipson's conclusion that "[t]he facility breached the standard of care by not providing twenty-four hour skilled nursing care." Exhibit A, at 6. Dr. Lipson offers no explanation or factual basis for his opinion. This conclusory statement does not put Defendant

3

on notice of the conduct complained of, nor does it constitute a good faith effort to comply with TEX. CIV. PRAC. & REM. CODE §74.351.

## VI.

Defendant objects to Dr. Lipson's conclusion that "[t]he nursing staff was not present in the halls or her room to prevent the sexual assault of Ms. Rivera." Exhibit A, at 6. Dr. Lipson offers no explanation or factual basis for his opinion. This is a mere conclusion, and it does not constitute a good faith effort to comply with TEX. CIV. PRAC. & REM. CODE §74.351.

## VII.

Defendant objects to Dr. Lipson's conclusion that "[t]he facility breached the standard of care by not preventing access to her room by unsupervised males." Dr. Lipson offers no explanation or factual basis for his opinion. This conclusory statement does not put Defendant on notice of the conduct complained of, nor does it constitute a good faith effort to comply with TEX. CIV. PRAC. & REM. CODE §74.351.

## VIII.

Defendant objects to Dr. Lipson's conclusion that "[t]he facility breached the standard of care by not moving Ms. Rivera to a room close to the nursing station where no unsupervised males could enter her room." Dr. Lipson offers no explanation or factual basis for his opinion. This conclusory statement does not put Defendant on notice of the conduct complained of, nor does it constitute a good faith effort to comply with TEX. CIV. PRAC. & REM. CODE §74.351.

## IX.

Defendant objects to Dr. Lipson's conclusion that Ms. Rivera was sexually assaulted. Dr. Lipson offers no explanation or factual basis to support his conclusion that a sexual assault occurred. Dr. Lipson offers no explanation or factual basis in support of his conclusion that the

4

alleged injury was due to sexual contact. Dr. Lipson offers no explanation or factual basis to support his conclusion that the alleged assailant was male. Dr. Lipson's opinions are merely speculative and, therefore, deficient.[3] Accordingly, Defendant objects to Dr. Lipson's report because his statements regarding the alleged sexual assault are merely conclusory, do not put Defendant on notice of the claim against it, do not give the trial court a reasonable basis to conclude that this claim has merit, and do not constitute a good faith effort to comply with TEX. CIV. PRAC. & REM. CODE §74.351. TEX. CIV. PRAC. & REM. CODE §74.351; *American Transitional Care Ctrs. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001).

## X.
## OBJECTIONS TO THE ATTACHMENTS TO THE REPORT

Defendant objects to the report, generally, to the extent it incorporates statements, medical records and other attachments and would require the Court to draw inferences and fill gaps in violation of the four corners rule. Exhibit A, C, D, E and F. *Am. Transitional Care v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001).

## XI.

Defendant objects to Ms. Black's statement or other documentation attached to and referenced in Dr. Lipson's report to the extent Plaintiff asserts those items, individually, constitute expert reports, which they do not.[4] Defendant reasserts its objections that Ms. Black lacks the qualification to offer expert opinions regarding causation because she is not a licensed physician. TEX. CIV. PRAC. & REM. CODE §74.403; TEX. R. EVID. 702. Defendant objects that no curriculum vitae was provided with respect to Ms. Black. TEX. CIV. PRAC. & REM. CODE

---

[3] In fact, it appears that Dr. Lipson failed to review all of Ms. Rivera's medical records.

[4] Exhibit 3 to Dr. Lipson's report, documents bearing the names of Austin/Travis County and St. David's Medical Center, are attached hereto as Exhibit F and incorporated herein for all purposes. Defendant attaches these documents for the purpose of objecting to them pursuant to TEX. CIV. PRAC. & REM. CODE §74.351. Defendant objects to the admissibility of these documents pursuant to TEX. R. EVID. 802.

5

§74.351, §74.402 and §74.403. Defendant objects that Ms. Black is not qualified to offer standard of care or breach opinions relating to Defendant. TEX. CIV. PRAC. & REM. CODE §74.402. Defendant further objects to Ms. Black's statement and all other documents authored by Ms. Black that are attached to Dr. Lipson's report because they are conclusory and do not provide the required explanation or factual bases to represent a good faith effort to comply with Section 74.351. TEX. CIV. PRAC. & REM. CODE §74.351; *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52-53 (Tex. 2002); *Palacios*, 46 S.W.3d 873, 878 (Tex. 2001).

## XII.

Defendant objects to the Affidavit of Martha Mahan to the extent Plaintiff asserts that Ms. Mahan's affidavit constitutes an expert report, which it does not. Plaintiff provided no curriculum vitae. Plaintiff lacks the knowledge, skill, training, education or experience to offer opinions regarding Defendant's standard of care, alleged breach or the alleged causal relationship. TEX. CIV. PRAC. & REM. CODE §74.351, §74.402 and §74.403. Defendant further objects to the Affidavit of Martha Mahan because it is conclusory, speculative, and does not constitute a good faith effort to comply with TEX. CIV. PRAC. & REM. CODE §74.351.

## XIII.

Defendant objects to the records attached to Dr. Lipson's report as Exhibit 3 because they do not constitute an expert report. TEX. CIV. PRAC. & REM. CODE §74.351. Defendant objects that no curricula vitae of the records' authors were produced. Defendant objects that the authors of the records attached as Exhibit 3 to Dr. Lipson's report are not qualified to offer opinions regarding Defendant's standard of care, alleged breach or the alleged causal relationship. TEX. CIV. PRAC. & REM. CODE §74.351, §74.402 and §74.403. Defendant further objects to the records attached to Dr. Lipson's report as Exhibit 3 because the opinions contained therein, if any, are

6

conclusory and do not constitute a good faith effort to comply with TEX. CIV. PRAC. & REM. CODE §74.351.

WHEREFORE, Defendant Gracy Woods I Nursing Home, actually known as PM Management – Austin NC, LLC d/b/a Gracy Woods Nursing Center, respectfully requests that its Objections be sustained and that it be granted such further relief to which it may show itself justly entitled.

Respectfully submitted,

**KEMP SMITH LLP**
816 Congress Avenue, Suite 1260
Austin, Texas 78701-2443
512-320-5466
512-320-5431 (facsimile)
emily.davenport@kempsmith.com


By:___/s/ Emily J. Davenport_____
    Emily J. Davenport
    State Bar No. 24012501

**ATTORNEYS FOR DEFENDANT**
**GRACY WOODS I NURSING HOME**
**A/K/A PM MANAGEMENT – AUSTIN NC,**
**LLC D/B/A GRACY WOODS NURSING**
**CENTER**

7

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served in accordance with TRCP 21a on the 20th day of February, 2015 to the following:

Jack Modesett III
Walter V. Williams
ModesettWilliams, PLLC
2202 Lake Austin Blvd.
Austin, TX 78703
jack@jmodesettlaw.com


    /s/ Emily J. Davenport
Emily J. Davenport

DECLARATION OF LOREN G. LIPSON, M.D.

I, Loren G. Lipson, M.D., declare as follows:

I am a licensed physician in the State of California. I am Board-Certified in Internal Medicine, as well as in Quality Assurance and Utilization Review. I have been board certified in Geriatric Medicine.

My curriculum vitae, attached hereto as Exhibit 1 accurately reflects my education, training and experience as a Medical Doctor, Professor Emeritus of Medicine at the Keck School of Medicine at the University of Southern California, Los Angeles, California, Affiliate Professor in the Biomedical WWAMI Program, College of Arts and Sciences, and Affiliate Professor at the College of Health and Social Welfare both at the University of Alaska Anchorage. I am the former chief of the section of Geriatric Medicine and Associate Professor of Medicine, Gerontology, Clinical Pharmacy, Medical Dentistry and Public Health, and Occupational Science and Occupational Therapy, all at the University of Southern California where I have been on the faculty for over 29 years.

In addition, I am a consultant to the Department of Justice United States and the States of California and New Mexico, and the Office of the Inspector General, U.S. Department of Health and Human Services in areas of geriatric care and elder abuse. I have served as a Consultant to the Departments of Administration, Health and Social Services and Law, State of Alaska, in the areas of geriatric medicine and long term care. I also have been the Physician Advisor to USC University Hospital in areas of utilization management and quality assurance.

I have extensive personal experience in primary medical care as well as subspecialty consultation and long-term care. I personally have provided care for patients in addition to my academic teaching, research and administrative responsibilities. My background is more fully

DECLARATION OF LOREN G. LIPSON, M.D.                     PAGE 1

described in my curriculum vitae attached hereto as Exhibit A.

I am familiar with the problem of sexual assault in the nursing home setting. I am familiar with the standard of care for preventing such assaults.

I continue to treat patients in the long term care setting and have done so for more than thirty years. I am familiar with the standard of care for the treatment of patients like Mary Rivera and familiar with the required training of employees providing care to residents like Mary Rivera.

I have reviewed the following records. They formulate a basis for my opinions in this matter.

1. The statement of the daughter, Martha Mahan;

2. The Gracy Woods I records;

3. The SANE Nurse Report;

4. The SANE Nurse Statement

5. The St. David's Hospital Records

6. The guardianship records regarding Ms. Rivera; and

7. Texas Department of Aging and Disability Services' Reports.

The nursing home had a complaint of a sexual assault of a resident several months before the assault of Ms. Rivera. This report should place the facility on a heightened alert for this problem. The facility was cited by DADS for:

1. Failing to implement written policies that protect against this activity; and

2. Failing to report the incident to law enforcement.

On June 20, 2013, Ms. Mary Rivera was placed under the guardianship of her daughter, Martha Mahan, by Judge Guy Herman. Judge Herman determined that Mary Rivera was a "totally incapacitated person without capacity to care for herself." (Ex. 1)

DECLARATION OF LOREN G. LIPSON, M.D.            PAGE 2

The findings of Judge Herman are consistent with the records from Gracy Woods I, (the nursing home) where Ms. Rivera was a long term resident.

When Ms. Rivera admitted to the nursing home she carried a diagnosis of dementia. A review of the nursing home chart indicates that Ms. Rivera's short- and long-term memory declined over the time of her residency. The chart indicated she frequently did not know the location of her room, the season of the year or recognize staff members. This is confirmed in the appointment of her guardian when Judge Herman finds Ms. Rivera as "totally incapacitated" due to mental as well as physical limitations.

The nursing home chart describes an individual who, while able to ambulate, clearly required careful monitoring due to significant mental limitations. The nursing home chart further indicates Ms. Rivera suffered from depression secondary to the diagnosis of dementia as well as due to her admission to the nursing home, an admission she likely did not fully understand.

The daughter of Ms. Rivera describes in her statement alcohol parties that the nursing home had on Friday afternoons. (Ex. 2) She states that another male resident would inappropriately touch or speak to Ms. Rivera. (Ex. 2) The daughter reported this concern to the management of the nursing home. The nurses caring for Ms. Rivera were aware of this behavior. (Ex. 2)

Early on November 9, 2013, a Saturday morning, the daughter visited her mother at the nursing home. She found her more confused than usual and crying. The daughter also found broken Christmas ornaments on the floor. She took her mom to the bathroom, and she appeared to be in pain. Ms. Rivera urinated standing up, which was unusual. After she put her mom back to bed, the daughter used the restroom herself. When she was discarding a paper towel she noted there was a pile of bloody rags in the trash.

DECLARATION OF LOREN G. LIPSON, M.D.                                    PAGE 3

Concerned that her mother had fallen, she took the rags to the charge nurse, Wendy, who did a head-to-toe skin examination. The nursing home records confirm that no open wounds were found. The daughter ultimately took her mother to the hospital where they found bruising to her back. No vaginal exam was done at that time.

The daughter reports Ms. Rivera continued to act like she was afraid. She noted bleeding from her mother's vagina. The daughter began to suspect sexual assault. The police were notified.

Ms. Rivera was taken to St. David's Hospital. An examination was done by a Sexual Assault Nurse Examiner (SANE Nurse). The SANE nurse told Ms. Rivera that her mother had suffered vaginal trauma. The SANE nurse exam specifically found trauma to the posterior fourchette/fossa navicularis as well as trauma to the periurethral area of the vagina. (Ex. 3) In other words, she found bruising to both the front of the vagina as well as the posterior of the vaginal wall. (Ex. 3) The statement of the SANE nurse indicates the findings "definitively indicate penetration of the female sexual organ." (Ex. 4) As referenced above, Ms. Rivera was incompetent. In other words, she was sexually assaulted as she is unable to give consent to sexual contact.

Sexual assault in the nursing home environment is a very serious problem. In the four years leading up to this assault, nearly four hundred sexual assaults were reported in Texas nursing homes. At high risk are seniors such as Ms. Rivera who suffer from dementia. They are poor historians due to their illness and many suffer from impaired communication skills. As such they are extremely vulnerable.

The good news is that, if the nursing home takes a few simple steps, the assaults can be prevented. Facilities such as this nursing home are 24 hour skilled nursing facilities. This means

DECLARATION OF LOREN G. LIPSON, M.D.                       PAGE 4

18

they are required by law to have skilled nursing staff as well as certified nurses' aides on duty and providing care to the residents twenty-four hours a day, seven days a week, three hundred and sixty five days a year. The nursing home in question has one hundred and eighteen beds in the entire facility. These types of assaults, according to most reports in the literature, occur at night.

The literature indicates that facilities with a history of abuse and noncompliance are more likely to have future incidents of abuse. This nursing facility has a history of reported abuse and sexual abuse and was cited by the state for several indications of neglect leading up to the assault of Ms. Rivera. The nursing home management and owners are aware of this history of abuse and are obligated to take steps to prevent future abuse. Everyone in the nursing home business is aware of the problem of sexual assault. It is well discussed in the literature and the press. Given the history of problems in the facility and the complaints of the daughter, it is foreseeable assaults like this would occur without the proper precautions.

This nursing home owes a duty of protection to patients suffering from mental incapacity due to decreased cognitive abilities. This duty includes monitoring the physical and mental conditions of the patients and meeting the fundamental care needs of the residents. Nursing homes are required to assess each resident's needs and capabilities. Some residents, like Ms. Rivera, require enhanced supervision and additional staff to protect them from others. The nursing home must take reasonable precautions to protect Ms. Rivera from the foreseeable consequences of her impairment including sexual assault. This is particularly true when there is a previously reported assault and the patient's family has voiced concerns of inappropriate behavior towards their mother.

DECLARATION OF LOREN G. LIPSON, M.D.                                    PAGE 5

19

## STANDARDS OF CARE

1.  The standard of care requires the nursing home provide twenty-four hour a day skilled nursing care. The practical result of this requirement is that the staff must be moving through the halls and the rooms of the residents all night long. There should never be a time when a staff member is not in the next room or moving through the halls next to a resident's room.

2.  The standard of care requires that following the report of an assault at a nursing facility that the facility control unsupervised access to the rooms of residents at risk. The standard of care requires the facility take note of the families' concerns of inappropriate behavior and eliminate access to the patient by unsupervised males. Residents at risk include women with significant dementia such as Ms. Rivera. In light of the families expressed concern of inappropriate advances to Ms. Rivera, the standard requires heightened scrutiny to include regular walks through the entire hall at intervals not to exceed ten minutes to prevent access to her room by males. The standard of care requires the nursing staff document the fact that it is performing the regular checks in the patients' charts. In addition, the standard of care requires Ms. Rivera be moved to a room in close proximity to the nursing station following complaints of inappropriate contact with Ms. Rivera.

## BREACH OF STANDARD OF CARE

1.  The facility breached the standard of care by not providing twenty-four hour skilled nursing care. The nursing staff was not present in the halls or her room to prevent the sexual assault of Ms. Rivera.

2.  The facility breached the standard of care by not preventing access to her room by unsupervised males. The records do not indicate any checks on Ms. Rivera the night she was assaulted. The facility breached the standard of care by not moving Ms. Rivera to a room close to the nursing station where no unsupervised males could enter her room.

## HARM

The harm caused Ms. Rivera is significant. She was sexually assaulted. The injuries to her vagina are well documented in the SANE nurse report and above. The daughter reports she was tearful and afraid. This is a common response in sexual assault victims. The daughter reports this behavior of fear continued even after Ms. Rivera was removed from the facility. The fact she suffered from dementia does not lessen the harmful mental effects of sexual assault. Even

DECLARATION OF LOREN G. LIPSON, M.D.                                    PAGE 6

20

an animal can remember when it has been abused. In many ways Ms. Rivera was like a small child – confused and afraid as a result of this sexual assault. The history of problems together with the decision to ignore the families' complaints and eliminate unsupervised males from Ms. Rivera's room indicates a conscious disregard for the well-being of Ms. Rivera by the facility's management.

I have considered other causes of this injury. I considered if the vaginal injuries were self-inflicted. There is no evidence in Ms. Rivera's chart to indicate she engaged in either sexual self-stimulation or self-abuse. I considered the injury may have been inflicted by someone outside the facility or even a family member. There is no evidence to support this approach. There is no record the family was anything other than supportive. The timeline in the chart indicates she was the facility at all relevant times save during transfer to the hospital. There is no evidence anyone sexually assaulted her when she was being transferred to the hospital to have her examined for injuries.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this __28th__ day of __January__, 2015.

_____
Loren G. Lipson, M.D.

22

CURRICULUM VITAE

Loren G. Lipson, M.D.

August 1, 2009

A. Personal Information

1. Name: Loren G. Lipson, M.D.

2. Titles: Professor Emeritus of Medicine at the Keck School of Medicine of the University of Southern California, Los Angeles, California; and Affiliate Professor, Biomedical WWAMI Program, College of Arts and Sciences, and Affiliate Professor, College of Health and Social Welfare at the University of Alaska Anchorage.

3. Mailing Address: P.O. Box J
South Pasadena, California 91031

4. Business Telephone: 626-403-0169

5. Fax: 626-403-0165

6. Pager: 800-209-2380 (Numeric Only)

B. Education

1. High School – Birmingham High School, Van Nuys, California. Graduated, June 1961.

2. University – U.C.L.A.: B.S. in Chemistry with a minor in Math and English.
(Summa Cum. Laude), June 1965.

3. Medical School – The Johns Hopkins University School of Medicine, Baltimore, Maryland: M.D., June 1969

4. Internship – The Johns Hopkins Hospital, Osler Medical Service, 1969 – 1970.

5. Residency - The Johns Hopkins Hospital, Osler Medical Service, 1970 – 1971

1

6. Fellowships:

   a. The Johns Hopkins University School of Medicine, Baltimore, Maryland: Clinical Fellow in Medicine, 1969-1971

   b. The National Institutes of Health, Bethesda, Maryland: Research Associate – Protein Chemistry, Physical Biochemistry, Molecular Biology – Laboratory of Chemical Biology, National Institute of Arthritis, Metabolic and Digestive Diseases (NIAMDD), 1971-1973.

   c. Massachusetts General Hospital, Boston, Massachusetts: Clinical and Research Fellow in Medicine (Endocrinology and Metabolism), 1973-1976

   d. Harvard Medical School, Boston, Massachusetts: Clinical and Research Fellow in Medicine (Endocrinology and Metabolism),1973-1975.

   e. Harvard Medical School, Boston, Massachusetts: John A. Hartford Senior Scholar in Geriatric Medicine, Division of Aging,1984-1985

   f. Beth Israel Hospital, Boston, Massachusetts: Clinical Fellow in Medicine (Gerontology), 1984-1985

   g. Brigham – Women's Hospital, Boston, Massachusetts: Clinical Fellow in Medicine (Gerontology), 1984-1985

   h. Hebrew Rehabilitation Center for the Aged, Boston, Massachusetts: Clinical Fellow in Geriatric Medicine, 1984 -1985.

   i Institute of Advanced Studies on Gerontology, Ethel Percy Andrus Gerontology Center, USC, Los Angeles, California: Fellow in Institute, Area – Drugs in the Elderly, 1985-1987

   j. Geriatric Research Institute, Ethel Percy Andrus Gerontology Center, USC, Los Angeles, California: Senior Research Associate, 1985-1989.

7. Honors and Award

2

| | |
|---|---|
| 1965 | Phi Beta Kappa; Recipient of Merck Award in Chemistry; Outstanding Undergraduate in Chemistry Award of Phi Lambda Upsilon; Medal for Scholarship of the American Institute of Chemists; The Ramsey Prize in Physical Chemistry; Sigma XI– All at U.C.L.A. |
| 1968 – 1969 | Henry Strong Denison Scholarship for Research in Medicine, The Johns Hopkins University School of Medicine. |
| 1975 - 1977 | National Research Service Award in Diabetes (NIAMDD), National Institutes of Health. |
| 1975 – 1978 | Daland Fellowship in Clinical Medicine, American Philosophical Society. |
| 1977 – 1978 | Clinical Investigator Award in Diabetes, NIAMDD, National Institutes of Health. |
| 1984 – 1985 | John A. Hartford Senior Scholar Award in Geriatric Medicine, Division of Aging, Harvard Medical School. |
| 1989 | The Genesis Award, For Innovative Health Care Delivery, Los Angeles Business Journal. |
| 1989 | Professional Leadership Program Award, Volunteer Center of Los Angeles. |
| 1999 | One of Top 20 Physicians in the Greater Los Angeles Area (and only Geriatrician named), Los Angeles Business Journal. |
| 2000 | One of Top Primary-Care Physicians in the U.S., Town and Country Magazine. |
| 2002 | One of Top Ten Physicians in Los Angeles, America-On-Line. |

8.   Licensure:   California.

3

9.  Boards:     American Board of Internal Medicine, 1974.

    American Board of Quality Assurance and Utilization Review Physicians, 1995

    Certificate of Expertise in Geriatric Medicine, American Board of Internal Medicine, 1996

C.  **Professional Background**

1.  Academic Appointments

    a.  The Johns Hopkins University School of Medicine, Baltimore, Maryland; Clinical Fellow in Medicine, 1969-1971.

    b.  Massachusetts General Hospital, Boston, Massachusetts; Clinical and Research Fellow in Medicine (Endocrinology and Metabolism), 1973-1976.

    c.  Harvard Medical School, Boston, Massachusetts; Clinical and Research Fellow in Medicine (Endocrinology and Metabolism), 1973-1975.

    d.  Harvard Medical School, Boston, Massachusetts; Instructor in Medicine (Diabetes), 1975-1978.

    e.  Massachusetts General Hospital, Boston, Massachusetts; Clinical Assistant in Medicine (Diabetes Unit), 1976-1978.

    f.  University of Southern California School of Medicine, Los Angeles, California; Assistant Professor of Medicine (Diabetes Division), 1978-1981.

    g.  University of Southern California School of Medicine, Los Angeles, California; Assistant Professor of Medicine, with tenure (Division of Diabetes and Clinical Nutrition), 1981 – January 1984.

    h.  Los Angeles County/University of Southern California Medical Center, Los Angeles, California; Staff Physician in Medicine (Diabetes Service), 1978 – January 1984

    i.  University of Southern California School of Medicine, Los Angeles, California; Associate Professor of Medicine (Division of Geriatric Medicine), January 1984 – September 2006.

4

j.      University of Southern California School of Medicine, Los Angeles, California; Chief, Division of Geriatric Medicine in the Department of Medicine, January 1984 – 2005.

k.      University of Southern California, Los Angeles, California; Associate Professor of Gerontology, Leonard Davis School of Gerontology, Ethel Percy Andrus Gerontology Center, January 1984 – September 2006.

l.      University of Southern California, Los Angeles, California; Associate Professor of Clinical Pharmacy, U.S.C. School of Pharmacy, October 1989 – September 2006.

m.      Los Angeles County/University of Southern California Medical Center, Los Angeles, California; Staff Physician in Medicine, (Geriatric Medicine), 1984-2004.

n.      Sabbatical Leave, Harvard Medical School, Boston, Massachusetts; Division of Aging, John A. Hartford Senior Scholar in Geriatric Medicine, 1984 – 1985.

o.      Brigham & Women's Hospital, Boston, Massachusetts; Clinical Fellow in Medicine (Geriatric Medicine), 1984-1985.

p.      Beth Israel Hospital, Boston, Massachusetts; Clinical Fellow in Medicine (Geriatric Medicine), 1984 – 1985

q.      University of Southern California, Los Angeles, California; Senior Research Associate, Gerontology Research Institute, Ethel Percy Andrus Gerontology Center, 1985 – 1989.

r.      University of Southern California, Los Angeles, California; Fellow Institute of Advance Study, Ethel Percy Andrus Gerontology Center, 1985 – 1987.

s.      University of Southern California University Hospital, Los Angeles, California; Chief of Geriatric Medicine, 1991- 2005

t.      University of Southern California – School of Dentistry – Associate Professor of Medical Dentistry and Public Health, 1994 – September 2006.

u.      University of Southern California – School of Independent Health Professionals – Associate Professor of Occupational Science and Occupational Therapy, 1998- September 2006.

v.   University of Alaska, Anchorage – Adjunct Associate Professor of Human Biology, 2001 – September 2006.

w.   University of Alaska Southeast, Sitka – Adjunct Associate Professor of Human Studies, 2001 - 2006.

x.   University of Alaska, Anchorage, Affiliate Professor, College of Health and Social Welfare, 2006 – Present.

y.   University of Alaska Anchorage, Affiliate Professor, Biomedical WWAMI Program, College of Arts and Sciences, 2006 – Present.

z.   University of Alaska, Anchorage, Faculty Consultant in Geriatrics, Alaska Family Medical Residency, September 2006 – Present.

aa.  University of Southern California, Keck School of Medicine, Professor Emeritus of Medicine, September 2006 – Present.

2A.  Teaching Responsibilities (University of Southern California)

a.   Attending Staff Physician LAC/USC Medical Center on the General Medical Service – teaching and supervising patient care, both inpatient and outpatient to house staff and students 1985 – 2004.

b.   Attending Staff Physician at USC University Hospital in Geriatric Medicine for Medical House Staff and students. 1991 – 2005.

c.   In charge of the Fellowship Program – Geriatric Medicine. 1985 – 2004.

d.   Development and improvement of Geriatric Medical Curriculum in the Medical School – University of Southern California. 1985 – 2004

e.   Development of Geriatric Medical Core Curriculum for the Medical House Staff – LAC/USC Medical Center, 1985 – 2004

f.   Member of Steering Committee, Key Faculty and Study Site Coordinator – Pacific Geriatric Education Center at the University of Southern California (DHHS), 1984 – 1993.

g.   Attending Physician Year III Medicine Rotation, 1992.

h.   Director and lecturer in various courses at the Ethel Percy Andrus Gerontology Center including Gerontology 599 – Geriatric Health Issues.

6

i. Director – Geriatrics Update – A Board Review Course.

j. Director – History of Medicine in the Health Sciences Program, 1994 – 2001.

2B. Teaching Responsibilities (University of Alaska)

a. Director – Care of the Elderly Conference, University of Alaska, Southeast – Sitka, 1994 – Present

b. Instructor – Promoting Best Practices in Aging, University of Alaska, Anchorage, 2006 – Present

c. Co-Director – University of Washington Medical School 596 – Human Biology – Course for Alaskan Students – Multi-Disciplinary and Ethnicity in Gerontology and Geriatrics. (University of Alaska, Anchorage - Spring and Fall, 2009 and then yearly).

d. Co-Director in Geriatric Education to Alaskan Medical Students in the University of Washington Medical School WW AMI Program, University of Alaska, Anchorage, 2006 – Present

e. Faculty consultant in Geriatrics to Residents of the Alaska Family Medicine Residency Program, 2006 – Present.

3. Administrative Responsibilities

a. Chief of the Division of Geriatric Medicine, Department of Medicine, University of Southern California School of Medicine. In charge of staff and fellow recruitment and training; divisional budget; grant procurement; program development and supervision of research and clinical activity. 1984 – 2005.

b. Study Site Coordinator and Key Faculty of the Pacific Geriatric Education Center, University of Southern California School of Medicine, 1984 – 1993.

c. Senior Staff Physician in charge of Geriatric Programs at Los Angeles County/University of Southern California Medical Center, 1985 – 2004.

d. Chief of Geriatric Medicine at the USC University Hospital, 1991 – 2004.

7

e. Faculty liaison between Geriatric Medicine and University affiliated hospitals and long term care facilities. Director of Geriatric Medicine Private Practice Plan. 1984 – 2004

f. Director of the USC Ambulatory Health Center sites at the Japanese Retirement Homes and Angelus Plaza, 1985 – 1993.

g. Director of the Division of Geriatric Medicine's Program at the V.A. Outpatient Clinic in downtown Los Angeles, 1986 – 2001.

h. Director of the USC Teaching Nursing Home Program at Hollenbeck Home and Atherton Baptist Home, 1999 – 2005.

i. Director of the Senior Cancer Center at Norris Comprehensive Cancer Center and Hospital, 1999 – 2001.

j. Director of the Senior Care Program – USC Care and USC Physicians. 1998 – 2002.

k. Co-Director – Adult Protective Team – Geriatric Medicine Program – LAC/USC Medical Center, 2000 – 2004.

l. Director – Care of the Elderly Conference, University of Alaska Southeast, Sitka, 1994 – Present.

m. Co-Director – Geriatric Education for Alaskan Medical Students in the WWAMI Program, University of Alaska, Anchorage. 2006 – Present.

n. Medical Director – Alaska Geriatric Education Center, University of Alaska, Anchorage. 2005 – Present.

o. Medical Director – National Resource Center for Studies in Native American, Alaskan, and Hawaiian Elders, University of Alaska, Anchorage, 2006 - Present

4. Service

A. University Service

a. Medical Executive Committee, Department of Medicine, USC 1985 – 2003.

b. Utilization Management Committee, USC University Hospital, 1991 – 1999, 2003 – Present, Chairman of this Committee, 1994 – 1999.

c. Pharmacy and Therapeutics Committee, LAC/USC Medical Center, 2001 – 2004.

d. Pharmacy and Therapeutics Committee, USC University Hospital, 1991 – 2005, Chairman, 1996 – 2000.

e. Patient Care Evaluation Committee, USC University Hospital, 1994 – 1999.

f. Lecturer in School of Pharmacy, University of Southern California, 1985 -2004.

g. Continuing Medical Post-Graduate Education Lectures at outlying hospitals, 1979 – 2004.

h. Core Curriculum Committee for the New Medical School Curriculum, USC School of Medicine, 1998 – 2002

i. County Operations Committee, Department of Medicine, LAC/USC Medical Center, 1997 – 2000

j. Development Committee, Department of Medicine, LAC/USC Medical Center, 1997 – 2000.

k. Senior Health Care Program, USC Care, (chair/member), USC 1998 – 2002.

l. Executive Committee, USC Norris Comprehensive Cancer Center and Hospital – Senior Cancer Care Center, 1998 – 2001.

m. Co-Director – Adult Protective Team – Geriatric Medicine Program – LAC/USC Medical Center, 2000 – 2004.

B. Public Service

a. Consultant in Geriatric Medicine and Long Term Care, State of Alaska, Departments of Administration Law, Health and Social Services, 1991 -2004

b. Consultant in Gerontology and Geriatric Medicine, University of Alaska, both at the Anchorage and Sitka campuses, 1994 – present.

c. Board of Directors, California Association of Medical Directors, 1992-1999.

d. Citizen's Oversight Committee – California Stem Cell Research & Cures Act, 2007 – Present.

e. Board of Directors, USC Friends of Music, 1989 – 1997.

f. Task Force on Elder Abuse, City of Los Angeles, 2001 – 2004.

g. California Rare Fruit Growers, 1988 – Present.

h. Pennsylvania Horticulture Society, 1992 – 2007.

i. Affenpinscher Club of America, 2002 – Present.

j. Kennel Club of Pasadena, 2004 – 2007.

5. Military Service

1971 – 1973    Active duty as Surgeon – U.S.P.H.S. serving as Research Associate (Protein Chemistry) in the Laboratory of Chemical Biology with Dr. Robert Goldberger and Dr. Christian Anfinsen, NIAMDD, NIH: Inactive Reserve U.S.P.H.S. 1969 – 1971, 1973 – 1979.

6. Other Activities

a. Editor for ENDOCRINOLOGY for Diabetes and Intermediary Metabolism, 1985 – 1986.

b. Member of the Committee of Interdisciplinary Geriatric Education, Association for Gerontology in Higher Education, 2002 – 2006.

c. Reviewer for:   AMERICAN JOURNAL OF PHYSIOLOGY
ANNALS OF INTERNAL MEDICINE
ARCHIVES OF INTERNAL MEDICINE
BIOCHEMICAL MEDICINE
DIABETES
ENDOCRINILOGY
EXPERIMENTAL GERONTOLOGY
JOURNAL OF CLINICAL ENDOCRINOLOGY AND METABOLISM
JOURNAL OF GERONTOLOGY
HORMONE AND METABOLISM RESEARCH
JOURNAL OF THE AMERICAN GERIATRICS SOCIETY
DRUGS AND AGING
NEW ENGLAND JOURNAL OF MEDICINE

D.    Society Memberships

1.    Local

Cross Town Endocrine Club
Professional Staff Association of LAC/USC Medical Center
Center Fellow of the UCLA/USC Long Term Care Gerontology
Center
Far Eastern Study Center USC/UCLA
California Association of Medical Directors

2.    Regional

Western Society for Clinical Investigation
Western Section of the American Federation for Clinical Research

3.    National

Sigma Xi, Phi Beta Kappa, Phi Lambda Upsilon
The Johns Hopkins Medical and Surgical Society
The Johns Hopkins History of Medicine Club
The Associates of the Countway Library
The American Association for the History of Medicine
American Federation for Clinical Research
American Diabetes Association
The Endocrine Society
American Physiological Society
The Gerontological Society of America
The American Geriatric Society
The American Federation for Aging Research
American Gerontological Association
American Association of Medical Directors

E.    Consultantships and Directorships

1.    Consultant in Geriatric Medicine and Supervisor of the Geriatric Program
at the Veterans Administration Outpatient Clinic in downtown Los
Angeles, 1986 – 2001.

2.    Executive Director of the USC Ambulatory Health Center at Angelus
Plaza, 1989 – 1993.

3.    Board of Directors, California Association of Medical Directors, 1992 –
1999.

4.    Board of Director, USC friends of Music, 1989 – 1997.

11

34

5. Consultant in Geriatric Medicine and Long Term Care — State of Alaska 1991 — 2004:

   a. Department of Administration
   b. Department of Health and Social Services
   c. Department of Law
   d. Mental Health Board

6. Appointments in Geriatrics — University of Alaska:

   a. Sitka

      I. Adjunct Associate Professor of Human Studies, 2003-2006.
      II. Course Director — Care of the Elderly Conference, 1994 Present

   b. Anchorage

      I. Affiliate Professor, College of Arts and Sciences, Biomedical WWAMI Program, 2006 - Present
      II. Consultant, Co-Founder and Medical Director — Alaska Geriatric Institute through the Alaska Geriatric Education Center, 2003 — Present.
      III. Consultant — Institute of Circumpolar Health
      IV. Consultant and Medical Director — National Resource Center for American Indians, Alaska Natives and Native Hawaiian Elders, 2005 — Present.
      V. Faculty Consultant in Geriatrics, Alaska Family Residency Program, 2005 - Present
      VI. Affiliate Professor, College of Health and Social Welfare.

7. Consultant, British Columbia Health Foundation, 1994 — 1999.

8. Consultant in Geriatric Medicine and Long Term Care, Silverado Senior Living Centers, San Juan Capistrano, CA 2001 — 2002.

9. Consultant in Geriatric Medicine and Supervisor of the Geriatric Medicine Medical House Staff Training Program, Kern Medical Center, Bakersfield, CA 1986 — 2003.

10. Consultant in Geriatric Medicine and Supervisor of the Geriatric Family Medicine House Staff Training Program, Glendale Adventist Medical Center, Glendale, CA 1998 — 2001

11. Consultant in Geriatric Program Development – Bay Shores Medical Group, Torrance, CA., 1986 – 1989.

12. Consultant in Geriatric Program Development – San Dimas Community, Hospital, 1986 – 1989.

13. Consultant in Geriatric Program Development and Long Term Care - Keiro Services – The Japanese – American Retirement Homes, Los Angeles, CA., 1986 – 1993.

14. Consultant in Geriatric Program Development and Long Term Care – The Motion Picture and Television Home, Woodland Hills, CA 1986 – 1990.

15. Consultant in Long Term Care and Geriatric Medicine, State of California, Department of Social Services, 2000 – Present.

16. Consultant in Elder Abuse, Geriatric Medicine and Long Term Care, State of California, Department of Justice, Office of the Attorney General, Bureau of Medical Fraud and Elder Abuse, 2000 – Present.

17. Consultant in Long Term Care, Elder Abuse and Geriatric Medicine – State of California, Department of Justice, Office of the Attorney General, Bureau of Medical Fraud and Elder Abuse – Operation Guardians (nursing homes - unannounced inspections) 2000 – Present.

18. Consultant in Long Term Care, Geriatric Medicine and Elder Abuse – State of New Mexico, Department of Justice, Office of the Attorney General, Medicaid Fraud and Elder Abuse Unit, 2003 – Present.

19. Consultant in Long Term Care, Geriatric Medicine and Elder Abuse, United States of America, Department of Justice, Civil Rights Division, 2006 – Present.

20. Consultant in Long Term Care, Geriatric Medicine and Elder Abuse, United States of America, Department of Health and Human Services, Office of the Inspector General, 2006 – Present.

21. Board of Directors, Musica Angelica, 2006 – Present.

F. Research Activities

1. Research Interests

a. Use of medications in the senior populations with specific emphasis on prescribing habits of physicians.

b. Health care systems and delivery modes for the demented elderly in Alaska.
c. Drug interactions in the elderly, looking at drug-drug interactions, changed actions, polypharmacy, misuse and abuse.
d. Studies in the elderly diabetic patient.
e. Studies in the elderly hypertensive patient.
f. Studies in sexual dysfunction in the elderly.
g. Studies in elder abuse.
h. Maintenance of independence of living in frail and demented seniors.

2. Research in Progress: Investigations in man

a. Studies in prescribing habits of physicians in retirement housing.
b. Studies of adverse drug effects in the aging population with special emphasis on the most commonly prescribe medication and psychotropic agents.
c. Studies on care of frail and demented seniors in Alaska.
d. Studies on the prevention and early detection of elder abuse.
e. Studies on decreased longevity in the Pueblo Indians.

G. Long Term Care Experience

1. Director of the two USC Teaching-Nursing Home Programs, 1999 - 2005

a. Hollenbeck Home – Los Angeles
b. Atherton Baptist Home – Alhambra

2. Member and Member Board of Director, California Association of Medical Directors, 1992 – 1999.

3. Consultant – State of Alaska, Department of Administration, Division of Longevity Services (Aging Programs and State of Alaska Long Term Care Facilities – the Pioneers' Homes). 1991 – 2004.

4. Affiliate Professor, College of Health and Social Welfare and College of Arts and Sciences, University of Alaska, Anchorage. Areas of involvement – Alaska Geriatric Education Center, Geriatric Assessment, Pre-med and Medical Education, Long Term Care, 2006 to Present.

5. Consultant – University of Alaska, Sitka. Areas of involvement – Care of Elderly Conference – Director, 1994 - Present

6. Consultant in Long Term Care, Elder Abuse and Geriatric Medicine – State of Alaska, Department of Law, 2000 - 2003

14

7. Consultant in Long Term Care and Geriatric Medicine — State of California, Department of Social Services.

8. Consultant in Long Term Care, Geriatric Medicine and Elder Abuse — State of California, Department of Justice, Office of the Attorney General, Bureau of Medical Fraud and Elder Abuse, 2000 – 2003.

9. Consultant in Long Term Care — State of California, Department of Justice, Office of the Attorney General, Bureau of Medical Fraud and Elder Abuse — Operation Guardians (nursing home- unannounced inspections), 2000 – Present.

10. Consultant in Long Term Care, Geriatric Medicine and Elder Abuse — State of New Mexico, Department of Justice, Office of the Attorney General, Medicaid Fraud and Elder Abuse Unit, 2003 – Present.

11. Consultant in Long Term Care, Geriatric Medicine and Elder Abuse, United States of America, Department of Justice, Civil Rights Division, 2006 – Present.

12. Primary care provider for Geriatric Medicine for Long Term Care Patients — Hollenbeck Home, Los Angeles, California, 1998 – 2004.

13. LAC/USC Medical Center Clinic — Adult Protective Team — Geriatric Medicine — Clinic Co-director, 2000 – 2004.

14. Member of the American Association of Medical Directors.

15. USC — Angeles Plaza — Senior Clinic — Founding Director and care provider (1989 – 1992). (The largest low-income senior housing project in the Western United States).

16. Consultant in Geriatric Medicine and Long Term Care — Silverado Senior Living Centers, San Juan Capistrano, 2001 – 2002.

17. Consultant in Geriatric Program Development and Long Term Care — Keiro Services — The Japanese American Retirement Homes, Los Angeles, 1986 – 1994.

18. Consultant in Geriatric Program Development and Long Term Care — The Motion Picture and Television Home, Woodland Hills, CA, 1986 – 1990

H. Significant Invited Lectures (Since July 1984 – selected from over 3,500 lectures given)

1. Harbor General Hospital — U.C.L.A. Medical Center, 7/84.

15

Medical Grand Rounds – new concepts in the treatment of Type II Diabetes.

2.  Harbor General Hospital – U.C.L.A. Medical Center, 7/84.
    Endocrine Grand Rounds – The newer oral agents.

3.  Martin Luther King General Hospital, Los Angeles, CA, 7/84
    Medical Grand Rounds – The approach to the patient with NIDDM.

4.  Nisei Awareness Day, Little Tokyo, Los Angeles, CA, 7/84
    Health issues for the elderly. Keynote speech.

5.  The Cleveland Clinic, 9/84. Symposium on Diabetes Mellitus –
    The Treatment of the Patient with NIDDM.

6.  American Academy of Family Practice, Kansas City, MO, 10/84
    National Meeting, Invited Speaker:
        a.  Nutrition in the elderly
        b.  New concepts in the therapy of the Type II diabetic patient.

7.  Associates of the Countway Library, Harvard Medical School, 11/84.
    Biannual History of Medicine lecture – "The Black Death Comes to America."

8.  Washington University of St. Louis and St. Louis V.A. Hospital, 11/84.
    Symposium on Diabetes Mellitus – The treatment of hypertension in the patient with Diabetes Mellitus.

9.  The Jackson Laboratory, Bar Harbor, Maine, 12/84.
    Visiting Scientist – Insulin secretion in aging.

10. Gordon Research Conference, Oxnard, CA, 2/85. The biology of aging –
    Invited Speaker – Cyclic AMP and insulin secretion in aging.

11. Thorndike Rounds, Beth Israel Hospital, Boston, MA 3/85.
    The approach to the treatment of diabetes mellitus in the elderly individual.

12. Division on Aging, Harvard Medical School, 3/85.
    Grand Rounds – Hyperosmolar coma – a complication of diabetes mellitus in the Elderly.

13. The University of New Brunswick, Saint John, N.B., 3/85.
    Visiting professor of Biology, Lecture topics:

        a.  The role of calmodulin in insulin secretion.

16

                b. The exciting new approaches to the treatment of diabetes
                    mellitus.

14. Beth Israel Hospital, Boston, MA, 3/85
Endocrine Grand Rounds – Sex and the diabetic.

15. The Johns Hopkins University Scholl of Medicine, Baltimore, MD, 3/85.
Visiting Professor of the History of Medicine. Lecture topic – "Black
Death Come to America."

16. Brigham-Women's Hospital, Boston, MA, 3/85
Endocrine Grand Rounds – Insulin secretion in aging.

17. Yale University School of Medicine, New Haven, CT, 4/85
Endocrine Research Conference – Insulin secretion in aging.
Hypertension Grand Rounds – Special problems of hypertension in
the diabetic patient.

18. University of Florida, Gainesville, FL 4/85
Geriatric Medicine Grand Rounds – The older diabetic patient.

19. University of California at Los Angeles School of Medicine, 4/85. Family
Medicine Grand Rounds – Treatment of diabetes mellitus in the elderly.

20. Stanford University of Medicine – V.A. Hospital, Menlo Park, CA, 5/85,
Clinical Conference – Sexual dysfunction in the elderly.

22. University of Pittsburgh School of Medicine, Pittsburgh, PA, 6/85.
Symposium on Diabetes Mellitus – The older diabetic patient.

23. University of Hawaii School of Medicine, Honolulu, HI, 8/85
Medical Grand Rounds – Diabetes in the elderly.

24. Department of Public Health and Social Welfare, Guam, 8/85
Special Lecture – Wellness and pathology in the elderly.

25. American Academy of Family Practice, Anaheim, CA. 10/85.
National Meeting – Invited Speaker – Diabetes in the elderly.

26. University of California at San Francisco – Valley Medical Center,
Fresno, CA, 11/85. Endocrine symposium – Sexual Dysfunction in the
elderly.

27. Mayor's Conference on Aging, Los Angeles, CA, 3/86. Treatment of
chronic diseases in the elderly.

28. V.A. Hospital, Martinez, CA and U.C. Davis School of Medicine, 4/86. Medical Grand Rounds – Treatment of hypertension in diabetic patients.

29. Pasadena Council on Alcoholism, Pasadena, CA, 4/86. Symposium on the Older Alcoholic Patient. Pathology and normalcy in aging.

30. Brown University Medical School, Providence, RI 4/86. Medical Grand Rounds – Hypertension in the elderly.

31. Medical Board Drug Review, Sacramento, CA, 5/86. Invited Speaker – The new oral agents.

32. Conference – Scientific Basis of Sexual Dysfunction – Sponsored by NIH and the National Kidney Foundation, Baltimore, MD, 6/86.

33. F.D.A. Symposium of Bioequivalence of Solid Preparations, Washington, D.C., 10/86. Invited Speaker – Oral sulfonylurea agents.

34. University of Nevada, Reno, NV, 2/87. Visiting Professor of Medicine, Lecture topic – Sex after 60.

35. University of Guam, Guam, USA, 4/87. Symposium on Care of the Elderly – Symposium Leader.

36. National Council on Hypertension, Biannual Meeting, Las Vegas, NV, 4/87. Invited Speaker – Antihypertensive medications and sexual dysfunction.

37. American Hospital Pharmacists Association, Washington, D.C. 5/87. Invited Speaker – Aging in America – Wellness vs. Disease.

38. University of California, Davis – School of Medicine, 6/87. Course on Medicine, Invited Speaker – Hypertension in the elderly.

39. University of Nevada, Las Vegas, Nevada, 10/87. Visiting Professor of Medicine, Lecture Topics: Geriatric Medicine Today, Geriatric Course Planning.

40. California Pharmacy Association, San Francisco, CA, 11/87. Invited Speaker – Endocrinology of aging.

41. Evanston Hospital, Northwestern University School of Medicine, Evanston, IL, 11/87. Visiting Professor of Medicine, Topic – Sex after 60.

41

42. Conference on Pathogenesis and Treatment of Pressure Sores. Kansas City, MO, 1/88. Invited Speaker.

43. Conference on "What Pharmaceuticals are Needed for the Elderly?" Phoenix, AZ, 2/88. Invited Speaker.

44. Conference on "Post Retirement Health Care Funding" sponsored by I.R.I., New York, NY, 3/88. Invited Speaker – The geriatric imperative.

45. Board Review Course: Geriatrics Update, 1988, U.S.C. School of Medicine, Pasadena, CA, 3/88. Two and one-half day symposium on geriatrics. Director, Moderator and Presenter for the course.

46. Symposium on Geriatric Medicine – Motion Picture and Television Retirement Home And Hospital, Woodland Hills, CA, 4/88. Moderator and Presenter.

47. American Geriatric Society National Meeting, Symposium and Physician – Patient Communication, Anaheim, CA, 5/88. Co-moderator and presenter.

48. Symposium on Geriatric Medicine, San Dimas Community Hospital, San Dimas, CA, 9/88, Moderator and Presenter.

49. American Society for Enteral and Parental Nutrition Conferences: Ethics and Nutrition, New York, NY, 10/88

50. Symposium on Nutrition in the Elderly, California Medical Center, Los Angeles, CA, 12/88. Moderator and Presenter, Topic – Nutrition in the Elderly.

51. California Academy of Family Medicine, Annual Meeting, San Francisco, CA 2/89. Invited Keynote Speaker, Topic – Dementia.

52. Kansas University Medical Center, Family Medicine Grand Rounds, Kansas City, KS, 5/89. Visiting Professor, Topic – Drugs in the elderly.

53. California Association for Homes for the Aged, Annual Meeting. Symposium on Drugs in the Elderly, San Diego, CA, 5/89. Invited Speaker, Topic – Medical Aspects of Drugs in the Elderly.

54. Symposium on Geriatric Care, Motion Picture and Television Home, Woodland Hills, CA, 6/89. Moderator and Presenter, Topic – Tests and exams periodically needed for Senior health

42

55. Symposium of Diseases Affecting Extended Care Management of the Elderly, California Federation on Aging, Newport Beach, CA, 6/89. Moderator.

56. Symposium of Diabetes in the Elderly, USC School of Medicine, Los Angeles, CA, 8/89. Moderator.

57. V.A. Medical Center, Phoenix, AZ, 9/89. Medical Grand Rounds, drugs in the Elderly.

58. Geriatric Medicine Symposium, Hawaii Medical Association, 9/89, Invited Speaker, Topic – Hypertension in the Elderly.

59. University Medical Center of Kansas City, Kansas City, MO, 9/89. Medical Grand Rounds – Sex after 60.

60. National Conference of Consulting Actuaries, Hot Springs, VA, 9/89. Invited Speaker.

61. California Pharmacists Association, Los Angeles, CA, 10/89. Endocrinology in the Elderly. Program Director.

62. Family Medicine Program, Santa Rosa, CA, 11/89. Visiting Professor of Geriatric Medicine.

63. Symposium on Geriatric Medicine. Tacoma General Hospital, Tacoma, WA, 1/90. Course Director and Speaker.

64. Symposium on Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 2/90. Course Director and Speaker.

65. University of Nevada School of Medicine, Reno, NV, 3/90. Visiting Professor of Geriatric Medicine.

66. USC Geriatric Review Course, USC School of Medicine, Los Angeles, CA, 3/90. Two and one-half day intensive course in geriatric medicine. Course Director and Speaker.

67. Eisenhower Hospital, Rancho Mirage, CA, 3/90. Medical Grand Rounds – Drugs in the Elderly.

68. American Geriatric Society Annual Meeting, Atlanta, GA, 5/90. Symposium on Syndrome X: The correlation of diabetes and hypertension.

69. American Diabetes Association Symposium, Santa Barbara, CA, 6/90. Diabetes in The Mexican American Population. Invited Speaker.

70. Loma Linda University School of Medicine, Loma Linda, CA, 7/90. Grand Rounds, Drugs in the Elderly.

71. American Heart Association/ American Diabetes Association Symposium, Santa Barbara, CA, 9/90. Treatment of the hypertensive diabetic patient. Keynote Speaker.

72. Baylor College of Medicine, Houston, TX, 10/90. Symposium on the Complicated Diabetic. Invited Speaker.

73. City of Hope, Duarte, CA, 1/91. Medical Grand Rounds, Diabetes in the Elderly.

74. Providence Hospital, Anchorage, AK, 2/91. Medical Grand Rounds, Sex after 60.

75. Symposium on Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 3/91. Course Director and Speaker.

76. U.C.S.F. — Valley Medical Center, Fresno, CA, 3/91. Medical Grand Rounds, Sex after 60.

77. U.C.D. — Sacramento, CA, 4/91. Medical Grand Rounds, Sex after 60.

78. Chicago Medical College, Chicago, IL, 5/91. Medical Grand Rounds, Drugs in the Elderly.

79. Symposium of Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 2/92. Course Director and Speaker.

80. Department of Administration, State of Alaska, 4/92. Invited Speaker, Assisted living in long term care.

81. International Institute for Research Symposium: Utilities and FAS 106, Washington, D.C., 7/92. Keynote Speaker, Drugs in the retired population.

82. Alaska Geriatric Institute, Anchorage, AK, 2/93, Keynote Speaker.

83. University of Oklahoma, Tulsa, OK, 3/93. Family Medicine Grand Rounds, Drugs in the elderly.

84. Symposium on Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 3/93. Course Director and Speaker.

21

85. Department of Administration, State of Alaska, 4/93. Invited Speaker, Medications in the nursing home population.

86. Dallas Business Group on Health, 5/93. Invited Speaker, Medications in the Elderly.

87. Symposium on Retirement Healthcare Benefits, Chicago, IL, 9/93. Invited Speaker, Medications in the elderly.

88. University of Hawaii, Division of Geriatric Medicine, Honolulu, HI, 10/9/93. Visiting Professor of Geriatric Medicine, Diabetes in the elderly, Use of drugs in the elderly.

89. Providence Hospital, Anchorage, Alaska. Medical Grand Rounds, 2/94. Dementia.

90. Nevada Academy of Family Medicine, Annual Meeting. Lake Tahoe, Nevada, 2/94. Keynote Speaker – Sex after 60.

91. University of Colorado Affiliated Hospital. Medical Grand Rounds, 3/94. Drugs in the Elderly.

92. University of Kentucky Affiliated Hospital. Geriatric Medical Grand Rounds, Lexington, Kentucky, 4/94. Dementia.

93. Alaska Psychiatric Institute – API 2000 Meeting, Anchorage, Alaska, 6/94. Plans for the Future – Consultant and Facilitator.

94. USC School of Medicine, Los Angeles, California – Medical Grand Rounds, 9/94. Drugs in the elderly.

95. Alaska State Mental Health Board – Quarterly Meeting, Dillingham, Alaska, 9/94. Invited Speaker, The Alaska Geriatric Institute.

96. Alzheimer's Society of Northern California, Sacramento, CA, 10/94. Speaker, Research in dementia.

97. Alaska Geriatric Institute, Anchorage, Alaska, 2/95. Organizer and Keynote Speaker. The largest health care symposium in the history of the state of Alaska.

98. V.A. Medical Center Westwood and UCLA – Medical Grand Rounds, 2/95.

99. Symposium on Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 3/95. Course Director and Speaker.

100. Nevada Academy of Family Medicine, Annual Meeting, Lake Tahoe, Nevada, 3/95. Keynote Speaker – Dementia

101. Idaho Academy of Family Medicine, Annual Meeting, Sun Valley, Idaho, 5/95. Keynote Speaker – Dementia: Sex after 60.

102. Martin Luther King, Jr. Medical Center, Los Angeles, CA, 6/95. Medical Grand Rounds – Dementia.

103. Martin Luther King, Jr. Medical Center, Los Angeles, CA, 8/95. Medical Grand Rounds – Sex after 60.

104. University of Alaska, Southeast – Sitka Geriatric Symposium, Sitka, Alaska, 9/95. Organizer, Keynote Speaker.

105. V.A. Outpatient Clinic, Las Vegas, NV, 10/95. Medical Grand Rounds, Dementia.

106. V.A. Outpatient Clinic, Los Angeles, CA, 11/95. Grand Rounds – Dementia.

107. V.A. Outpatient Clinic Los Angeles, CA, 12/95. Grand Rounds – Sleep disorder in the elderly.

108. State of Alaska, Division of Senior Services, 2/96. Lectures and site visits to six State of Alaska nursing homes.

109. Symposium on Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 3/96. Course Director and Speaker.

110. Family Medicine Training Program, Spokane, Washington, 3/96. Lecture – Dementia.

111. Family Medicine Training Program, Central Montana, 4/96. Lecture – Drugs in the Elderly.

112. University of Utah Affiliated Programs, Salt Lake City, 4/96. Lecture – Depression in the Elderly.

113. State of Alaska, Department of Administration, Division of Senior Services, Course Coordinator for visits of 16 Alaskan State officials to USC School of Medicine, Andrus Gerontology Center and affiliated local Southern California Geriatric Programs. Duration – one month, early May to early June, 1996, Los Angeles, CA.

23

114. State of Alaska, Division of Senior Services, Department of Administration. Site visit to Administrative offices for review of Geriatric Programs. Juneau, Alaska, 6/96. Outside Consultant and Lecturer.

115. University of Alaska, Southeast Sitka. Care of the Elderly Symposium, Sitka, Alaska, 9/96. Course Director and Lecturer.

116. Boise Health Consortium — Medical Grand Rounds, Boise, Idaho, 11/96. Sex after 60.

117. Symposium on Long Term Care for Providers, Milwaukee, Wisconsin, 2/97. Keynote Speaker – Drugs in the elderly.

118. Symposium on Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 3/97. Course Director and Speaker.

119. Osteopathic Medical College, Des Moines, Iowa, 4/97. Symposium on diabetes Mellitus, Keynote Speaker — Diabetes in the Elderly.

120. University of Southern Illinois Medical School, Champaign, Urbana, Illinois, 4/97, Medical House Staff Lectures. Topics – Diabetes in the Elderly, Drugs in the Elderly.

121. Allegheny Medical School, Philadelphia, PA, 5/97. Keynote Speaker – Symposium on Diabetes and Lipids in the Elderly.

122. State Senior Care Program, Oklahoma City, Oklahoma, 7/97, Keynote Speaker – State of Oklahoma Senior Care Program.

123. Eastern Carolina University Medical School, Greensboro, North Carolina, 8/97. Medical Grand Rounds.

124. University of Alaska, Southeast Sitka. Care of the Elderly Symposium, Sitka, Alaska, 9/97, Course Director and Lecturer.

125. University of Colorado, Denver, CO, 10/97. University of Colorado Affiliated Programs, Several States, Medical Grand Rounds.

126. Arizona Chapter of the American Gerontologic Society, Phoenix, AZ, 11/97. Sex After 60.

127. Symposium of Geriatric Medicine, Antelope Valley Medical Center, Lancaster, CA, 3/98. Course Director and Speaker.

128. Medical University of South Carolina, Charleston, South Carolina, 4/98. Family Medicine Grand Rounds, Sex After 60.

129. University of Colorado, Denver, CO, 4/98, University of Colorado Affiliated Programs, Several Sites, Medical Grand Rounds.

130. Eisenhower Medical Center, Rancho Mirage, CA, 4/98. Medical Grand Rounds, Drugs in the Elderly.

131. University of Alaska and U.S.C., Sitka, Alaska, 9/98. Care of the Elderly Symposium, Course Director and Speaker.

132. University of South Carolina School of Medicine, Charleston, South Carolina, 10/98. Family Medicine Grand Rounds, Sex After 60.

133. V.A. Outpatient Clinic, Los Angeles, CA, 10/98. Memorial Lecture Series, Medications in the Elderly.

134. V.A. Outpatient Clinic, Los Angeles, CA, 10/98, Memorial Lecture Series Alzheimer's disease.

135. Visiting Professor of Geriatric Medicine, Alaska Geriatric Institute, Anchorage, Alaska, April, 1/99. Multiple Lectures.

136. Visiting Professor of Geriatric Medicine, University of New Mexico School of Medicine, Albuquerque, New Mexico, 6/99, Alzheimer's disease.

137. University of Alaska, Sitka, Alaska, 9/17/99-9/19/99. Care of the Elderly Conference, Course Director and Lecturer.

138. Visiting Professor of Geriatric Medicine, University of Arizona Affiliated Hospitals of Tucson and Phoenix, AZ, 10/20/99-10/23/99.

139. Symposium of the Gerontological Society of America, San Francisco, CA, 11/21/99. Interdisciplinary Approaches to Teaching Geriatrics, Invited Speaker.

140. State of Alaska, Anchorage, Alaska, 2/20/00-2/23/00. Task Force for the Assessment of Assisted Living in the Pioneers' Homes, Leader and Spokesperson.

141. Visiting Professor of Geriatric Medicine, University of Colorado School of Medicine Affiliated Hospitals, Denver, Colorado, 3/7/00-3/8/00.

142. Visiting Professor of Geriatric Medicine, Affiliated Internal Medicine Programs, El Paso, Texas, 4/26/00-4/27/00.

48

143. Newport Beach, California, 5/5/00. Annual Meeting of the California Association of Medical Directors, Invited Speaker.

144. Antelope Valley Hospital, Lancaster, California. Medical Grand Rounds, 11/17/99. Treatment of Arthritic Pain in the Elderly.

145. Kern County Medical Center, Bakersfield, California. Medical Grand Rounds, 1/7/00. Hazards of Drug Therapies in the Elderly.

146. Hoag Hospital, Newport Beach, California. Medical Grand Rounds, 3/10/00. Sex After 60.

147. Visiting Professor of Geriatric Medicine, Affiliated Internal Medicine Programs, El Paso, Texas. 4/26/00-4/27/00

148. Arrowhead Medical Center, San Bernardino County Hospital, Colton, California, 5/17/00. Medications in the Elderly.

149. "Annual Meeting of the California Association of Medical Directors," Invited Speaker, Newport Beach, California. 5/5/00.

150. Riverside General Hospital, Merino Valley, California, 6/16/06. Medical Grand Rounds, Medications in the Elderly.

151. The Elderly Diabetic. Care of the Elderly Conference, University of Alaska, Sitka, Alaska, 9/21/00.

152. Treatment of Arthritic Pain. Care of the Elderly Conference, University of Alaska, Sitka, Alaska, 9/21/00.

153. Depression in the Elderly. Care of the Elderly Conference, University of Alaska, Sitka, Alaska, 9/21/00.

154. Treatment of Hypertension in the Elderly. Care of the Elderly Conference, University of Alaska, Sitka, Alaska, 9/21/00.

155. Medications in the Elderly. Continuous Quality Improvement (CQI) in the State-Assisted Living Facilities, Department of Administration, State of Alaska, Anchorage, Alaska, 11/13/00.

156. Falls in the Elderly. Continuous Quality Improvement (CQI) in the State-Assisted Living Facilities, Department of Administration, State of Alaska, Anchorage, Alaska, 11/13/00.

157. Dementia. Memorial Lecture Series, Outpatient Department, Veterans Administration, Los Angeles, California, 1/2/01.

158. Geropsychiatric Assessment of the Elderly. Bureau of Medi-Cal Fraud and Elder Abuse, Department of Justice, State of California, Ontario California, 2/22/01.

159. Treating Chronic Pain in the Elderly. Memorial Lecture Series, Outpatient Department, Veterans Administration Los Angeles, California, 1/2/01.

160. Medications in the Elderly. Continuous Quality Improvement (CQI) and the Risk-Plus Program in the State-Assisted Living Facilities, Department of Administration, State of Alaska, Sitka, Alaska, 5/1/01.

161. Falls in the Elderly. Continuous Quality Improvement (CQI) and the Risk-Plus Program in the State-Assisted Living Facilities, Department of Administration, State of Alaska, Sitka, Alaska, 5/1/01.

162. Sexuality. North American Forum on Women's Health, Los Angeles, California, 6/19/01.

163. Alzheimer's Disease. North American Forum on Women's Health, Los Angeles, California, 6/19/01

164. Geropsychological Evaluation of Seniors. Symposium on Elder Abuse. Department of Justice-Bureau of Medical Fraud and Elder Abuse, Rancho Mirage, California, 9/7/01

165. Depression in the Elderly. Hoag Hospital. Newport Beach, California, 9/7/01.

166. Sleep Disorders in the Elderly. Care of the Elderly Conference. University of Alaska – Sitka, Sitka, Alaska, 9/23/01.

167. Medications in the Elderly. Memorial Hospital, Santa Rosa, California, 10/19/01.

168. Dementia. Medical Grand Rounds, Riverside General Hospital, Marino Valley, California, 11/15/01.

169. Dementia in the Elderly. Medical Grand Rounds, Arrowhead Medical Center, San Bernardino General Hospital, Colton, California, 11/29/01.

170. Patient and Family Satisfaction in Long Term Care. Alaska Pioneers' Home, Anchorage, Alaska. A site visit and symposium, 12/11/01-12/15/01.

50

171. Normal Aging vs. Disease. Symposium on Geriatric Medicine. Annenberg Center, Rancho Mirage, California, 2/2/02.

172. Medications in the Elderly, Memorial Lecture Series, Outpatient Department, Veterans Administration, Los Angeles, California, 2/26/02.

173. Life Style Redesign in Elder Care. 2nd Annual North American Forum on Women's Health, Anaheim, California, 3/1/02.

174. Dementia in the Elderly. Memorial Lecture Series, Outpatient Department, Veterans Administration, Los Angeles, California, 3/12/02.

175. Diabetes in the Elderly. Endocrine Grand Rounds. Harbor General Hospital, Torrance, California, 4/1/0/2.

176. Medications in the Elderly. Multi-lecture series, Commission on Aging, State of Alaska, Anchorage and Fairbanks, 4/22/02-4/26/02.

177. Treatment of Pain in the Elderly. Care of the Elderly Conference, University of Alaska, Sitka. Sitka, Alaska, 9/19/02.

178. Treatment of Cardiovascular Risk Factors in the Elderly. Care of the Elderly Conference, University of Alaska, Sitka, Alaska 9/19/02.

179. Special Issues in Long Term Care. Assessment and Evaluation of the Anchorage Pioneers' Home, Anchorage, Alaska, 12/10-12/14/02.

180. Identification and Treatment of Cardiovascular Risk Factors in the Elderly – A symposium Montgomery Cardiology Programs. Montgomery, Alabama, 3/21/03.

181. Medications in the Elderly. Multi-lecture series, Commission on Aging, State of Alaska, Anchorage and Fairbanks, 4/23-4/26/03.

182. Assessment of Mental Competency and Discussion of an Elder Abuse Case. Symposium on Elder Abuse, Department of Justice – Bureau of Medi-Cal Fraud and Elder Abuse, Squaw Valley, California, 5/27-5/30/03.

183. Medications in the Elderly. Multi-lecture series, Commission on Aging, State of Alaska, Juneau and Ketchikan, 6/27-6/29/03.

184. Dementia in the Elderly: Medications in the Elderly. Care of the Elderly Conference, University of Alaska, Sitka, Sitka, Alaska, 9/18-9/19/03.

185. Dementia. Geriatric Symposium – St. Mary's Hospital and Scan, Long Beach, California, 10/4/03.

186. Senior Assessment for the Care Provider. Public Health Forum – State of Alaska. Anchorage, Alaska, 12/1/03.

187. Senior Assessment Workshop. Alaska Geriatric Education Center, University of Alaska, Anchorage, Alaska, 1/23/04.

188. Sleep Disorders in the Elderly. Coping with Chronic Disease. Care of the Elderly Conference, University of Alaska, Anchorage, Alaska, 9/17/04.

189. Elder Abuse. Coping with Chronic Disease. Cardiovascular Risk Factors in the Elderly. Senior Lives Conference, University of Alaska, Anchorage, Alaska 6/10/05.

190. Assessment of the Chart in Skilled Nursing Facilities. Symposium on Elder Abuse, Department of Justice, Bureau of Medical Fraud and Elder Abuse, Long Beach, California, 6/6-6/9/05.

191. Coping with Chronic Disease. The Chart in the Skilled Nursing Home. Care of the Elderly Conference, University of Alaska, Sitka, 9/16/05.

192. Sex After 60. The Chart in the Skilled Nursing Home. Promoting Best Practices in Aging Conference, University of Alaska, Anchorage – 6/8/06 – 6/10/06.

193. Medical Realities and Diminished Tribal Longevity. New Aspects of Long Term Care. Care of the Elderly Conference, University of Alaska , Sitka, 9/14/06 – 9/16/06.

194. Standard of Care, Symposium on Elder Abuse, Department of Justice, State of California, Bureau of Medi-CAL Fraud and Elder Abuse, San Mateo, California May 2007.

195. Integrated Therapies for Aging. The Therapies, Care of the Elderly Conference, University of Alaska, Southeast, Sitka 9/25/08 – 9/27/08.

196. Human Biology 596 Course University of Washington Medical School – WWAMI Program – Multi-Disciplinary and Ethnicity in Gerontology and Geriatrics. Lectures to Alaskan Medical Students, University of Alaska, Anchorage, April 2009.

197. Mental Health and Dementia. Inter-disciplinary Practice in Geriatrics Sex After 60. Prompting Best Practices in Aging Conference, University of Alaska, Anchorage, 6/3/09 – 6/5/09.

I. PUBLICATIONS

29

Papers — Peer Review

1. McCleverty, J.A. and Wilkinson, G. (Submitters), Lipson, L.G., Maddox, M.D. and Kaesz, H.D. (Checkers): Dichlorotetracarbonyldirhodium. Inorganic Synthesis Vol. VIII, oltzclaw, H.F., Jr. (Ed) McGraw-Hill, New York, 1966, pp.211-214.

2. McCleverty, J.A. and Wilkinson, G. (Submitters), Lipson, L.G., Maddox, M.D. and Kaesz, H.D. (Checkers): Chlorocarbonylbis (triphenylphospine) rhodium and chlorocarbonylbis (triphenylarsine) rhodium. Inorganic Synthesis Vol. VIII, Holtzclaw, H.G. Jr. (Ed), McGraw-Hill, New York, NY 1966, pp214-217.

3. Lipson, L.G., Capuzzi, C.M. and Margolis, S.M: Effect on method of cell isolation on the metabolic activity of isolated rat liver cells. J. CellSC. 10:167-179, 1972.

4. Lipson, L.G.: Plague in San Francisco in 1900, Ann. Int. Med. 77:303-310, 1972.

5. Kohler, T.R., Lipson, L.G., Flores, J., Witkum, P.A., Fischer, J.B., and Sharp, G.W.G.: Sequence of events in the activation of adenylate cyclase by cholera toxin. Bull Schweitz, Akad. Med. Wiss. 32-223-232, 1976.

6. Beiteins, I.Z., Lipson, L.G. and McCarthur, J.W.:Luteinizing hormone, follicle stimulating hormone and their subunits released in culture by human pituitary tumors. J. Clin. Endo. Metab. 45:1271-1280, 1977.

7. Fischer, J.B., Kohler, T.R., Lipson, L.G., Flores, J., Witkam, P.A., and Sharp, G.W.G.: Studies on the time course and rate limiting steps in the activation of adenylate cyclase by cholera toxin. Biochem. J. 173: 59-64, 1978.

8. Lipson, L.G., Beitins, I.Z., Kornblith, P.D., McArthur, J.W., Friesen, H.G., Kliman, B. and Kjelberg, R.N.: Tissue culture studies on human pituitary tumors: Radioimmunoassay of anterior pituitary hormones in culture medium. Acta. Endocrin. 88:239-249, 1978.

9. Lipson, L.G. and Sharp, G.W.G.: Insulin secretion in pregnancy: Studies on adenylate Cyclase, phosphodiestarase, protein kinase and phosphoprotein phosphotase in Isolated islets of Langerhans of the rat. Endocrinology 103:1272-1280, 1978.

10. Lipson, L.G., Beitins, I.Z., Kornblith, P.D., McArthur, J.W., Friesen, H.G., Kliman, B. and Kjelberg, R.N.: Tissue culture studies on human

pituitary tumors: Long-term release of anterior pituitary hormones. Acta. Endocrin. 90:421-433, 1979.

11.    Lipson, L.G., Siegal, E., Wohlheim, C.B. and Sharp, G.W.G.: Insulin release in fasting: Studies on adenylate cyclase, phosphodiestarase, protein kinase and phosphoprotein phosphatase in isolated islets of Langerhans of the rat. Endocrinology 105:702-717, 1979.

12.    Lipson, L.G., Bush, M.J., Tietjen, G.E. and Yoon, A.: Role of the adenylate cyclase system in altered insulin release from islets of Langerhans of aging rats. Acta. Endocrin. 96:222-226, 1981.

13.    Lipson, L.G., Bobrycki, V.A., Bush, M.J., Tietjen, G.E. and Yoon, A.: Insulin release in aging: Studies on adenylate cyclase, phosphodiestarase and protein kinase in islolated islets on Langerhans of the rat. Endocrinology 108: 602-624, 1981.

14.    Lipson, L.G., Moore, D., Pope, A.M., Todd, G.J., and Avila, S.: Sexual dysfunction in Hypertensive diabetic patients. J. Cardiovascular Med. 6: Supp. 1, 30-37, 1981.

15.    Cotton, D.B., Strassner, H.G., Lipson, L.G., and Goldstein, D.A.: The effects of terbutaline on acid-base, electrolytes and glucose homeostasis during the management of preterm labor. Am. J. Obstet. And Gyn. 141: 617-624, 1982.

16.    Oldham, S.B., Lipson, L.G. and Tietjen, G.E.: Evidence for the presence of calmodulin in human parathyroid tissue. Mineral and Electrolyte Metabolism 7: 273-280, 1982.

17.    Lipson, L.G., Oldham, S.B.: The presence of calmodulin – stimulatable phosphodiestarase in pancreatic islets of Langerhans of pregnant and normal female rates. Life Sciences 32: 775-780, 1983.

18.    Mircheff, A.C., Conteas, C.N., Lu, C.C., Santiago, N.A., Gray, G.M. and Lipson, L.G.: Basal-lateral and intracellular membrane populations of the rate exorbital lacrimal gland. Am. J. Physiol. 245: G 133-142, 1983.

19.    Premdas, F.H., Molina, J.M. and Lipson, L.G.: Insulin release in aging: Role of glyceraldehydes. Acta. Endocrin. 103: 539-543, 1983.

20.    Lipson, L.G. and Lipson, M.: Treatment of the obese maturity onset diabetic patient, Arch. Int. Med. 144: 135-138, 1984.

54

21. Oldham, S.B., Molloy, C. and Lipson, L.G.: Calcium inhibition of adenylate cyclase in the parathyroid gland. Endocrinology 114: 207-214, 1984.

22. Lipson, L.G.: Sexual dysfunction in the diabetic patient with hypertension. Am. J. Cardiol. 53: 46A-50A, 1984.

23. Lipson, L.G.: Special problems in the treatment of hypertension in the patient with diabetes mellitus. Arch. Int. Med. 144: 1829-1831, 1984.

24. Oldham, S.B., Rude, R.K., Molloy, C. and Lipson, L.G.: The effect of magnesium on calcium inhibition of parathyroid adenylate cyclase. Endocrinology. 115: 1883-1890, 1984.

25. Molina, J.M., Premdas, F.H., Klenck, R.E., Eddlestone, G., Oldham, S.B. and Lipson, L.G.: The dynamic insulin secretory response of isolated pancreatic islets of the diabetic mouse: Evidence for a gene dosage effect on insulin secretion. Diabetes 33: 1120-1123.

26. Eddlestone, G.T., Oldham, S.B., Lipson, L.G., Premdas, F.H. and Beigelman, P.M.: Electrical activity, cAMP concentration and insulin release in mouse islets of Langerhans, Am. J. Physiol. 248: C 145-153, 1985.

27. Molina, J.M., Premdas, F.H. and Lipson, L.G.: Insulin release in aging: Dynamic response of isolated islets of Langerhans of the rat to D-glyceraldehyde. Endocrinology 116: 821-826, 1985.

28. Oldham, S.B. and Lipson, L.G.: The high affinity calcium inhibition of parathyroid adenylate cyclase is not calmodulin-dependent. Calcif, Tissue Int. 38: 275-281, 1986.

29. Bailey, C.J., Day, D., Bray, G.A., Lipson, L.G. and Flatt, P.R.: Role of adrenal glands in the development of the abnormal glucose and insulin homeostasis in genetically obese (ob/ob) mice. Hormone and Metabolism Research. 18: 357-360, 1986.

30. Prochazka, M., Premdas, F.H., Leiter, E.H. and Lipson, L.G.: Estrone treatment dissociates primary versus secondary consequences of "diabetes" (DB) gene expression in mice. Diabetes, 35: 725-728, 1986.

31. Lipson, L.G.: Diabetes in the elderly: Diagnosis, pathogenesis, and therapy. Am. J. Med. 80: Supp. 5A: 10-21, 1986.

32. Fadda, G.Z., Akmal, M., Premdas, F.H., Lipson, L.G. and Massry, S.G.: Insulin release from pancreatic islets: Effects of CRF and excess PTH. Kidney Int. 33: 1066-1072, 1988.

33. Leiter, E. H., Premdas, F.H., Harrison, D.H. and Lipson, L.G.: Aging and glucose homeostasis in C57BL/6J male mice. FASEB Journal. 2: 2807-2811, 1988.

34. Fadda, G.Z., Akmal, M., Lipson, L.G., Soliman, A. and Massry, S.G.: Correction of glucose intolerance and the impaired insulin release of chronic renal failure by verapamil. Kidney Int. 36: 773-770, 1989.

35. Fadda, G.Z., Akmal, M., Lipson, L.G. and Massry, S.G.: Direct effect of parathyroid hormone secretion from pancreatic islets. Am. J. Physiol., 258 (Endocrinol. Metab. 21): E975-E984, 1990.

36. Mulligan, R., Lipson, L.G. and Heaton, S. G.: Detecting diabetes in an elderly dental patient population. Special care in Dentistry: Feature Article: September-October, 142-147, 1990.

37. Xin-Gin, Z., Fadda, G.Z., Lipson, L.G. and Massry, S.G.: Phosphate depletion impairs insulin secretion by pancreatic islets. Kid. Int. 39: 120-128, 1991.

38. Fadda, G.Z., Hajjar, S.M., Perna, A.F., Chau, X.J., Lipson, L.G. and Massry, S.G.: On the mechanisms of impaired insulin secretion in chronic renal failure. Jour. Clin. Invest. 87: 225-261, 1991.

39. Clark, F. Carlson, M., Zimke, R., Frank, G., Patterson, K., Larson, B., Rankin-Martinez, A., Hobson, L., Crandall, J., Mandel, D. and Lipson, L.G.: A qualitative study of the life domains and adaptive strategies of the low income, well elderly. Am. J. Occup. Therapy, 1994

40. Clark F. Carlson, M., Zimke, R., Frank, G., Patterson, K., Ennevor, B., Rankin-Martinez, A., Hobson, L., Crandall, J., Mandel, D.and Lipson, L.G.: Life domains and adaptive strategies of a group of low-income, well older adults. Am. Jr. of Occupational Therapy, 99-108, 1995.

41. Rho, Jay P. and Lipson, L.G.: Focus on acetylcholinestrerase inhibitor for the treatment of Alzheimer's disease. Formulary, Vol. 32, 677-684, 1997.

42. Clark, F., Azen, S.P., Zemke, R., Jackson, J., Carlson, M., Mandel, D., Hay, J., Josephson, K., Cherry, B., Hessle, C., Palmer, J. and Lipson, L.G.: Occupational Therapy for Independent-Living Older Adults. JAMA, 278: 1321-1326, 1997.

56

43. Clark, F., Azen, S.P., Carlson, M., Mandel, D., LaBree, L., Hay, J., Zemke, R., Jackson, J. and Lipson, L.G.: Embedding health-promoting changes into the daily lives of independent-living older adults: Long-term follow-up of occupational therapy intervention. Journal of Gerontology: Psychological Sciences, 56B, pp. 60-63, 2001.

Requested Chapters, Papers, and Monograms

1. Sharp, G.W.G., Fisher, J.G., Lipson, L.G., Kohler, T.R., Flores, J. and Witkum, P.A.: Time course studies on the mechanisms of action cholera toxin. Hormonal Receptors in Digestive Tract Physiology. In Bonfils, S., Fromageot, P., Rosselin, G. (eds.), Eldevier-North Holland Biomedical Press, Amdsterdam, pp.447-454, 1976.

2. Sharp, G.W.G., Wiedenkeller, D.E., Lipson, L.G., Oldham, S.B., Krausz, Y., Janjis, D., Pian-Smith, M.C.M. and Wollheim, C.B.: Multiple roled of calmodulin, the endocrine pancreas and the control of insulin secretion. Proceedings of the 11th Congress of the International Diabetes Federation. Int. Congress Series #600: Excerpta Medica, Princeton, N.J., Mngola, En.N. (Ed.) pp 329-336, 1983.

3. Lipson, L.G.: Hypertension and diabetes mellitus. Diabetes forecast 38:53, 1985.

4. Lipson, L.G.: Diabetes mellitus in the elderly: Special problems, special approaches. Co. Medical, New York, N.Y., pp. 1-20, 1985.

5. Lipson, L.G.: Diabetes after sixty-five. Diabetes Forecast. Vol. 39, No. 7, 54-58, 1986.

6. Lipson, L.G.: Diabetes in the elderly: A multifaceted problem. Am. J. Med. 80: supp. 5A:1-2, 1986.

7. Lipson, L.G. and Bray, G.A." Energy intake and utilization in aging man: Chen (ed.), Nutritional Aspects of Aging, Vol. 1, CRC press, Inc., Boca Raton, FL. Pp. 184-185, 1986.

8. Lipson, L.G.: Diabetes and aging. In Beigelman, P.M. and Kuman, D., (Eds), Diabetes Mellitus for the house officer. Williams and Wilkins, Baltimore, MD., pp. 184-185, 1986.

9. Lipson, L.G. and Kumar, D.: Oral hypoglycemic agents. In Beigelman, P.M. and Kumar, D. (Eds.) Diabetes Mellitus for the House Officer. Williams and Wilkins, Baltimore, MC. Pp. 112-118, 1986.

57

10. Lipson, L.G.: Dental problems in the diabetic patients. In Beigelman, P.M. and Kumar, D. (Eds.) Diabetes Mellitus for the House Officer. Williams and Wilkins, Baltimore, MD., pp. 181-183, 1986.

11. Lipson, L.G.,: Hypertension in the diabetic patient. In Beigelman, P.M. and Kumar, D., (Eds.) Diabetes Mellitus for the House Officer. Williams and Wilkins, Baltimore, MD., pp 160-163, 1986.

12. Lipson, L.G.: Hypertension in the diabetic patient. In Beigelman, P.M. and Kumar, D., (Eds.), Diabetes Mellitus for the House Officer. Williams and Wilkins, Baltimore, MD., pp. 173-175, 1986

13. Dinwiddie, R. and Lipson, L.G.: Improved control of serum glucose in obese, new-onset Insulinopenic non-insulin dependent diabetes mellitus: Partial respiration of Norman dynamic insulin secretion. Roerig Division, pp. 1-6, 1986.

14. Lipson, L.G. and Kato-Palmer, S.: Diabetes in Asians. Diabetes Forecast, Vol. 41, No. 9, 48-51, 1988.

15. Lipson, L.G., Kato-Palmer, S., Boggs, W.L., Moore,D., and ope, A.: Diabetes in the Black population. Diabetes Forecast Vol. 41, No. 9, pp. 34-38, 1988.

16. Williams, B.R., Nichol, M.B., Lowe, B.F., McCombs, J.S., Yoon, P.S. and Lipson, L.G.: pharmacist intervention residential care facilities. In Rowe, J.W. and Ahronheim, J.C. (Eds.) Annual Review of Gerontology and Geriatrics; Focus on Medications and the Elderly. Springer Publishing Co. New York, N.Y., pp. 150-162, Vol. 12, 1992.

17. The Use of Medications: A Training and Reference Manual Developed for Staff in Residential Care Facilities for the Elderly, 1195. Lipson, L.G. – Project Co-Director.

18. Weiner, J. and Lipson, L.G.: Human diseases as models of accelerated aging. In Rosen, C., Glowacki, J. and Bilezikian, J. (Eds.) The Aging Skeleton, Academic Press, Chapter 6: pp. 51-58, 1999.

19. Raghaven, D., Weiner, J. and Lipson, L.G.: Cancer in the elderly : principles of treatment in Soulhami, R.L. et al (Eds.), Oxford Textbook Oncology, 2nd Edition, Oxford University Press, Oxford, London, 1999.

Films and Videos

58

1.  Discharge Planning for the Elderly Hospitalized Patient: I. What to do when you go Home. Hospital Satellite Network, 1986. 15 min. L.G. Lipson – Moderator and Context Exper.

2.  Discharged Planning for the Elderly Hospitalized Patient: II. The patient with acute medical problems after discharge. Hospital Satellite Network, 1986, 15 min. L.G. Lipson – Moderator and content expert.

3.  Discharge Planning for the Elderly Hospitalized Patient: III. The chronically disabled patient. Hospital Satellite Network, 1986, 15 min. L.G. Lipson – Moderator and content expert.

4.  Discharge Planning for the Elderly Hospitalized Patient: IV. Community programs for the elderly. Hospital Satellite Network, 1986, 15 min. L.G. Lipson – Moderator and content expert.

5.  Normal Aging Versus Disease. Physician Journal Update. Lifetime Network, 1987, 15 min. L.G. Lipson – Content expert.

6.  Drugs and the Elderly. Physician's Journal Update. Lifetime Network, 1987, 15 min. L.G. Lipson – Content expert.

7-26.  Caring for and Aging Society. 20 videos on various aspects of Geriatrics and Gerontology. Each 30 minutes in length. Producer – Neil Steinberg Productions, Executive Producers – Hospital Satellite Network and Age Wave, Sponsor – Marion Laboratories. 1987-1988. L.G. Lipson – Technical advisor and content expert.

## CARING FOR AN AGING SOCIETY

### SHOW TITLES AND NUMBER

| NSP# | HSN# | TITLE | EXPERT |
|------|------|-------|--------|
| 001 | 8649X | NEW IMAGES OF AGING (F) | DYCHTWALD |
| 002 | 0462X | HOW TO TALK TO YOUR DOCTOR (F) | LIPSON |
| 003 | 5733X | GERIATRIC ASESSMENT (F) | BUTLER |
| 004 | 8648X | DRUGS AND THE ELDERLY (F) | LAMY |
| 005 | 7716X | ACUTE CARE GERIATRIC NURSING (F) | FULMER |
| 006 | 5734X | HEART DISEASE AND THE ELDERLY (F) | SWAN |
| 012 | 8650X | PRINCEPLES OF AGING (F) | HAZZARD |
| 013 | 5735X | PRESENTATION OF DISEASE (F) | ABRASS |
| 014 | 5736X | GEROPSYCHIATRIC FOUNDATIONS (W) | OLSEN |
| 015 | 5737X | PHYSICIAN'S ROLE IN DRUG THERAPY (F) | VESTAL |
| 016 | 8652X | ETHICAL ISSUES IN ELDERCARE (F) | CASSEL |
| 017 | 7717X | GEROPSYCHIATRIC NURSING (W) | WYKLE |
| 018 | 6725X | THE HUB CONCEPT (W) | DYCHTWALD |
| 019 | 6726X | ELDERCARE FINANCING (W) | DYCHTWALD |

59

| 020 | 6727X | ELDERCARE: MODELS OF SUCCESS (F) | DYCHTWALD |
|-----|-------|----------------------------------|-----------|
| 021 | 5738X | DIABETES IN THE ELDERLY (W) | LIPSON |
| 022 | 8651X | GERIATRIC DISCHARGE PLANNING (F) | WERTHEIMER |
| 023 | 0473X | PROMOTING WELLNESS (W) | FARQUHAR |
| 024 | 0475X | SELF-MEDICATION IN THE ELDERLY (W) | SIMONSON |
| 025 | 0474X | FAMILY ROLES IN HEALTHCARE FOR THE ELDERLY | BRATTER |

27. Medical Checkup: Health Awareness '88. Aging in the Black Community. A 30 min. Video. Producer, Mark Alyn Communications, Sponsor – Marion Laboratories, 1988. L.G. Lipson – Moderator and content expert.

28. Medical Checkup: Health Awareness '88 Aging in the Hispanic Community. A 30 min. Video. Producer, Mark Alyn Communications, Sponsor – Marion Laboratories, 1988. L.G. Lipson – Moderator and content expert.

29. Medical Checkup: Health Awareness '88. Aging in the Asian Community. A 30 min. Video. Producer, Mark Alyn Communications, Sponsor – Marion Laboratories, 1988. L.G. Lipson – Moderator and content expert.

30. Medical Checkup: Health Awareness '88. Diabetes Mellitus in the Black Community. A 30 min. Video. Producer, Mark Alyn Communications, Sponsor – Marion Laboratories, 1988. L.G. Lipson – Moderator and content expert.

31. Medical Checkup: Health Awareness '88. Diabetes Mellitus in the Asian Community. A 30 min. Video. Producer, Mark Alyn Communications, Sponsor – Marion Laboratories, 1988. L.G. Lipson – Moderator and content expert.

32. Medical Checkup: Health Awareness '88. Diabetes Mellitus in the Hispanic Community. A 30 min. Video. Producer, Mark Alyn Communications, Sponsor – Marion Laboratories, 1988. L.G. Lipson – Moderator and content expert.

33-38. Diet and Exercise – Lifestyles for Aging. Hospital Satellite Network. Six 10-minute Segments, 1989. L.G. Lipson – content expert.

39. How to Talk to the Older Patient. Baylor Hospital and Age Wave, 1989. L.G. Lipson – Medical Moderator and content expert.

40-41. The Aging Skin. Age Wave, 1991. L.G. Lipson – Medical Editor.

42. Diabetes and the Elderly. Living with Diabetes: Diabetes on the Air, 1991.

43. Sex and Sexuality in Seniors – A Documentary, 1999 L.G. Lipson – Guest Expert.

Abstracts

60

*1.     Lipson, L.G., Margolis, S.M. and Capuzzi, D.M.: Comparison of acetate and amino acid incorporation in rat liver cells isolated by three techniques. Fed. Proc. 28:336 (abst. 607), 1969.

2.     Lipson, L.G., Ackerman, I.P. and Kliman, B.: simultaneous acromegaly and partially suppressible adrenocortical function in a patient with a pituitary tumor. Clin. Res. 24: 274A, 1976.

3.     Lipson. L.G., Beitins, I.Z., Kornblith, P.D., McArthur, J. W., Friesen, H.G., Kliman, B. and Kjelberg, R.N. Hormone secretory patterns of human pituitary tumors in tissue culture. Clin. Res. 328A, 1976.

4.     Lipson, L.G., Forristall, C.A. and Sharp, G.W.G. Phosphorylation and dephosphorylation in the control of the insulin release: Islet phosphoprotein phosphatase. Diabetes 25: Supp. 1,374 (abst. 213), 1976.

*5.     Lipson, L.G., Vachon, C., Forristall, C.A., and Sharp, G.W.G.: Stimulation of specific protein phosphorylation in intact rats islets of Langerhans by both 3-isobutyl-l-methlxanthine and D-glucose. Clin. Res. 26:530A, 1978.

6.     Lipson, L.G. and Sharp, G.W.G.: Insulin release in pregnancy; Relatiorship to protein and phosphorylation. Endocrinology 102: (abst. 711), 1978.

7.     Lipson, L.G. Wollheim, C.B. and Sharp, G.W.G.: Insulin release in fasting. Diabetes 27: Supp. 2, 489 (abst. 236), 1978.

8.     Lipson, L.G., Bobrycki, V.A., Bush, M.J., Gross, E. and Inouyte, D.: Role of adenylate cyclase system in altered insulin release from islets of aged rats. Clin.Res. 28:51A, 1980.

*9.     Cotton, D.B., Strassner, H.G., Lipson, L.G. and Goldstein, D.A.: Effect of terbutaline on serum concentrations of glucose, insulin, potassium, ionized and total calcium lactate, and colloid osmotic pressure. Gyecol. Invest. 1980.,

*10.     Lipson, L.G., Bush, M.J., Tietjen, G.E. and Yoon, A.: Insulin release in aging: the role of adenylate cyclase system. Endocrinology 106: (abst. 34), 1980.

11.     Mircheff, a.C., Lipson, L.G., Bush, M.J., Yoon, A. and Barish, J.J.: Analytical fraction of B-cells. Diabetes 29: Supp. 2, 109A (abst. 425), 1980

12.     Moore, D., Pope, A.M., Todd, G.J., Rosenquist, R.J., and Lipson, L.G.: Treatment of hypertensive diabetic patients with prazosin. Diabetes 29: Supp. 2, 67A (abst. 267) 1980.

*13.     Oldham, S.B., Lopson, L.G. and Tietjen, G.E.: Evidence for the presence of calmodulin in human parathyroid tissue. VIII International Conference in Calcium Regulating Hormones, 1980.

*14.    Lipson, L.G., Bush, M.J. and Bobrycki, V.A.: The role of the adenylate cyclase system in the decreased glucose-stimulated insulin release from isolated islets of Langerhans of aging rats. Gordon Research Conference — The Biology of Aging. 1980.

15.    Lipson, L.G. Oldham, S.B. and Bush, M.J.: Calmodulin — stimulatable phosphodiestarase in isolated islets of Langerhans of the rat. Clin. Res. 29:56A, 1981.

16.    Lipson. L.G., Moore, D., Pope A.M., Todd, F.J. and Avila, S.: Incidence of hypertension in male diabetic populations. Clin. Res. 29:413A. 1981.

17.    Lipson, L.G. and Oldham, S.B.: Colmodulin-stimulatable phosphodiestarase in pancreatic islets of the pregnant rat. Clin. Res. 29-413A, 1981.

*18.    Conteas, C.N., Lipson, L.G. and Mircheff, A.C.: Basal lateral membranes from rat parotid acinar cells. Gastroenterology 80: 1128A, 1981.

19.    Lipson, L.G. and Oldham, S.B.: The presence of a calmodulin-stimulatable phosphodiestarase in pancreatic islets from pregnant and normal female rats. Endocrinology 108:343, (abst. 1942), 1981.

20.    Lipson, L.G. Bush, M.J. and Najdziuk, J.: Insulin release in aging: Role of glyceraldehydes. Diabetes 30: Supp. 1 (abst. 296), 1981.

*21.    Lipson, L.G.: Insulin release in aging. Gordon Research Conference — The Biology of Aging. 1982.

22.    Lipson. L.G., Moore, D., Pope, A.M. and Todd, G.J.: Sexual dysfunction in hypertensive diabetic patients: The role of prazosin in its prevention. Diabetes 31: Sup. 2 (abst. 365), 1982.

*23.    Oldham, S.B. and Lipson, L.G.: Biphasic inhibition of parathyroid adenylate cyclase activity by calcium. Calif., Tissue int. 34:S43, 1982.

*24.    Lipson, L.G., Premdas, F.H., Molina, J.M.:Studies on dynamic insulin release in aging. The physiologist 25: 288 (abst. 47.8), 1982.

*25.    Molina, J.M., Premdas, F. H. and Lipson, L.G.: Dynamics of insulin secretion in aging Clin.Res. 31:58A, 1983.

*26.    Sharp, G.W.G., Wolheim, C.B., Siegel, E., Lipson, L.G. and Kraus, Y.: The role of calmodulin in insulin secretion. International Diabetes Fed. Meeting in Kenya, November 1982.

*27.    Eddlestone, G.T., Oldham, S.B., Lipson, L.G. and Beigelman, P.M.: Forskolin increases cyclic AMP and potentiates electrical activity in the mouse pancreatic B-cell. Fed. Proc. 42: 897, (abst. 3544), 1983.

62

*28.   Eddlestone, G.T., Oldham, S.B., Lipson, L.G. and Beigelman, P.M.: Forskolin potentiation of the B-cell response to glucose. Diabetes 32: Supp. 1(abst. 552), 1983.

*29.   Oldham, S.B. and Lipson, L.G.: The effects of ionic calcium on magnesium activation of parathyroid adenylate cyclase. Calcif. Tissue Int. 35:686, 1983.

*30    Premdas, F.H., Molina, J.M. and Lipson, L.G.: Restoration of normal dynamic insulin in secretion in aging rats. The Physiologist 26:A50, (abst. 32.1), 1983.

*31.   Oldham, S.B. and Lipson, L.G.: Calcium inhibition of parathyroid adenylate cyclase: Is calmodulin medicated? VIII International Conference on Calcium Regulation Hormones, Kobe, Japan, October, 1983.

32.    Johnson, M.D. and Lipson, L.G.: Prevalence of Hypertension and sexual dysfunction in diabetic women. Clin. Res. 32:48A, 1984.

*33.   Molina, J.M., Premdas, F.H., Lipson, L.G., Klenck, R., Eddlestone, G. and Oldham, S.B.: Comparison of dynamic insulin release to D-glucose and D-glyceraldehyde in isolated pancreatic islets from the db/db mouse. Clin. Res. 32:51A, 1984.

*34.   Oldham, S.B. and Lipson, L.G.: Ionic control of parathyroid adenylate cyclase activity. UCLA symposium 1984 on Membrane Receptors and Cellular Recognition.

35.    Lipson, L.G., Liebig, P.S. and Sloane, R.B.: Training of faculty mentors and advocates in geriatrics. Annual Meeting of Gerontological Society of America. November, 1984, San Antonio, Texas.

*36.   Lipson, L.G., Premdas, F.H., Molinas, J.M. and Lewis, D.: Cyclic AMP and insulin secretion. Gordon Research Conference – The Biology of Aging, 1985.

*37.   Fadda G., Akmal, M., Premdas, F.H., Lipson, L.G. and Massry, S. G.: Direct evidence of an inhibitory effect if parathyroid hormone (PTH) on insulin release in chronic renal failure (CRF). Kidney International. 31:348, 1987, American Society of Nephrology, Washington, D.C., 1986.

*38.   Fadda G., Akmal, M., Premdas, F.H., Lipson, L.G. and Massry, S. G.: Correction of glucose intolerance (GINT) and the impaired insulin release o chronic renal failure (CRF by verapamil. American Society of Nephrology, San Antonio, Texas 1988.

39.    Palmer, S.K., Madison, R.E. and Lipson, L.G.: Self-reported prevalence and associated factors in type II diabetes in Japanese Americans in Los Angeles. Diabetes: 37:150A (abst. 587), 1988.

*40.   Garcia, D.L., Palmer, S.K., Boggs, W.L. and Lipson, L.G.: Challenges in-patient compliance of elderly Mexican American Diabetics. Diabetes: 37:68A (abst. 269), American Diabetes Association, New Orleans, L.A., 1988.

63

41. Schwann, W.J., Lefevre, T.M. and Lipson, L.G.: Falls in the elderly: The use of multiple balance tests. Nov. 1988 meeting of Gerontological Society of America.

*42. Oldham, S.B., Eddlestone, G.T., Premdas, F.H. and Lipson, L.G.: the influence of age on glucose and forskolin – stimulated insulin release from islets of the diabetic mouse. No. 1988 meeting of Gerontological Society of America.

*43. Lipson, L.G.: Caring for an aging society – twenty 30 minute videos on gerontology and geriatrics. Nov. 1988, meeting of Gerontological Society of America.

*44. Palmer, S.K., Madison, R.E. and Lipson, L.G.: Diabetes in older Japanese-Americans. November 1988 meeting of Gerontological Society of America.

*45. Boggs, W.L., Garcia, D.L., Palmer, S.K., and Lipson, L.G.: Patient compliance in an ethnic population: Diabetes care in elderly Mexican-Americans, Nov. 1988, meeting of Gerontological Society of America.

*46. Fadda, G.Z., Akmal, M., Lipson, L.G. and Massry, S.G.: Correction of Glucose Intolerance (GINT) and the impaired insulin release of chronic renal failure (CRF) by Verapoamil. Kidney Int. 35:427, 1989, 1989 Meeting of the 21st National Kidney Foundation scientific Symposium.

*47 Fadda, G.Z., Akmal, M., Lipson, L.G. and Massry, S.G.: Evidence for a direct effect of parathyroid hormone (PTH) on pancreatic islets. Kidney Int. 37:466, 1990, 1990 meeting of the 22nd National Kidney Foundation Scientific Symposium.

*48 Fadda, G.Z., Akmal, M., Lipson, L.G. and Massry, S.G.: Mechanism of impaired insulin secretion in chronic renal failure. Kidney Int. 37:505, 1990. 1990 meeting of the 22nd National Kidney Foundation Scientific Symposium.

*49. Comunale, R., Fadda, G.Z., Premad, F.H., Thanakitcharu, P, Lipson, L.G. and Massry, S.G.: Reduced K-induced insulin secretion in chronic renal failure (CRF) contribute to impaired extrarenal disposal of K: Role of excess PTH. Am. Soc. Nephrol. 1:624, 1990.

*50 Williams, B., Lowe, B., Nichol, M., McCombs, J., Yoon, P. and Lipson, L.G.: Improving drug therapies in residential care facilities. 1994 Annual Meeting of the American Geriatric Society, Los Angeles, CA.

*51. Lipson, L.G., McCombs, J., Jelliffe, R., Williams, B., and Wilson, P.: Medications I the elderly: problems, policies and new solution, a symposium. 1995 Annual Meeting of the Gerontological Society of America, Los Angeles, CA.

*52. Lipson, L.G. and Kohn, J.: Governmental responsiveness to changes in demographics of aging disease: A unique state approach to geriatric ADRD care and treatment. 1996 Annual Meeting of Southern Medical Association, Baltimore, Maryland.

64

53. Symposium Annual Meeting of Gerontological Society of America, San Francisco, California, 1998.

*Presented

I. **Grants and Research Funding (1975-2001)**

1. National Research Service Awards in Diabetes, 1975-1977. NIAMDD, NIH. 1F32 AM 05219 MET.

2. Clinical Investigator Award in Diabetes. 1977-1978. NIAMDD, NIH. 1 KOB AM 0320 MET. Two additional years of support were given up in order to change institutions.

3. Daland Fellowship in Clinical Medicine (Diabetes Research) of the American Philosophical Society, 1975-1978.

4. NIH research Grant – "Pregnancy: Its role in altered insulin release." NICHID, NIH 1/79 through 12/81, $134,000. 1RO1 HD 12517. L.G. Lipson, P.I.

5. American Diabetes Association Grant – "Mechanism of Insulin Release." 3/79 through 8/80. L.G. Lipson, P.I.

6. American Cancer Society Pilot Project Grant – "Tissue Culture Studies on Human Pituitary Tumors." 10/78 – 9/79. L.G. Lipson, P.I.

7. Los Angeles County Medical Association Auxiliary Grant – "Research in Clinical Diabetes." 7/78-1/82. L.G. Lipson, P.I.

8. NIH Research Grant – "Calcium modulated proteins in the parathyroid." NIAMDD, NIH 1R01 am 27816. 12/80 through 6/85. *205,000 L.G. Lipson, Co-P.I.

9. NIH Training Grant – "Training in Endocrine Hypertension and Endocrinology – Metabolism." NIAMDD, NIH. T 32 AM 07119. 7/80 THROUGH 6/85 $414,500. L.G. Lipson, Instructor.

10. NIH Training Grant – "Training in the Endocrinology and Neurobiology of Aging." NIA, NIH, 9/82 through 8/87, $803,882. L.G. Lipson, Co-director. AG 00093.

11. NIH Research Grant – "Microencapsulation: A novel transplantation technique." NIA, NIH. 3/83-2/85. L.G. Lipson, P.I.

12. American Diabetes Association Grant – "The role of cyclic AMP in insulin secretion in the diabetic mouse." 8/83 through 1/85. L.G. Lipson, Co-P.I.

13. DHHS Center Grant – "Geriatric Education Center Grant." DHHS 1D31 AH 69000. $952,000. 10/83 through 9/88. L.G. Lipson, Faculty Coordinator and Member of the Steering Committee.

14. NIH Center Grant – "Southern California Consortium for the Study of Alzheimer's Disease." NIA, NIH. 1/85 through 12/89. $750,000/year. L.G. Lipson, Clinical Investigator.

15. John A. Hartford Senior Scholar Award in Geriatric Medicine – at Harvard Medical School. 9/84 through 8/85. L.G. Lipson, Awardee.

16. Research Grant from Roerig, Pfizer Pharmaceuticals, "Diabetes in Elderly Mexican Americans." 1/86 through 7/87. $80,000 L.G. Lipson, M.D., P.I.

17. Research Grant from Ross Laboratories, "Diet and Dementia." 1/88 through 12/89. $37,500. L.G. Lipson, M.D., P.I.

18. Research Grant from Hoechst Pharmaceuticals – "Neuropathy in the Elderly." 1/88 through 12/89, $27,500. L.G. Lipson, M.D., P.I.

19. Research Grant from Boehringer Ingelheim Pharmaaceuticals – "Control of Mild Hypertension in the Elderly Inner – City Population." 6/88 through 12/88. $45,000. L.G. Lipson, M.D.,P.I.

20. Research Grant from Marion Laboratories – "A New Treatment for Pressure Sores." 6/88 through 3/89. $15,000 L.G. Lipson, M.D., P.I.

21. Research Grant from Roerig Pharmaceuticals – "Diabetes in the Elderly." 7/1/89 – 12/31/90. $15,000, L.G. Lipson, M.D., P.I.

22. Research Grant from the John A. Hartford Foundation – "Prescribing Habits of Physicians in Retirement Housing." 2/89 through 1/93. $487,000. L.G. Lipson, M.D., P.I.

23. DHHS center Grant – "Geriatric Education Center." 10/89 through 9/92. $450,000 L.G. Lipson, M.D. Clinical Site Coordinator, Key Faculty Member, and Member of the Steering Committee.

24. Geriatric Medicine Fellowship Grant from the Japanese Retirement and Skilled Nursing Facilities (Keiro Services), 7/88 through 7/90. $170,000. L.G. Lipson, M.D., P.I.

25. Geriatric Medicine Fellowship Grant from the Motion Picture and Television Retirement Home and Hospital. 7/87 through 6/90. $50,000/year. L.G. Lipson, M.D., P.I.

26. NIH Research Grant – NIDDK – "Subtle Disturbances of Cobalamin Status." 2R01-DK32640-07. 2/1/91 through 1/31/95. $235,827. L.G. Lipson, M.D., Co-Investigator.

43

27. Development Grant – USC Irvine Foundation. Diversity Project. Course Development. "Diversity in Aging: Roles in Ethnicity, Gender, Biology and Environment." 1992-onward, $5,000. L.G. Lipson, M.D., Course Director and P.I.

28. NIH Research Grant – "Multicenter Trail of Prednisone in Alzheimer's Disease." 1995, $80,000. L.G. Lipson, M.D., Co-P.I.

29. State of Alaska – Educational Grant "Training of Administrators in Long Term Care Institutions and Health Care Providers and Planners in Special Topics of Gerontology and Geriatrics." 3/1/96 – 5/20/96, $16,000. L.G. Lipson, M.D., Director.

30. Glendale Adventist Medical Center – "Family Practice Residency Training in Geriatric Medicine." 7/1/96 – 6/30/00, $6,000/year. L.G. Lipson, M.D., Director.

31. Research Grant from G.D. Searle and Co. ' "Controlled Onset Verapamil Investigation of Cardiovascular Endpoints." 5/97 through 5/02. $75.000. L.G. Lipson, M.D., P.I.

32. State of Alaska, "Training in Geropharmacy, Fall Prevention, and Quality Assurance in the frail and demented elderly." 4/98- 1/1/02, $200,000. L.G. Lipson, M.D., P.I.

33. Research Grant from Pfizer Pharmaceuticals, - "Studies in Fine Motor Coordination in Alzheimer's Disease." 6/98-10/99, $97,000. L.G. Lipson, M.D., P.I.

34. Research Grant from the Keck Foundation "Studies on the Use of Medications in the Elderly." 9/30/02, $4,000. L.G. Lipson, M.D., P.I.- 12/31/02.

35. State of Alaska, "Training in Geropharmacy: Quality Assurance in the Frail and Demented Elderly: CQI of Pioneers' Homes." 1/1/02-12/31/02. $100,000. L.G. Lipson, M.D., P.I.

36. State of Alaska, "Training in Quality Assurance of the Frail and Demented Elderly: CQI of Pioneers' Homes," 1/1/03-12/21/03. $100,000 L.G. Lipson, M.D., P.I.

37. State of Alaska – University of Alaska. Alaska Geriatric Education Center – Consultant 7/1/03 – 12/31/04. $18,000.

38. State of Alaska – University of Alaska, Alaska Geriatric Education Center – Consultant 10/1/07 – 6/30/08. $10,000.

39. State of Alaska – University of Alaska, Alaska Geriatric Education Center – Consultant 7/1/08 – 6/30/09. $10,000.

44